**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ADT LLC, *et al.*,

     Plaintiffs,

       v.

Safe Home Security, Inc., *et al.*,

     Defendants.

Case No. 1:20-cv-23918

---

## FIRST AMENDED COMPLAINT

Plaintiffs ADT LLC and The ADT Security Corporation (together "ADT"), bring this action for damages, punitive damages, attorneys' fees and costs against Defendants Alliance Security, Inc. ("Alliance"); Anthem Alarm LLC ("Anthem"); Safe Home Security, Inc. ("Safe Home"); and Security Systems, Inc. d/b/a Safeguard America ("Safeguard") (all defendants together, "Defendants"), and in support allege as follows:

### SUMMARY OF THE CASE

1.     This case is about each of the Defendants' practice of using false and misleading sales practices to target ADT customers across the country during unannounced door-to-door sales visits to ADT customers' homes.

2.     In a calculated attempt to convert ADT customers to Defendants' customers without their knowledge, each Defendant's sales representatives, through well-rehearsed deceptive tactics, have misled masses of ADT customers to believe their receptive employer is affiliated with ADT. These willful affiliation misrepresentations lead ADT's customers to do business with these Defendants under false pretenses, often leaving ADT customers unwittingly bound to multi-year contracts with these entities. Even for ADT customers that learn the true nature of Defendants'

scam, it is often too little, too late. By ensuring their contracts are next to impossible to cancel, Defendants have successfully trapped ADT customers in multi-year contracts worth thousands of dollars.

3.       Each Defendant accomplishes this scam by freeriding on the goodwill of ADT, convincing ADT customers, among other things: (1) that the Defendant's sales agent is there to simply "update" or "upgrade" the ADT customer's equipment, when in reality he or she is switching out the ADT system for that of the respective Defendant; (2) that ADT has been bought out or is going out of business and that the Defendant is taking over ADT accounts; and (3) that the Defendant is a subcontractor, installer or is otherwise affiliated with or acting on behalf of ADT. These (and other) routinely-used acts of deception allow Defendants to successfully take advantage of ADT's goodwill and steal ADT's customers under false pretense, all the while damaging the goodwill underlying the "ADT" brand name.  Indeed, the Defendants' scheme leads some customers to ultimately cancel ADT's services, and others to become so frustrated with ADT because of Defendants' practices that the customer stops paying for any alarm system at all.

4.       Not only do these willfully deceptive tactics rob ADT of its customers and damage ADT's name – they violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the related common law of unfair competition. ADT thus seeks damages to remedy: (1) its loss of numerous customers, both known and unknown, and the disruption of thousands of others since each individual Defendant's deceptive practices began; (2) ADT's injuries to its goodwill and reputation; (3) ADT's lost royalties from Defendants' unauthorized use of the ADT brand; (4) each Defendant's profits from its respective ill-gotten gains; (5) ADT's attorneys' fees; and (6) punitive damages to punish and deter each Defendant from continuing to engage in its intentionally false and misleading conduct.

2

5.      There is no indication the Defendants intend to stop their deceptive sales practices, and ADT anticipates by the time of trial the volume of reports about deceptive sales practices by the Defendants will be even more numerous. To be sure, the number of reported incidents of deceptive sales practices is only the tip of the iceberg of ADT customers each Defendant has deceived. For every report of a deceptive sales incident, many more go unreported.

6.      ADT has been fighting this problem for many years. Defendants' conduct not only irreparably harms ADT and its customers, it inflicts damage on the entire home security system industry. Home alarm providers like ADT make their keep by instilling a sense of security and trust in their customers. Defendants' scamming and deceptive conduct ruins that effort, instilling in the consuming public distrust for home alarm providers.

## THE PARTIES

7.      Plaintiff The ADT Security Corporation, is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. The ADT Security Corporation is a holding company that owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks"). The ADT Security Corporation is ultimately wholly owned by ADT Inc., a Delaware corporation whose common stock is traded on the New York Stock Exchange.

8.      Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. ADT LLC is an operating company that conducts the ADT alarm services business in the United States. ADT LLC uses the ADT

Trademarks under license from The ADT Security Corporation. ADT LLC is owned by The ADT Security Corporation.

9.      Defendant Alliance Security, Inc. is a Delaware corporation with its principal place of business located at 33 Broad Street, Providence, Rhode Island 02903. Alliance was incorporated in 2013. Alliance's registered agent for service of process in Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801. Alliance's registered agent for service of process in Florida is API Processing, 3419 Galt Ocean Drive, Suite A, Fort Lauderdale, Florida 33308.

10.      Defendant Anthem Alarm LLC is a Utah limited liability company with its principal place of business located at 1209 E. Country Road, Fruit Heights, Utah 84037. Anthem was formed in 2015. Anthem's registered agent for service of process in Utah is Bradley Leeflang, 2696 N University Avenue, Suite 104, Provo, Utah 84604.

11.      Anthem is an authorized dealer of the products and services offered by Safe Home.

12.      Defendant Safe Home Security, Inc. is a Connecticut corporation with its principal place of business located at 1125 Middle Street #201, Middletown, Connecticut 06457. Safe Home was incorporated in 1988. Safe Home's registered agent for service of process in Connecticut is Incorp Services, Inc. 6 Landmark Square, 4th Floor, Stamford, CT 06901. Safe Home's registered agent for service of process in Florida is InCorp. Services, Inc., 17888 67th Court North, Loxahatchee, FL 33470.

13.      Defendant Security Systems, Inc. d/b/a Safeguard America ("Safeguard") is a Connecticut corporation with its principal place of business located at 1125 Middle Street #201, Middletown, Connecticut 06457. Safeguard was incorporated in 1992. Safeguard's registered agent for service of process in Connecticut is Incorp Services, Inc. 6 Landmark Square, 4th Floor,

4

Stamford, CT 06901. Safeguard's registered agent for service of process in Florida is InCorp. Services, Inc., 17888 67th Court North, Loxahatchee, FL 33470.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Section 1331 of Title 28 because it presents a federal question under Section 43 of the Lanham Act.

15.     This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to Section 1367(a) of Title 28.

16.     Venue lies in this District pursuant to Section 1391(b) of Title 28 because events giving rise to the claims asserted in this Complaint occurred in this District and because each of the Defendants are subject to the Court's personal jurisdiction in this District for committing tortious conduct purposefully directed at this District, as described in this Complaint.

## GENERAL ALLEGATIONS

### ADT and the Defendants Compete in the Home Security System, Automation, and Smart Home Markets

17.     ADT, founded in 1874, is the oldest, largest, and best-known provider of electronic security, automation and smart home services and equipment for homes and businesses in the United States.

18.     ADT provides security, automation, and smart-home services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

19.     ADT's name and trademarks are registered with the United States Patent and Trademark Office.

20.     As a Florida resident, ADT is injured in Florida by the tortious activities of each of the Defendants.

21.     Defendant Safe Home's reach is nationwide, operating in most states, including

Florida. Safe Home is registered to do business in Florida with the Florida Department of State, Division of Corporations.

22.     Alliance, Anthem, and Safeguard each operate in various states across the country, including Florida.

23.     A substantial fraction of the violations that form the basis of this complaint occurred in Florida. At all times relevant to this Complaint, each Defendant misled Florida consumers and engaged in the deceptive sales practices that are the subject of this civil action.

24.     Defendants and ADT are direct competitors in the security systems, automation, and smart home markets. ADT and the Defendants market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers. The companies also provide substantially similar security monitoring services to their respective customers. ADT operates in each of the states in which the Defendants sell and install alarm systems.

**Defendants' Deceptive Sales Practices**

25.     Each Defendant's respective sales agents target ADT customers in various yet near-identical ways, often by seeking houses with the distinctive ADT yard sign and/or window stickers that ADT's customers post on their premises to deter burglars and trespassers. In addition, these yard signs and window stickers communicate to competitors, such as the Defendants, that the homeowner has an existing business relationship with ADT.

26.     The complaints received by ADT show that the Defendants' sales agents many times intentionally target ADT customers that are over the age of 65, are infirm, or have diminished mental capacities.

27.     The Defendants' sales agents generally solicit ADT's customers in unannounced "cold" door-to-door sales visits to the customers' homes. At the beginning of these visits, and often throughout the sales encounter, the agents use deceptive sales pitches that are intended to mislead (and that do mislead) ADT's customers into believing that the individual Defendant represents ADT, is affiliated with ADT, that the Defendant's sales agent is visiting ADT's customer at ADT's direction, that Defendant's sales agent works for the companies that made the ADT alarm equipment installed in the customers' homes, or that ADT has otherwise blessed the Defendant to work on ADT's behalf.

28.     Despite knowing that these statements are false, each Defendant's sales agents use these pitches to induce ADT customers to believe that they have an existing business relationship with the agents, to trust them, and to grant the agents entry into their homes. Once inside, having won the customers' trust by this deception, the agents lead the customers to sign the respective Defendant's sales contracts and install the respective Defendant's alarm systems in the often mistaken belief that they are receiving new ADT equipment from ADT, an ADT affiliate, an ADT successor, that the Defendant has or is assuming the ADT customer's account, or that the customer has no choice but to permit the transaction to go forward if he or she wishes to continue to have operational alarm-monitoring services.

29.     In reality, neither Defendants nor their sales agents are affiliated with ADT in any way. Nor have any of the Defendants legitimately assumed any ADT customer accounts or succeeded ADT in the home security monitoring market. Accordingly, the statements made by the Defendants' respective sales agents in order to gain entry into the homes of ADT's customers and convince them to allow the sales agent to replace ADT equipment and/or the underlying alarm monitoring services are false and misleading.

7

30.     Having heard the Defendant's untrue claims of affiliation with ADT, ADT's customers allow these sales agents into their homes in the mistaken belief that they are speaking with a person somehow affiliated with ADT, visiting to provide the customers with goods and services that are related to their existing ADT alarm system. ADT's customers repeatedly confirm that but for this initial confusion, they would never have allowed any of the Defendants' sales agents into their homes or to otherwise inspect, manipulate, or replace the equipment previously installed by ADT.

31.     The alarm monitoring services provided by ADT and subscribed to by ADT's customers require the use of equipment compatible with ADT's services. Accordingly, once the Defendants remove ADT's equipment from customer homes, ADT is typically no longer able to provide the services its customers have contracted for.

32.     As a result, a number of ADT customers have unwittingly found themselves with Defendants' alarm systems installed in their homes, and with simultaneous contractual obligations to both ADT and the Defendant who deceived them into entering into a contract under false pretenses.

33.     In other instances, the customers retained Defendants' systems and terminated their ADT contracts, often because the respective Defendant makes it too cumbersome and time-consuming for the customer to end the Defendant's service, despite it being consummated through deceptive means. In some circumstances, each of the Defendants will require their dishonestly obtained customers to pay substantial contract-termination fees without consideration that the customer's contract was acquired through false and deceptive means.

4840-2095-3043

34.     As highlighted above, such deceptive sales practices and claims of affiliation with ADT are typical of the hundreds of complaints ADT has received from its customers about the Defendants and their deceptive sales practices.

35.     Indeed, ADT has already uncovered numerous instances of each Defendant engaging in these types of deceptive sales practices. For example, on January 17, 2020, a Safe Home sales agent visited ADT customer P. Franklin's home in Orlando, Florida. The sales agent told Ms. Franklin that Safe Home was a part of ADT and that he was there to perform a necessary upgrade to her ADT system. A technician accompanying the Safe Home sales agent removed ADT's equipment and installed Safe Home equipment while the sales agent had Ms. Franklin fill out paperwork on an iPad ostensibly related to the "upgrade."

36.     Upon further investigation, Ms. Franklin realized she had been deceived and that the individuals who had visited her home were not, in fact, related to or affiliated with ADT at all, nor did her equipment require any upgrades whatsoever. She then called ADT's customer care center to report the deceptive sale, and ADT subsequently sent out a technician to reinstall the ADT equipment Safe Home had removed so that Ms. Franklin could continue to receive alarm monitoring from ADT.

37.     Nor are Safe Home's deceptive sales practices limited to Florida. On January 7, 2020, a Safe Home sales agent visited the home of ADT customer F. Ferrell in Bogalusa, Louisiana.  Mr. Ferrell is a 74-year old man suffering from partial paralysis. He was preparing for surgery when a Safe Home sales agent knocked on his door. Mr. Ferrell informed the sales agent that he was in great pain and was preparing for surgery, but the sales agent insisted on entering Mr. Ferrell's home, telling him that ADT had sent the sales agent to inspect ADT's equipment and arrange for an upgrade. ADT did no such thing.

38.     During this interaction, Mr. Ferrell made it clear to the sales agent that he already had a contract with ADT. In order to avoid being confronted with his false claims of affiliation with ADT, the Safe Home sales agent stated that the upgrade would merely "extend" Mr. Ferrell's contract with ADT and not to worry. He then instructed Mr. Ferrell to sign what Mr. Ferrell believed was paperwork documenting the upgrade. In reality, this paperwork was a new contract with Safe Home unrelated to the services provided by ADT.

39.     On January 10, 2020, Safe Home sent a technician to Mr. Ferrell's home to remove the ADT equipment installed in his home and replace it with Safe Home equipment. ADT received a notification that its installed equipment had been disconnected and promptly called Mr. Ferrell to determine the cause of the alarm-monitoring interruption. During this call, ADT informed Mr. Ferrell that it had not sent anyone to his home to upgrade or otherwise inspect his equipment and that the Safe Home sales agent was not in any way related to or affiliated with ADT. Upon Mr. Ferrell's request, ADT subsequently sent out a technician to reinstall the ADT equipment that Safe Home had removed.

40.     ADT customer D. Riney was the victim of a similarly deceptive sale at the hands of Defendant Anthem. On January 29, 2019, Anthem sales agent Nolan Jackson knocked on Ms. Riney's door in Joshua, Texas. He told Ms. Riney that he (and Anthem) were affiliated with ADT and that he was there to service the ADT alarm systems in the area. Mr. Jackson then proceeded to replace the ADT-installed equipment, foreclosing ADT' ability to provide Ms. Riney with alarm monitoring services.

41.     At times, Safeguard takes a slightly different approach to its deceptive sales tactics, convincing ADT's customers that ADT already has or is currently going out of business and that Safeguard is taking over all of ADT's accounts in the area.

42.     This is what happened to ADT customer D. Brown, among others. On April 8, 2019, a Safeguard sales agent visited Ms. Brown's home in Plant City, Florida. The sales agent told Ms. Brown that ADT was no longer servicing the area and that he would upgrade her system with a medical alert. A technician subsequently replaced the ADT-installed equipment, rendering ADT unable to provide the alarm monitoring services contracted for by Ms. Brown. Ms. Brown did not discover Safeguard's deception until the equipment installed by Safeguard began to malfunction, leading her to call ADT's customer care department.

43.     Safeguard's sale agents also make the same false claims of current affiliation with ADT as the other Defendants. On August 7, 2019, a Safeguard sales agent knocked on the door of ADT customer D. Edwards, claiming that he had been sent by ADT to perform maintenance on Mr. Edwards' ADT alarm equipment and provide him with an upgrade. Sensing that ADT would not send a technician out to his home to perform such maintenance without first setting up an appointment, Mr. Edwards refused to let the sales agent into his home without first confirming the need for any such upgrade.

44.     Despite the prevalence of such misleading sales practices among the Defendants' door-to-door sales teams, their deceptive and infringing conduct is not limited to in-person sales. In early October 2019, an Alliance sales agent called ADT customer M. Gallo, stating that she was with her current alarm services provider and had been instructed to offer her a better monthly rate due to her tenure with ADT. The sales agent then scheduled an appointment for October 15, 2019 in order to install upgraded equipment.

45.     In order to disguise her deceptive sales practices, the Alliance sales agent told Ms. Gallo that Alliance had purchased ADT and that she should not be alarmed when she received future invoices on Alliance letterhead. Contrary to these misrepresentations, Alliance had not

11

purchased ADT, nor had ADT instructed an Alliance sales agent to call Ms. Gallo and offer her a different contract rate or new equipment.

46.     On October 15, 2019, Alliance technician Dwight Hammothe removed ADT's equipment and installed Alliance's own equipment. Ms. Gallo did not realize that she had been duped until her attempts at calling the customer service numbers provided by Alliance failed, leading her to call the ADT customer care center directly. ADT's customer care team informed Ms. Gallo that ADT had neither been purchased by Alliance nor had a customer service representative call to offer her a new plan or equipment. Accordingly, Ms. Gallo requested that ADT reinstall the equipment removed by Alliance in order to reinstate her alarm monitoring service with ADT.

47.     The above anecdotes are by no means all of the reports of deceptive sales practices received by ADT. To date, ADT has itself collected hundreds of customer complaints regarding the sales practices of the Defendants. And as a result of nearly every such complaint, ADT is left to spend its own capital correcting and otherwise repairing the damage done by the Defendants' conduct.

48.     Nor do the customer complaints received by ADT represent the full scope of Defendants' illegal conduct. Even a cursory review of the various enforcement actions brought by state attorneys general reveals a massive number of deceptive sales targeting ADT's customer base, the vast majority of which ADT was previously unaware of.

49.     Accordingly, ADT's investigation into the Defendants' deceptive sales practices remains ongoing.

**ADT Has Incurred Significant Damages Resulting from Defendants' Conduct**

*Costs Incurred Repairing and/or Mitigating the Effects of Defendants' Deception*

50.     Defendants' deceptive sales tactics irreparably injure ADT's relationships with its existing customers. As a result of each Defendant's manipulation, ADT's customers allow the Defendant's sales agents entry to their homes under false pretenses, sign the Defendant's contracts, uninstall their ADT alarm systems, replace these systems with the Defendant's own equipment—or in the case of Anthem, Safe Home's equipment—and terminate their ADT contracts.

51.     Even where ADT's customers subsequently recognize the scam perpetrated by the Defendants' respective sales agents, ADT has no option but to send technicians to the deceived customers' houses to reinstall, or even replace, the removed ADT equipment at considerable expense to ADT. Each Defendant is liable to ADT for these costs and damages caused by their individual company's conduct.

52.     The constant need to assist ADT customers in fixing problems resulting from each Defendant's deceptive sales conduct imposes a substantial cost on ADT to maintain and train customer service agents appropriately. In effect, ADT is forced to constantly police each of the Defendant's salespeople. The Defendants are also liable for these costs and damages.

*Injury to ADT's Goodwill and Reputation*

53.     The Defendants' deceptive sales tactics also injure ADT's goodwill and reputation. Depending on which false story each Defendant communicated to any given customer, ADT's customers are left with the false belief that ADT is out of business, that ADT has been acquired, that their ADT alarm systems are outdated and vulnerable to burglars, or that the individual Defendant has taken over ADT accounts. Others mistakenly believe that the Defendant inappropriately gained access to the private data the customers had entrusted to ADT, leaving them to question ADT's ability to safeguard their interests, a critical shortcoming given the necessity of trust between any alarm services provider and its customers.

13

54.     In a broader sense, each Defendant's actions damage ADT's goodwill and reputation as a reliable provider of security, automation and smart home services. Each Defendant's targeting of ADT customers has led some to cease all services with ADT as a result of falling victim to these types of false and misleading practices. Some wrongly blame ADT for the Defendants' conduct and never come to understand the lack of affiliation between the Defendant that deceived them and ADT.

55.     Even where ADT customers understand the Defendants' scams for what they are, ADT's goodwill and reputation is harmed, as such customers may reconsider their ADT service because ADT is a target of scammers.

56.     Customers often blame themselves for falling victim to the Defendants' false and misleading sales tactics. Such self-blame not only contributes to an under-reporting of deceptive sales conduct, but irreparably harms ADT's goodwill and reputation because customers believe they never would have fallen victim if they did not have an ADT system in their home in the first place.

*Misappropriation of ADT's Authorized Dealer Licensing*

57.     By falsely claiming an affiliation with ADT in their sales to consumers, each of the Defendants further injures ADT by taking for itself the essential benefit of being an ADT affiliate without paying any royalty or other consideration to ADT for the claim of affiliation. This is a benefit for which hundreds of *licensed* ADT dealers pay substantial financial consideration to ADT. Each of the Defendants pays nothing to use ADT's name and brand for its own benefit, despite others in this marketplace paying substantial sums for the rights provided through an official licensing relationship with ADT. Moreover, the Defendants do not abide by ADT's dealer guidelines and so misappropriate a right of affiliation with ADT.

<u>*Each Defendant's Deceptive Conduct Is Knowing and Intentional*</u>

58.     Such practices violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name . . . at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

59.     Each of the Defendants knows these types of sales practices are contrary to the law and established industry standards, yet knowingly continues such conduct. None of the Defendants have taken appropriate action to curb such conduct by their respective sales agents.

60.     Each Defendant's conduct is knowing and intentional. At best, each Defendant is aware of such conduct by its sales agents but does not take sufficient actions to stop them despite having the ability to do so. At worst, each Defendant knowingly teaches and condones these actions by its sales agents.

61.     Moreover, each Defendant's conduct is geographically widespread and numerically voluminous, especially considering that many deceptive sales encounters never get reported to ADT.

62.     ADT has received reports of deceptive sales practices in most states in which each Defendant sells alarm systems. Many of the reported incidents occurred in the state of Florida.

63.     The numerous reports ADT has received thus far are but the tip of the iceberg. It is an accepted (and obvious) tenet of consumer complaint behavior that for every aggrieved customer

who reports a deceptive sales practice, many more go uncounted. The complaints that ADT received over the period discussed above are likely indicative of thousands of other occurrences where the customer either does not take the time to complain or never realizes he or she has been duped.

64.     Upon information and belief, each Defendant's own internal records will show how widespread and pervasive its deceptive sales practices are. Many ADT customers subjected to the Defendants' deceptive sales practices will never complain to ADT. Rather, upon learning of the deceptive conduct the respective Defendant subjected them to, they will complain to that Defendant. ADT would therefore not have records of such conduct. Nevertheless, on information and belief, each of the Defendants will have exclusive possession and control of such records demonstrating their respective deceptive sales tactics.

65.     Defendants' conduct has not stopped, and will not stop, because each Defendant generates significant profits from its deceptive tactics. Every alarm account the Defendant acquires through deceptive sales conduct creates a new revenue stream for that Defendant, potentially for several years beyond the initial term of the new contract. Thus,  the Defendants deceptive practices are designed to obtain as many accounts as possible through whatever means possible. On information and belief, such conduct has permitted each Defendant to bolster their financial reports and receive new credit and/or equity investments that otherwise might not be possible without the illegal sales conduct.

### COUNT I - UNFAIR COMPETITION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)
**(All Defendants)**

66.     ADT incorporates paragraphs 1 through 65 as if set forth fully herein.

67.     The ADT Security Corporation owns the ADT Trademarks. ADT LLC uses the ADT Trademarks under license from The ADT Security Corporation. Both are injured by any effort by each respective Defendant to confuse ADT's customers as to the affiliations of that Defendant's sales agents with ADT.

68.     Each Defendant's sales agents use false representations of affiliation with ADT to confuse ADT's customers as to the agents' true affiliation, to interest the customers in their pitches, to win the customers' trust, and to gain access to their homes.

69.     In fact, each Defendant's sales agents do not represent ADT, nor are any of the Defendants affiliated in any manner with ADT.

70.     Each Defendant's sales agents make these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

71.     These false and misleading statements are likely to confuse consumers regarding the Defendant's apparent (but false) affiliation with ADT in the initial stages of a sale.

72.     Some ADT customers, initially confused at their doorsteps, eventually realize by the end of the sale that the sales agents represent the Defendant, not ADT. But many do not, and remain confused at the point of sale and sign contracts with the Defendant in the mistaken belief that they are contracting with ADT or one of its affiliates. Even when the customer is initially confused but later comes to understand the sales agent is not affiliated with ADT, ADT is still damaged by the Defendant's freeriding on ADT's name and brand recognition.

73.     ADT has been and will continue to be damaged as a result of each Defendant's false representations by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationships with its customers, by the diversion of ADT's customers to the Defendant, by

ADT's lost royalties, by ADT's loss of control of the use of its brand in the market, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

74.     ADT is entitled to an award of compensatory damages, as well as each Defendant's profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a). The court, pursuant the discretion confided to it under this section of the Act, should also consider enhancing these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against each of the Defendant's, and award the following relief:

a.   Compensatory damages, in an amount to be established at trial, but believed to be in excess of $10 Million;

b.   An accounting of each Defendant's profits resulting from its deceptive practices, and payment of such profits to ADT;

c.   Attorneys' fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

d.   Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT II -  COMMON LAW UNFAIR COMPETITION
### (All Defendants)

75.     ADT incorporates paragraphs 1 through 65 as if set forth fully herein.

76.     ADT and each of the Defendants compete for a common pool of customers. Each of the parties in this lawsuit market security, automation, and smart-home services to the same target market of residential customers.

77.     Each Defendant has engaged in unfair and deceptive misconduct by fielding a staff of sales agents who prey on unsuspecting and sometimes elderly and infirm customers and who

18

make false sales pitches to ADT's customers that are designed to mislead them into believing that they are acting on ADT's behalf, when in fact they represent a competitor freeriding ADT's goodwill to interfere with ADT's contracts with its customers, and to sell and install new alarm systems.

78.    The Defendants actions are contrary to honest practice in industrial or commercial matters. They are prohibited by the alarm industry's own code of conduct. They are independently actionable, *inter alia*, as tortuous interferences with ADT's contractual relationships, and as violations of the Lanham Act.

79.    Each Defendant's actions are likely to cause confusion among consumers, and in fact already have caused confusion, as demonstrated by the attached declarations, not only in the initial stages of their agents' sales pitches, but also at the point of sale.

80.    Each Defendant's actions are also contrary to law because they prey upon elderly and infirm customers who are easy targets for their agents' false sales pitches.

81.    ADT has been injured as a result of each of the Defendant's actions.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against each of the Defendants, and award the following relief:

a.  Compensatory damages, in an amount to be established at trial, but believed to be no less than $10 Million;

b.  Punitive damages in a sum sufficient to deter each respective Defendant from engaging in further deceptive sales tactics;

c.  Attorneys' fees and costs incurred in the prosecution of this action; and

d.  Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT III - TRADE SLANDER/COMMERCIAL DISPARAGEMENT
### (All Defendants)

82.    ADT incorporates paragraphs 1 through 65 as if set forth fully herein.

83.    Each Defendant, through its respective sales agents, has intentionally made false and misleading statements about ADT, about ADT's products and services, or about Defendant's affiliation with ADT in their sales pitches to ADT's customers as alleged herein.

84.    These statements include, but are not limited to, representations to ADT's customer that the Defendant's respective sales agent works for or with ADT, that the Defendant is ADT's successor-in-interest or has otherwise acquired ADT's customer accounts, that the ADT equipment installed in the customer's home is no longer of good quality or adequate to provide the services the customer has contracted for and therefore must be replaced or "upgraded," or that ADT's equipment is defective and requires the Defendant's sales agent to perform repairs.

85.    In every instance, there are no issues with ADT's equipment requiring anyone, let alone the Defendant, to repair, replace, or otherwise "upgrade" the equipment installed in the customer's home.

86.    Nor has or would ADT affiliate itself with the Defendant or otherwise permit its customer accounts to be acquired by the Defendant given the poor market reputation possessed by each, or in the case of Safe Home, the numerous legal and/or administrative proceedings asserted against it by various state attorneys general.

87.    Each of the Defendants' false and misleading statements demean the quality of ADT's goods and services.

88.    At the time the statements were made, the Defendant knew the statements to be false.

89.     The statements are defamatory *per se* in that the statements suggest conduct incompatible with the lawful exercise of business.

90.     The statements are injurious and damage ADT in its industry and marketplace by causing ADT to lose sales and good will, and to suffer injury to its reputation.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against each Defendant, and award the following relief:

    a.  Compensatory damages, in an amount to be established at trial;

    b.  Punitive damages in a sum sufficient to deter each Defendant from engaging in further deceptive sales tactics; and

    c.  Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT IV - TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS
#### (All Defendants)

91.     ADT incorporates paragraphs 1 through 65 as if set forth fully herein.

92.     ADT maintains valid and enforceable contracts and business relationships with its customers.

93.     Typically, ADT customers display an ADT sign or window sticker outside their homes to deter potential burglars and broadcast to the outside world that the home is protected by ADT's alarm system.

94.     Each Defendant is knowledgeable of the contractual and business relationship between ADT and its customers. When the Defendant's sales agents visit the homes of these individuals, they become (or are already) aware of such relationship and contract by, among other means: the sign displayed in front of the customer's home, talking with the customer, observing

the ADT equipment in the customer's home, or through prior research and intelligence conducted on the customer's address regarding existing alarm systems.

95.     Despite knowledge of the customer's contractual and business relationship with ADT, the Defendant's sales representatives intentionally and without valid justification interfere with such relationship and procure the breach of the ADT contract upon the promise that the Defendant will "buy out" the remaining term by paying to the customer an amount equal to the remaining obligation on their ADT contract.

96.     ADT is damaged by the Defendants' unlawful conduct by losing revenue streams that otherwise would remain with ADT absent the Defendant's "buy out" offer, and also because the customer does not always remit any remaining amounts due and owing to ADT that the Defendant provides to its deceptively obtained customer.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against each of the Defendants, and award the following relief:

    a.  Compensatory damages, in an amount to be established at trial;

    b.  Punitive damages in a sum sufficient to deter each Defendant from engaging in further deceptive sales tactics;

    c.  Attorneys' fees and costs incurred in the prosecution of this action; and

    d.  Such other and further relief as the Court may deem appropriate in the circumstances.

## **JURY DEMAND**

ADT demands a trial by jury on all issues so triable.

Dated: December 8, 2020.

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

By: /s/ Jennifer A. McLoone
Jennifer A. McLoone
Florida Bar No. 029234
jmcloone@shb.com
Eric S. Boos
Florida Bar No. 0107673
eboos@shb.com
201 S. Biscayne Blvd., #3200
Miami, Florida 33131
Tel: (305) 358-5171
Fax: (305) 358-7470

*Counsel for Plaintiffs ADT LLC and The ADT
Security Corporation*