UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

CASE NO. 20-cv-23918

ADT, LLC, et al.,

        Plaintiffs,                FORT PIERCE, FLORIDA

   vs.

                            APRIL 4TH, 2022

SAFE HOME SECURITY, INC., et al.,

                          PAGES 1 - 74

        Defendants.
_____/

SAFE HOME SECURITY, INC., et al.,

        Counterclaim-Plaintiffs,

   vs.

ADT, LLC, et al.,

        Counterclaim-Defendants.

_____/

TRANSCRIPT OF PARTIAL SUMMARY JUDGMENT/DAUBERT HEARING

BEFORE THE HONORABLE AILEEN CANNON

UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:  JASON R. SCOTT, ESQ.
                    Shook, Hardy & Bacon, LLP
                    2555 Grand Boulevard
                    Kansas City, Missouri 64108
                    JENNIFER A. MCLOONE, ESQ
                    Shook, Hardy & Bacon, LLP
                    201 S. Biscayne Boulevard, #3200
                    Miami, Florida  33131



FOR THE DEFENDANTS: JOSEPH LIPARI, ESQ.
                    The Sultzer Law Group, PC
                    270 Madison Avenue, Suite 1800
                    New York, New York 10016












REPORTED BY:        DIANE M. MILLER, RMR, CRR
                    Official Court Reporter
                    Alto Lee Adams, Sr.
                    U.S. Courthouse
                    101 South U.S. Hwy 1
                    Fort Pierce, FL  34950
                    (772) 467-2337
                    diane_miller@flsd.uscourts.gov

Monday, April 4th, 2022

```
 1                  P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Good morning, you may be seated.
 3          THE COURTROOM DEPUTY:  Calling case
 4  20-cv-23918-Cannon, ADT versus Safe Home Security, Inc.  Can we
 5  have the parties enter their appearance, starting with the
 6  Plaintiff.
 7          MR. SCOTT:  Good morning, Your Honor, Jason Scott on
 8  behalf of the Plaintiff, ADT, along with Jennifer McLoone.
 9          MS. McLOONE:  Good morning, Your Honor.
10          THE COURT:  Good morning.
11          MR. LIPARI:  Good morning, Your Honor, Joseph Lipari
12  on behalf of Defendants Safe Home Security and Safe Home
13  Security, Inc.
14          THE COURT:  Good morning, Mr. Lipari.
15          All right.  We are here to hear argument on two
16  motions, the first is Defendants' motion for partial summary
17  judgment, that's at docket entry 122, and then Defendants'
18  motion to exclude Plaintiffs' experts, which I believe is also
19  at docket entry 122, is that correct, Mr. Lipari?
20          MR. LIPARI:  Yes, Your Honor.
21          THE COURT:  Okay.  All right.  So since those are
22  both your motions, Mr. Lipari, I'm going to ask that you
23  address the Court first, and let's take the issue of the
24  partial summary judgment first, starting with the goodwill
25  issue.
```

```
 1          MR. LIPARI:  Okay.

 2          Thank you, Your Honor.  So as we asserted in our

 3     motion, it's our contention that we are entitled to summary

 4     judgment on the compensatory damages for goodwill and

 5     reputation, and the argument is simple, Your Honor.

 6          In Plaintiffs' Rule 26 disclosures throughout the

 7     entirety of the discovery process, ADT indicated that

 8     reputational and goodwill damages would be calculated or

 9     computed by an expert, and they indicated that those damages

10     would be based upon the testimony of Frank Cona.  ADT did not

11     itemize or categorize any particular documents that they would

12     be relying upon in support of those categories of damages.

13          Ultimately, the experts were disclosed and none of

14     them opined on goodwill or reputational damages, and one of

15     their damages experts, in fact, indicated that he was not going

16     to opine on those things.

17          So we moved for summary judgment simply because there

18     is no basis, no evidence in opposition to our motion.  They

19     pointed to one document, which was essentially an itemization

20     of the monies spent by ADT just generally speaking, right, the

21     net amount spent in connection with their brand.  And they

22     pointed to an affidavit by an individual named Brandt Stigler

23     speaking generally about how he handles customer complaints.

24          Your Honor, that's insufficient as a matter of law

25     for a couple of reasons.  First, the document, in and of
```

1   itself -- I'll start with Rule 37(c), all right.  So first, the

2   document and the affidavit of Stigler should be excluded under

3   Rule 37(c), and even if they are not excluded, they are

4   nonetheless insufficient for ADT to meet their burden.

5          So starting with Rule 37(c), Rule 37(c) provides that

6   where a party fails to provide information or identify a

7   witness as required by Rule 26(a) or (e), the party is not

8   allowed to use that information or witness to supply evidence

9   at a motion hearing or trial.

10          So Your Honor, from our perspective, given the fact

11   that none of the information that they are now relying upon in

12   opposition to the motion was disclosed in the Rule 26; given

13   that throughout the entirety of the discovery, Defendants were

14   reasonably operating under the assumption, based upon those

15   Rule 26 disclosures, that it would be an expert calculation and

16   expert testimony, we now find ourselves in the unfortunate

17   prejudicial position of having to guess, right, at the amount

18   of reputational damages that will be presented to a jury at

19   trial and the underlying methodology.

20          THE COURT:  So at this point, do you actually even

21   have a computation of goodwill damages?

22          MR. LIPARI:  No, Your Honor.  At this point, Your

23   Honor, what we have, again -- and let me get to the second

24   point.

25          The first point is all of that should be excluded in

1   view of Rule 37.  Even if it is not excluded, they still cannot

2   meet their burden because, and we indicated this in our brief,

3   there is another ADT case, *ADT, LLC versus Capital Connect*, a

4   Northern District of Texas case, and in that case, ADT pointed

5   to what they are pointing to here, which was just the gross

6   spend on their brand.  And that's insufficient because it does

7   not show that ADT spent money, a specific sum of money in order

8   to rehabilitate its brand, all right.  There is no

9   rehabilitative component to what they have disclosed.

10          THE COURT:  Can you probe that a little bit further?

11  What exactly is an inquiry of goodwill?  Goodwill, generally

12  speaking, means reputation, so when we are talking about injury

13  to reputation, what sorts of evidence would actually hone in on

14  that particular issue?

15          MR. LIPARI:  Okay, Your Honor.  So what wouldn't hone

16  in on it is what they disclosed, which is just gross.  What

17  would hone in on it is potentially a comparative analysis, a

18  comparative analysis of what they spent from one year to the

19  next and some evidence tending to demonstrate that an increase

20  or some portion of what they spent was attributable in some

21  way, shape or form to the conduct of Defendant as opposed to

22  simply, you know, continuing to spend money in order to

23  maintain their brand awareness.

24          THE COURT:  What is your best authority to suggest

25  that merely telling us what your advertising spend is over a

 1    period of, I think, five years is insufficient as a matter of

 2    law to seek damages for injury to reputation and goodwill?

 3         MR. LIPARI:  Well, Your Honor, we would simply point

 4    to that Northern District of Texas case, *ADT versus Capital*

 5    *Connect*.

 6         THE COURT:  What is the citation?

 7         MR. LIPARI:  Oh, sure.

 8         That's 2017 U.S. District LEXIS, 60711, and it's

 9    Northern District of Texas 2017.

10         THE COURT:  And in that case, what was at issue and

11    what was decided?

12         MR. LIPARI:  Your Honor, what was at issue was

13    whether they could maintain their reputation and goodwill

14    damages claim and the court indicated that they could not

15    because it was insufficient to simply point to what ADT is

16    pointing to now, which is simply gross spend on brand

17    awareness.

18         THE COURT:  What about the Ninth Circuit case that

19    perhaps supports Plaintiffs' position that this is, I guess,

20    adequate?

21         MR. LIPARI:  Well, Your Honor, this is a summary

22    judgment motion and there needs to be summary judgment

23    evidence.

24         To simply point to a document and indicate that,

25    okay, Based upon this, we could cobble something together,

1    create a methodology and then present a specific figure to the

2    jury, I mean, I suppose that is true, but it's insufficient on

3    a summary judgment motion where we are indicating that they

4    haven't come forward with evidence.

5          It would be akin to simply saying, Look at all of

6    this documentation, Your Honor, I'm sure we can find something

7    in here, and then present it to the jury on this issue, and

8    that's really what we are talking about, Your Honor.

9          Admittedly, ADT may ultimately be in a position at

10   trial to come up with some computation, some methodology in

11   part based upon that very document, but just pointing to that

12   very document is insufficient on a summary judgment motion, not

13   to mention prejudicial.

14   THE COURT:  All right.  So focusing in again on the

15   timing aspect, that one page document, did you have that

16   document during discovery?

17   MR. LIPARI:  Your Honor, as we indicated, and I think

18   there was actually an error in my brief, we pointed to a

19   particular document and I don't even think that document

20   corresponds to the production.  So I can represent, Your Honor,

21   that it is our understanding that document was produced after

22   December, right, after that December 2nd date, some time after

23   December.  The point is no, we didn't have it, and we didn't

24   have it when the experts were disclosed.

25   THE COURT:  All right.  Let's stay then on the

```
 1   subject of goodwill, and let me turn to Plaintiffs' Counsel.

 2        It does seem at least problematic to the Court that

 3   there appears to still be no computation of damages for injury

 4   and merely pointing to a document, you know, suggesting how

 5   much money has been spent for advertising and marketing over a

 6   lengthy period of time makes it exceedingly difficult for

 7   Defendant to reasonably respond to that.  So how do you

 8   overcome the fact that all you have supplied, it appears, is

 9   that sort of top line number from which it is very difficult to

10   discern what actually is the injury to reputation and goodwill?

11        MR. SCOTT:  Thank you, Your Honor.  I think you are

12   actually right on, and Judge Rosenberg and Judge Middlebrooks

13   were right on in discussing that Ninth Circuit case, the

14   Skydive case that you were referencing earlier.

15        In that case, it is pretty clear that in measuring

16   harm to goodwill, a jury may consider a plaintiff's

17   expenditures in building its reputation in order to estimate

18   the harm to its reputation after defendant's bad acts.

19        What we have here is we have production of the

20   resources, the money that ADT spends in building its brand and

21   reputation over a five year period of time, in conjunction with

22   testimony provided by its chief IP litigation counsel,

23   Mr. Cona, as it relates to the fact that ADT is spending

24   hundreds of millions of dollars in order to build up and

25   protect its brand and reputation, and that in addition to the
```

Monday, April 4th, 2022

```
 1    declaration of its internal legal department, who is handling

 2    the investigation of the claims made by these customers, the

 3    complaints that come through.

 4            THE COURT:  So one moment, let's itemize.  You have

 5    this spreadsheet, let me get the actual records.

 6            All right.  So we have docket entry 131-1, which is a

 7    one page document outlining how much money was spent in

 8    marketing from 2016 to 2021, okay.  What else do you have?

 9            MR. SCOTT:  And just briefly on that particular

10    document, Your Honor, that was in direct response to a

11    discovery request that Safe Home had made with regard to the

12    financials ADT spends in order to support and build its brand,

13    marketing its brand, its reputation, its goodwill.

14            That was -- also that request came in after

15    Mr. Cona's testimony on the issue, where he had identified ADT

16    would spend in the hundreds of millions of dollars in order to

17    build up that brand.

18            So we have that document provided during the course

19    of discovery, it was not after the close of discovery, it was

20    while discovery was going on, in conjunction with the testimony

21    of Mr. Cona, in addiction to the declaration that came through

22    of Mr. Stigler.

23            THE COURT:  So what does Mr. Cona say specifically on

24    goodwill?

25            MR. SCOTT:  I think Mr. Cona is talking that there is
```

 1   harm to ADT's reputation and goodwill that occurs when these
 2   misrepresentations, these door-to-door deceptive sales
 3   practices happen.  And he is talking about the fact that ADT is
 4   spending hundreds of millions dollars a year in order to build
 5   up and protect its brand through its marketing and advertising
 6   spend.

 7           He does not have a specific calculation as to that
 8   harm, and I don't think at the time of his deposition he had
 9   the specific numbers related to what that spend would be, but
10   in conjunction with what is required by the Ninth Circuit and
11   what they found in that *Skydive* case, and what this Court and
12   Judge Middlebrooks and Judge Rosenberg have found to be
13   admissible at least to go to a jury so they can then make a
14   determination as to the harm.  That, the spend, the testimony
15   as it relates to the spend and the fact that harm occurs, and
16   the declaration from Mr. Stigler identifying instances where
17   harm has actually occurred to ADT as a result of the deceptive
18   sales practices by other competitors going door to door, those
19   are more than enough to satisfy --

20           THE COURT:  It just seems to me like it's very in the
21   ether just to say, Yes, there is harm, we spend money on our
22   reputation, how is the Defendant supposed to defend against
23   that?  There is not even anything approximating a computation.
24           MR. SCOTT:  Your Honor, I think that's the difficulty
25   as it relates to these Lanham Act cases when it comes to harm

```
 1    to a company's goodwill, that's exactly what the Ninth Circuit
 2    discusses and exactly what Judge Rosenberg and Middlebrooks
 3    picked up on.  One, there is no requirement to have an expert
 4    do a computation.
 5             THE COURT:  Although you agree that you essentially
 6    kind of promised that you would supply expert testimony and
 7    then nothing actually materialized and all we got was the one
 8    page document and that kind of generalized testimony of harm by
 9    Mr. Cona, and I didn't get to the third item, so we will go
10    back to that in a moment.  But there is no expert testimony
11    purporting to compute or ascertain some amount, short of this
12    very large figure just representing the full scope of ad spend
13    for five years.
14             MR. SCOTT:  You are right, Your Honor, there's no
15    specific expert testimony as it relates to a computation of
16    what that particular harm would be, nor do I believe that's
17    required under the Lanham Act and under the cases interpreting
18    the Lanham Act, as specifically discussed in the *Skydive*
19    opinion that was relied upon by Judge Rosenberg and Judge
20    Middlebrooks.
21             THE COURT:  Other than that *Skydive* case, do you have
22    any other kind of emerging authority on this subject as to what
23    sorts of evidence would be required to at least get to a jury
24    on goodwill damages?
25             MR. SCOTT:  I think the *Skydive* case does the best
```

1  job of laying out the parameters of what would necessarily be

2  required to present so the jury can come up with their own

3  analysis.  I think that Judge Rosenberg's and Judge

4  Middlebrooks' opinions discussing that *Skydive* case and

5  applying it specifically to what is essentially nearly

6  identical facts and circumstances to what we have in this case,

7  those would probably be the best sources for on-point authority

8  discussing what we are talking about for the issue here.

9          THE COURT:  Why didn't your client attempt to provide

10  expert testimony on this topic?

11          MR. SCOTT:  I believe, Your Honor, that -- again,

12  going back, and I'm sorry to be a broken record here, but it is

13  a very difficult thing to compute.

14          I think that what Mr. Lipari is discussing as it

15  relates to a comparative analysis, there are so many different

16  variables and factors as it relates to what can happen here,

17  that it would be very difficult for any expert to provide an

18  expert opinion as it relates to harm to reputation and goodwill

19  for a particular company over a given period of time based upon

20  a set number of acts by this particular actor.

21          I think that's why Judge Rosenberg and Judge

22  Middlebrooks are relying upon, that if you can provide the jury

23  with information as to here's what ADT does in order to build

24  up, to protect and to market its brand and here is evidence

25  that this type of conduct is harmful to the brand, then the

```
 1   jury then has what it needs in order to be able to say, Okay,
 2   based upon this conduct and based upon what ADT is spending
 3   here, we believe that a proper award for harm to reputation and
 4   goodwill can be whatever their determination is.  It's
 5   something that should go to the jury.  It is not something that
 6   relates to the -- I'm sorry, to the trier of fact to make a
 7   determination as to what that amount is.  The parameters that
 8   support it I think are outlined by that Ninth Circuit case,
 9   Judge Middlebrooks and Judge Rosenberg.
10           THE COURT:  All right.  So let's just finish up the
11   trio here, it was the document, the 131-1, the testimony of
12   Mr. Cona, and the final piece?
13           MR. SCOTT:  There was a declaration of Brandt Stigler
14   that was provided in conjunction with ADT's opposition to the
15   motion for partial summary judgment.
16           THE COURT:  Bront (sic), how do you spell his first
17   name?
18           MR. SCOTT:  B-R-A-N-D-T.
19           THE COURT:  Brandt, okay.  And what does he say, in
20   the nature of computing damages for goodwill?
21           MR. SCOTT:  So he is not talking about a computation
22   of damages for goodwill.  He is talking about the fact that he
23   has real experiences and specific examples of instances where
24   he is interacting with customers that have called in to
25   complain about the conduct of a competitor going door to door
```

```
 1   and performing deceptive sales practices; how even though it is
 2   not ADT that is doing that conduct, it is ADT that is
 3   negatively affected because those customers don't even want to
 4   be a part of the process anymore, right, they will cancel their
 5   ADT service because they are just frustrated by the whole fact
 6   that they are dragged into this process.
 7           So it is additional evidence that there is harm that
 8   flows from it, there is harm to ADT's brand and reputation and
 9   goodwill as a result of deceptive sales practices by
10   competitors going door to door, misrepresenting that they are
11   affiliated with or somehow taking over ADT.
12           THE COURT:  Now, did you ever make any witness
13   available to examine on the topic of goodwill?
14           In other words, I don't know exactly when this
15   document was turned over, but did Defendant ever have an
16   opportunity to ask any corporate witness to, you know, I guess
17   just further probe how much the goodwill would really amount
18   to?
19           MR. SCOTT:  I think Mr. Cona was deposed for a
20   significant period of time, Mr. Stigler was also deposed in
21   this case.  I don't think that any particular witness would
22   have had the ability to provide that specific computation.
23           I know that Your Honor keeps coming back to that, but
24   I don't believe that under the Lanham Act precedent, a specific
25   computation is required in order for the jury to be able to
```

 1   perform its analysis as the trier of fact to make a

 2   determination.

 3           THE COURT:  I don't know.  The rule says you have to

 4   provide a computation of each category of damages claimed, and

 5   I'm not sure you have ever done that or that you have even done

 6   that to date.

 7           Let me ask you another question.  Assuming goodwill

 8   damages were off the table, what other categories of damages

 9   would be available in your case still, setting aside punitive

10   damages for a moment?

11           MR. SCOTT:  So there would be additional direct

12   consequential damages as it relates to the harm that go to the

13   value of the lost accounts.  In particular, I think what

14   Mr. Urban will be talking about is the value of those accounts,

15   Dr. Taylor's analysis as to the number of customers potentially

16   affected by that, and then Dr. Matolo's analysis as it relates

17   to the royalty associated with the harm.

18           THE COURT:  Okay.  One final thing:  To your

19   understanding, this document, 131-1, it was provided when?

20           MR. SCOTT:  131-1 was provided in conjunction with a

21   response to a discovery request, it was a request for

22   production.  I don't have the specific date, Your Honor, I'm

23   fairly confident it was provided within the discovery time

24   period, it was before discovery had closed.

25           One more point, Your Honor, if I may.  What we are

```
 1   running into here that we have to recognize is that Safe Home
 2   has an identical counterclaim against ADT, and their Rule 26
 3   disclosures made the same promises as it relates to a
 4   computation of damages, and as it stands right now, the
 5   documents and evidence and testimony associated with harm to
 6   reputation and goodwill is nonexistent for Safe Home.  So to
 7   the extent that Your Honor is inclined to preclude ADT from
 8   seeking a recovery of goodwill and harm and reputational
 9   damages as consequential damages for its claims here, I think
10   the same would hold true with regard to Safe Home given the
11   lack of evidentiary support, which is actually less than what
12   ADT has put forth.
13            THE COURT:  Thank you.
14            All right.  Let me turn it back to Defense Counsel,
15   can you respond to that final point?
16            MR. LIPARI:  Well, yeah.  Your Honor, may I respond
17   to just a few points?
18            THE COURT:  Yes, but let's start on this one, the
19   issue that your client is similarly seeking damages for
20   goodwill and has provided essentially nothing better than what
21   Plaintiff has.
22            MR. LIPARI:  Your Honor, I don't necessarily
23   disagree.  We are not ADT, we are a much, much smaller
24   Connecticut company, so we don't have the paperwork or the
25   infrastructure that ADT does.
```

1          Nevertheless, I think it would be inappropriate to

2    sort of just casually or in a perfunctory manner dispose of one

3    of our claims when there is not actually a pending motion for

4    summary judgment.  Moreover, I don't think we are similarly

5    situated at all in a few important respects.

6          Number one, yes, we had an opportunity to depose Cona

7    because Cona was the only one on the Rule 26 disclosure who was

8    set forth for purposes of testifying about goodwill and

9    reputational damages, the only one.

10          So when we asked him, he testified -- and we include

11    this in the report, he testified that he would defer to the

12    experts in terms of how those things were calculated,

13    particularly as to impact.  Then he testified that he could

14    only testify to the fact that their actions had a negative

15    impact on ADT, the extent of which would be something that

16    would be determined by the experts, and again, Your Honor, that

17    was it.  That was their witness.

18          We deposed Stigler, too, keeping in mind that Stigler

19    was never disclosed as an individual who would have anything to

20    say about goodwill and reputational damages, he is a customer

21    services individual.

22          With respect to the disclosure, Your Honor, it is our

23    contention that because the document was disclosed in December,

24    that is outside the discovery period; it was certainly outside

25    of the expert disclosure period.  If we had any inkling that

1   there was going to be documentation pertaining to goodwill and

2   reputational damages and that there was going to be evidence,

3   we certainly should have had the opportunity to disclose our

4   own expert on that issue.

5           The other thing, Your Honor, so we keep talking about

6   the *Skydive* case, and I have indicated, Your Honor, that I

7   think the *Skydive* case is distinguishable, in part because of

8   some of the Rule 37 issues that are at play.

9           THE COURT:  If you could slow down.

10          MR. LIPARI:  Oh, sorry.

11          But setting that aside, *Skydive*, which they keep

12  pointing to as, you know, so authoritative and kind of setting

13  the standard for this issue, even that had some language, I

14  think, that bolsters our argument.  And specifically in

15  *Skydive*, when the court was trying to determine whether or not

16  there was an excessive jury award, they indicated that

17  plaintiff demonstrated the geographic reach of the harm and

18  counsel directed the jury to consider *Skydive Arizona's* need to

19  undertake corrective advertising due to the extremely harmful

20  ramifications of the misrepresentations.

21          So they pointed specifically to what we were alluding

22  to earlier, which is it's not enough to simply say, Here is the

23  document, now, you know, the jury has to come up with some sort

24  of reasonable approximation of how we have been damaged.

25          In that particular case, they told the jury -- they

1    directed the jury to consider their corrective advertising,

2    right, and that, the court took into consideration in

3    determining that it was not an excessive jury award.

4         Here, Your Honor, again, this is just gross spend.

5    You can't even infer from it what corrective advertising would

6    be, and if we knew there was going to be sort of a corrective

7    advertising component and if we were provided with this

8    document when we were supposed to, then we would have been

9    essentially forwarded opportunity to put in our own expert

10   analysis on it.

11        THE COURT:  So when you say you weren't provided the

12   document, I'm still confused about when you were provided the

13   document and why that was too late.  You don't know exactly

14   when you got it, you just believe it was after December?

15        MR. LIPARI:  Yes, Your Honor, December.

16        THE COURT:  And the discovery cutoff was?

17        MR. LIPARI:  Well, Your Honor, I think we can check,

18   but I believe that the discovery cutoff was before November,

19   which is when the expert disclosures were due.

20        THE COURT:  And I take your point that there is

21   certainly no motion with respect to the goodwill damages being

22   sought by Defendant in this case, but you have taken, I think,

23   the view today that there would be no evidence on the record

24   specifically computing such damages.

25        MR. LIPARI:  Correct.

```
 1            THE COURT:  All right.  Let's turn to the issue of
 2   punitive damages then, Mr. Lipari, let's get started on that.
 3            MR. LIPARI:  Sure, Your Honor.
 4            So Your Honor, as we indicated in the motion, it is
 5   our contention that we are entitled to summary judgment as to
 6   ADT's claim for punitive damages.  In essence, the standard --
 7   and, you know, there are various cases we cited, the Tiger
 8   Point case in particular -- it requires a showing of willful
 9   and wanton misconduct with an element of outrage similar to
10   that usually found in a crime.
11            Moreover, we cited the Florida Power & Light versus
12   Dominguez case, standing for the proposition that in punitive
13   cases against corporations, it must be shown that there was a
14   willful or malicious misconduct from a corporation's managing
15   agent or at least knowledge.
16            Here, Your Honor, you know, we set forth a bunch of
17   cases in our moving papers essentially indicating that, you
18   know, the level of outrage had to be very high; again, it had
19   to be, you know, bordering on criminal conduct, and there was
20   nothing in the record that approached that.
21            In opposition to our motion, they set forth about
22   eight exhibits in support of their punitive's claim, and they
23   are as follows:  There are four snippets from consumer
24   depositions, where essentially consumers were indicating that
25   the door-to-door salesman mentioned ADT to them.  There is a
```

```
 1   motion for contempt against my client in a proceeding in
 2   Connecticut State Court by the Attorney General, and within
 3   that motion for contempt, there are tables put together by an
 4   unknown person, right, that include maybe double or triple
 5   hearsay regarding complaints.
 6         Then there is a -- then there are two deposition
 7   transcripts, there is a deposition transcript from my client's
 8   representative, Brad Leeflang, and essentially the Court can
 9   read the deposition transcript and specifically the snippet
10   cited, but it specifically pertains to Mr. Leeflang testifying
11   there were systems in place for customer complaints.
12         Then there is a rough deposition of another
13   representative for my client, Gladys Santiago, and in that she
14   indicates that they note the account when there are complaints,
15   and that it is up to the dealer or it is incumbent upon the
16   dealer to ultimately rectify the situation.
17         And then the final bit of evidence is a long email
18   chain.  A lot of it pertains to customer complaints surrounding
19   an individual named Sam Fife; however, there really appears to
20   be only one significant email and that is an email from the
21   corporate president, David Roman, where he indicates that if,
22   you know, he gets one more complaint, he is going to completely
23   stop ADT takeovers, which is essentially -- Your Honor, I mean,
24   to the extent that it is not already clear, it essentially
25   means that if there is an account -- you know, if there is a
```

```
 1   customer who was an ADT customer, he is not going to accept

 2   that customer as a new customer simply because he doesn't want

 3   to deal with it anymore.

 4          In any event, it is an innocuous email, these are all

 5   relatively innocuous sections within these transcripts, and

 6   then the remainder of the evidence is simply hearsay evidence;

 7   it is inherently unreliable hearsay evidence that is

 8   inappropriate for a motion for summary judgment.

 9          THE COURT:  All right.

10          Let's see, let's turn to Plaintiffs' Counsel.  Why do

11   you think you should go to a jury on the issue of punitive

12   damages specifying the evidence in support of that?

13          MR. SCOTT:  Thank you, Your Honor.

14          One other point, and I apologize, before we dive into

15   that, I believe discovery closed in this matter on January 3.

16          THE COURT:  Thank you.

17          MR. SCOTT:  So as it relates to the evidence that's

18   been provided here, I think there's three points to address;

19   one, none of the cases that Safe Home cited or relied upon deal

20   with the unfair competition or the Lanham Act type of dispute

21   that we have here, which is you have sales representatives

22   going door to door lying about who they are.

23          THE COURT:  I'm just going to ask that you slow down

24   a little bit for the benefit of our court reporter.

25          MR. SCOTT:  I apologize.  She's asked me once
```

1    already, I'm sorry.

2              So the cases that they are relying upon, they deal

3    with personal injury, and that's why there is discussion of

4    conduct that's akin to criminal manslaughter being sufficient

5    to satisfy punitive damages, and that's not the case we are

6    talking about here.  This is not a case involving personal

7    injury, this is a case involving intentional conduct and unfair

8    competition as it relates to Safe Home's dealers going door to

9    door and making misrepresentations.

10             So those cases, while they may be applicable in a

11   personal injury type lawsuit, are not really controlling or

12   even persuasive in discussing the evidentiary support required

13   for punitive damages here.

14             Moreover, there is sufficient evidence of intentional

15   conduct or at the very least severe gross negligence on the

16   part of Safe Home in allowing its dealers to continue to go

17   door to door, despite multiple instances of notice going as far

18   back as 2014 and not taking any action to remedy or rectify it.

19             Starting at the reverse, I think that email chain

20   that was discussed, and if Your Honor can go through and look

21   at the dates, I think we outlined a summary in our opposition,

22   after, after that email from the president of the company

23   saying, If we get any additional complaints, we will stop ADT

24   takeovers, you have seven or eight additional complaints about

25   the same dealer, the same salesperson, and Safe Home to this

1   day is still doing ADT takeovers.  So to the extent they are

2   paying lip service to it or to the extent they have knowledge

3   of it and not following up and taking any action, that's the

4   intentional conduct, gross negligence that would support the

5   jury being able to find punitive damages.

6          Moreover, the evidence that we are presenting here,

7   to the extent that Mr. Lipari doesn't believe it is sufficient

8   and is able to present to this Court a directed verdict

9   argument that the jury is not entitled to hear it, to the

10  extent anybody is harmed, it would be ADT from having presented

11  in opening statements the idea that we are entitled to punitive

12  damages and the jury not being instructed on that or hearing

13  that to make a determination at the end.

14         So I think that we are kind of putting the cart

15  before the horse in terms of making a determination at the

16  summary judgment stage given all of the evidence that is

17  available and in the record; the customer testimony; the

18  documentation that was provided by Safe Home, its internal

19  correspondence relating to notice about its dealers' conduct;

20  and then the additional documentation from other State Attorney

21  Generals taking action against Safe Home for what is

22  essentially identical conduct going back to 2014.

23         I understand Mr. Lipari's concerns with regard to the

24  hearsay of that evidence, but we are not providing it

25  necessarily to prove the truth of the matter asserted therein,

```
 1    just to show that Safe Home has been on notice going as far

 2    back as 2014, when its president, David Roman, entered into

 3    that consent judgment and said they would collect and monitor

 4    and track and respond to these customer complaints, and then

 5    the recently filed motion for contempt because they have not

 6    done that, and all of the evidentiary support provided by

 7    affidavit of the Attorney General in support.

 8             So the record is more than sufficient to at least get

 9    it to a jury to make this determination, and it is not -- it is

10    not for a summary judgment decision at this time.

11             THE COURT:  All right.  I think I have heard enough

12    on that point, but Mr. Lipari, if you want to respond briefly,

13    I'll give you a few minutes.

14             MR. LIPARI:  Sure, Your Honor.  I won't belabor it,

15    but I'll simply cite the case that we cited in our moving

16    papers, it's Macuba versus Deboer, an Eleventh Circuit case

17    from 1999, where the Eleventh Circuit indicated that a court

18    cannot consider hearsay in opposition to a motion for summary

19    judgment unless the hearsay will be presented in an admissible

20    form during trial.

21             So Your Honor, we are not saying, Oh, look, they do

22    have a lot of evidence; however, it is merely insufficient,

23    right.  We are saying the evidence they have presented is

24    either beside the point or it constitutes inadmissible hearsay

25    and they are not going to be able to get it in during trial.
```

 1   To the extent that we cited some personal injury cases for the

 2   standard, I don't think we were trying to argue that this is

 3   akin to a personal injury case.

 4          In the other intellectual property cases where

 5   punitives have been considered, and ADT has even been involved

 6   in some of these cases, they have come forward with evidence

 7   indicating that a company has trained their outside dealers and

 8   trained their employees to poach and pilfer ADT accounts and to

 9   use sort of subterfuge and nefarious actions in order to get

10   these ADT accounts, there is nothing like that here.  This is

11   so thin.

12          I mean, they have been reduced to pulling things off

13   of the public docket that again constitute triple hearsay, and

14   then putting in emails that have a perfectly innocuous -- I

15   mean, they're beside the point, they don't even speak to the

16   issue of knowledge.  And this is a far cry from the kinds of

17   cases where, you know, a high ranking corporate representative,

18   you know, during the deposition, you have elicited testimony

19   that you could present to a jury indicating that they have

20   knowledge of and they are training outside representatives in

21   order to pilfer accounts, and that's not what we have here.

22          THE COURT:  Just out of curiosity, are there any

23   other cases involving ADT and Safe Home that have gone to trial

24   or that have materialized to a more mature point than this

25   litigation?

```
 1              MR. LIPARI:  You mean just involving these parties?

 2              THE COURT:  Correct.

 3              MR. LIPARI:  No, luckily this is our first rodeo with

 4     ADT.

 5              THE COURT:  Okay.  All right.

 6              All right, let's turn then to the expert issues.  I

 7     understand there are three experts whose testimony is being

 8     challenged, starting with Mr. Eric Matolo, M-A-T-O-L-O.

 9              Mr. Lipari, what is your argument as to why he should

10     be excluded altogether?

11              MR. LIPARI:  So Honor, we have multiple arguments

12     with respect to Matolo.  Our first argument is as it pertains

13     to Mr. Matolo plagiarizing his report.  Ultimately -- that's

14     number one.  Ultimately, we get into the methodological flaws,

15     et cetera, but just focusing on the plagiarization for one

16     second, because we devoted a significant portion of our brief

17     to it, this is not an issue where, you know, we brought it to

18     the Court's attention and it is just sort of a fact that we

19     wanted to note, but ultimately, it comes down to credibility

20     and it can go to a jury.

21              This is disqualifying and the cases that we cited in

22     our brief indicate that it is, in fact, disqualifying.  As a

23     matter of fact, we cited three or four cases, one in particular

24     was the _Spiral Direct_ case, which is a Middle District of

25     Florida case from 2017, where an expert was excluded because he
```

 1   plagiarized large sections of another expert's report and

 2   didn't acknowledge it until the deposition; and therefore, the

 3   credibility was undermined, and there are other cases like

 4   that.

 5          The credibility was so undermined and so compromised

 6   that the court, exercising its gatekeeper role, couldn't put

 7   that expert in front of the jury.  And what we have here is

 8   even worse than the fact patterns of those particular cases.

 9          Here -- and Your Honor, I don't want to oversell

10   this.  Your Honor can make her own determination and that is

11   why I put the excerpts from transcripts into the brief.  I

12   believe he was asked questions where the plagiarizing of

13   Matolo's (sic) report absolutely should have been disclosed.

14          I asked him specifically, Okay, you know, what did

15   you do -- what help did Mr. Mangan -- I'm sorry, I said

16   Matolo's report, I meant Mangan. I asked Matolo, What help did

17   Mr. Mangan give you, and he evaded the question.  It wasn't

18   until he was confronted with the Mangan report that, you know,

19   he began testifying maybe he had seen it, you know, maybe

20   that's one of the ones that he looked at, when, in fact, Your

21   Honor, it wasn't disclosed, right, his reliance upon the Mangan

22   report wasn't disclosed when he was asked about it before he

23   was confronted with it.

24          When he was asked about it during his deposition, he

25   evaded those questions and then when he was confronted with it,

1   he still gave evasive answers, and Your Honor, we have put

2   those reports in front of Your Honor to do a comparative

3   analysis and there are just large swaths that were entirely

4   copied.

5           Your Honor, this is not -- and it's especially

6   problematic for two reasons.  It is not just this abstract

7   credibility determination, even though there is that.  It is

8   also he didn't take notes with respect to witness interviews,

9   the witness interviews supported his opinions, and then when

10  you do an analysis of the references to the way the witness

11  interviews are in the Mangan report and the Matolo report, they

12  are identical, right.  They are not all identical, but the ones

13  we cited are identical, which begs the question, did you even

14  conduct these witnesses interviews, that's what we called him

15  out on.

16          In opposition to the *Daubert* motion, there is no

17  affidavit by Matolo, there is no affidavit by, you know, the

18  individual he allegedly interviewed.  All we have is his

19  testimony and the comparative analysis and it is profoundly

20  suspicious.

21          The other thing, Your Honor -- again, this is not an

22  abstract credibility determination -- is his methodology itself

23  is perplexing.  He used -- he apparently used a self-developed

24  methodology, which doesn't even adhere to any of the

25  methodological -- or any of the methods that are typically

```
 1    employed in these types of reports, and he indicated that he
 2    used market methods plus adjustments that he needed to make as
 3    he saw fit, all right, so it's a self-developed methodology.
 4         And when we asked him questions about that
 5    methodology, he had difficulty explaining it, you know,
 6    coherently or cogently.  And when I say self-developed
 7    methodology, well, you know, it was something that came from
 8    this Mangan report, which he plagiarized, but it wasn't a
 9    traditional methodology that's typically used in these royalty
10    damages calculations as we set forth in our papers, so the fact
11    that he couldn't even explain it.
12         And in opposition to our Daubert motion, they argue
13    that he used an established royalty methodology.  So I said,
14    Okay, we are confused about attacking and undermining his
15    methodology because what he used was an established royalty
16    methodology, but Your Honor, as I pointed out, Matolo
17    explicitly disavowed that.  He explicitly said he did not use
18    the established royalty methodology.
19         So Your Honor, it is this incomprehensible hodgepodge
20    that he could not even explain during his deposition.  So you
21    have the credibility issue in and of itself, right, and there
22    is case law standing for the proposition that he could be
23    excluded just for that, and then you have the credibility,
24    right, with the addition of this incomprehensible methodology,
25    which he apparently just plagiarized from Mangan and can't
```

 1   explain himself, and then you have the issue of the witness

 2   interviews, where he is just basing things on witness

 3   interviews, but the sources of information is from the Mangan

 4   report.

 5            So it is completely unreliable and it is the kind of

 6   thing -- again, Your Honor, it's the kind of thing that we are

 7   not just bringing it to Your Honor's attention so that guides

 8   the opinion about whether or not it's a reliable methodology,

 9   but in and of itself, this type of action has been deemed so

10   severe, I mean so untrustworthy that an expert should be

11   stricken.

12            THE COURT:  All right, thank you.

13            Let me hear from Plaintiffs' Counsel on Mr. Matolo

14   starting with the plagiarism component.

15            MR. SCOTT:  Thank you, Your Honor.  And I think what

16   would be helpful here, going back to the 2015, 2016 time

17   period, ADT began pursuing these Lanham Act lawsuits against

18   companies that were committing deceptive sales practices, going

19   door to door.  One of the difficulties that ADT ran into in

20   conjunction with that is being able to, from a compensatory

21   damage standpoint, identify, Okay, what is the "royalty," and

22   I'm using quotations because it is not a traditional royalty in

23   the sense that you would normally think of that ADT places upon

24   the value of its brand, such that another company, another

25   dealer, another entity going door to door and wanting to use

1    ADT's name and brand and recognition in selling alarm systems,

2    what would that be -- what would the value of that be?

3         And so ADT reached out to Dr. Mangan, and Dr. Matolo

4    was working with Dr. Mangan in that 2015, 2016 time period, and

5    they worked with ADT to identify internally, Well, look, there

6    is already a contractual relationship ADT has with over 400

7    authorized dealers and these contracts specify what the

8    valuation is -- I'm sorry, what ADT is willing to charge, if

9    you will, a dealer in order to use its name in selling alarm

10   systems door to door.

11        So Dr. Matolo and Dr. Mangan put together this what

12   I'm going to term reverse royalty calculation to apply to these

13   particular instances because of the difficulties surrounding a

14   calculation of a traditional royalty in this sense.

15        They did not need to go and start from scratch, they

16   did not need to create a hypothetical negotiation.  There was

17   already a market supported valuation principle that was able to

18   be developed utilizing ADT's contractual relationship with its

19   authorized dealers, so Dr. Matolo, working in conjunction with

20   Dr. Mangan, helped to put together that analysis.  That

21   analysis has been the same or very, very similar since that

22   2015, 2016 time period.

23        If there had been a change, that would have been

24   noted, but ADT has been utilizing its authorized dealer program

25   in a pretty consistent manner with changes as it relates to

 1    certain valuations and markups and incentives that it can

 2    provide dealers based upon volume of sales, but the overall

 3    analysis of what ADT is charging those dealers to utilize its

 4    name and brand has remained the same.

 5            So Dr. Matolo's report that he utilized and that he

 6    has put together not only in this case, but in another case

 7    that is pending in the Southern District of Florida against a

 8    competitor, Vivint, and also worked in conjunction with

 9    Dr. Mangan to put together in the *APT* case, and worked with

10    Dr. Mangan to put together in the *Capital Connect* in the

11    Northern District of Texas, that analysis is identical to what

12    was done in 2015 through what he did today.

13            So the statement that Dr. Matolo was somehow

14    plagiarizing, because he is doing the same analysis, he is

15    reviewing the same materials, and he is pulling together the

16    same conclusions as it relates to ADT's valuation of its brand

17    vis-a-vis its authorized dealer relationships did not change

18    and his opinions and the reports that he is putting together

19    necessarily would not change.

20            What Dr. Matolo testified to as it relates to the

21    interview with Sue Gates, because I think we are focusing

22    specifically on that, is because he had already performed that

23    interview, he did not need to create notes because when he

24    interviewed her again, he was confirming, Has this information

25    changed, right.  Has the information that you provided me as it

```
1    relates to ADT's authorized dealer program and the specifics

2    surrounding that program as it relates to what ADT would

3    utilize for a reverse royalty, has that changed since we last

4    did this analysis, whether that was in 2015, 2016, or even in

5    2020, when he was doing the analysis in conjunction with the

6    Vivint case.

7         So there is no concealment, there is no lie about an

8    interview with Sue Gates, he is utilizing reports and

9    information that he had put together over the past six years

10   working with Dr. Mangan and --

11        THE COURT:  Did he ever acknowledge that

12   collaboration in any way with Mr. Mangan?

13        MR. SCOTT:  I believe he did testify to working with

14   Dr. Mangan both generally, and then specifically as it relates

15   to this type of analysis.

16        THE COURT:  So where would that be, the testimony of

17   him acknowledging some collaborative effort with Dr. Mangan?

18        MR. SCOTT:  Sorry, Your Honor, I need to delve into

19   my notes here.

20        THE COURT:  My other question would be, I know you

21   mentioned that his method has been accepted by other courts,

22   can you just shed light on that?

23        What particular cases have accepted Dr. Matolo's, I

24   guess, reverse royalty calculation and has that actually been

25   tested in the form of a motion to strike like we have here?
```

```
 1            MR. SCOTT:  Yes, Your Honor.  So two things; one, I

 2   believe Exhibit D to our opposition is Matolo's deposition

 3   testimony relating to his work with Dr. Mangan and utilizing

 4   that work as a roadmap to put together opinions here.

 5            But in conjunction with the testing, yes, it was

 6   tested, I think in the Northern District of Texas case that was

 7   cited earlier, the ADT versus Capital Connect; it was tested in

 8   the APT decision by Judge Rosenberg, that was in 2017; and it

 9   was also tested and upheld in Judge Middlebrooks' opinion in

10   the ADT versus Vivint matter.

11            THE COURT:  By it, we are talking about the same form

12   of methodology, this reverse royalty calculation, are we

13   talking about the same thing?

14            I just want to make sure I understand that the courts

15   you have just mentioned have denied motions to strike perhaps

16   Dr. Matolo's methodology and permitted him to testify at trial

17   using that method of calculation.

18            MR. SCOTT:  Dr. Matolo or Dr. Magnan, yes, Your

19   Honor.

20            THE COURT:  Okay.  So the pages where you say he did

21   ultimately acknowledge collaborating with Dr. Mangan -- I mean,

22   Mr. Lipari makes -- you know, emphasizes a great deal this

23   notion of plagiarism, so I would like to hear where in the

24   record is there a reasonable basis to believe that Dr. Matolo

25   was at least attempting to reveal his collaboration with
```

1    Dr. Mangan?

2           MR. SCOTT:  I believe, Your Honor -- and if we are

3    looking at the citation that we have in the record, it's

4    Matolo's deposition at page 213, from lines 14 to 18 where he

5    is acknowledging that he had utilized Dr. Mangan's initial

6    report, right, the report that they had -- they had worked to

7    put together as the framework for his report here.

8           Again, the overlapping, the identical nature of what

9    that report shows, whether it be the report from the *Capital*

10   *Connect* case in 2016, the report from the *APT* case in 2017 or

11   the *Vivint* case in 2017, the identical nature of what is

12   contained in that report is not surprising because there is

13   nothing that has changed as it relates to ADT's relationship

14   with its dealers that would affect the valuation, that reverse

15   royalty percentage.  So the analysis that Dr. Matolo is doing

16   is building upon an efficiency of having already done this

17   work.

18           THE COURT:  Okay.  All right, thank you.

19           Anything further, Mr. Lipari?

20           MR. LIPARI:  Sure, Your Honor.  So I would just

21   direct the Court to the quotes within our motion, where it is

22   brutally apparent that Matolo goes out of his way to avoid

23   answering the question.

24           For instance, "You can't give me a specific example

25   of anything that Mangan did or provided that assisted you in

 1   this case?

 2           "ANSWER:  Well, again, with working with him over

 3   time, I have learned more about analysis and available

 4   remedies, and I think that contributed to my work."

 5           So Your Honor, every opportunity he had to disclose

 6   his work with Mangan, his use of the Mangan report, he did not

 7   do that.  This is exactly the kind of plagiarism and exactly

 8   the kind of evasive testimony that should be excluded.

 9           Just quickly, moving on to the methodology, I'll say

10   two things.  First, the explanations that ADT is providing to

11   the Court, those are ADT's Counsel's explanations.  There is no

12   evidence that was put before the Court in opposition to this

13   *Daubert* motion that refutes anything we said.

14           At no point did Mr. Matolo testify about the things

15   ADT is now saying, you know, his long collaboration with

16   Dr. Mangan, his history of working, how nothing has changed.

17   None of that is before the Court, this is just a narrative.

18           The methodology itself, I don't think there is -- I

19   don't think it has been established, and I don't think it can

20   be established that this methodology has ever been accepted.

21   It is because it is such a bizarre hybrid methodology and that

22   is revealed just by ADT's own papers.

23           Again, there are three -- there are three established

24   methodologies here and both experts agree; it's one, establish

25   royalty license; two, analytical approach; three, hypothetical

1    negotiation, those are the methodologies.

2            Dr. Matolo said he didn't need to do any of those and

3    what he did was market rate plus adjustments as he deems fit.

4            Our expert, all right, came in and said, This is not

5    even a methodology, it's a hybrid.

6            THE COURT:  But what do you say to their argument

7    that other courts have accepted that methodology?

8            MR. LIPARI:  Your Honor, the -- this is what we know.

9    We know that other cases -- other courts have made

10   determinations about whether a -- whether reasonable royalty

11   damages are permissible, and we believe that other courts have

12   indicated that reasonable royalty damages are permissible.

13           I have not seen any court accept Matolo's methodology

14   that's, you know, the same methodology that he has employed in

15   this case because it is this hybrid, bastardized methodology.

16   And as we indicated in our papers, our expert, James

17   Harrington, said, Here is the 26 things you failed to consider.

18   Moreover, here are the established methodologies, you didn't

19   use any of them.  He called it market adjustments -- market

20   rate plus adjustments as he deemed fit.

21           What is particularly telling, Your Honor, is ADT, in

22   opposition to the motion, they sort of hedged their bets.  We

23   say, Well, you have to apply these factors, the so called

24   Georgia-Pacific factors, and even Matolo said he didn't apply

25   them, what he did just sort of overlapped with the

```
 1   Georgia-Pacific factors.  They come in and they say, He didn't
 2   even need to apply them because his methodology was an
 3   established royalty rate methodology.
 4          But Your Honor, as we indicated in our reply, we
 5   asked Matolo that, and four times, he said, No, that's not my
 6   methodology.  So Your Honor, they are arguing that his
 7   methodology is one thing, and his testimony establishes that it
 8   is another.  And my expert, Your Honor, has indicated that
 9   there are things he has failed to consider, and that it is not
10   even a recognizable reliable methodology.
11          THE COURT:  All right.  So what is the methodology?
12   Is it is the reverse royalty calculation -- this is for
13   Plaintiffs' Counsel -- or is it something else, if you were to
14   describe it?
15          MR. SCOTT:  So I think, Your Honor, Judge Rosenberg
16   did a very good job of summarizing the methodology that is
17   utilized by Dr. Matolo and --
18          THE COURT:  Slow down.
19          MR. SCOTT:  Apologies.
20          And that's in the ADT versus Alarm Protection, LLC
21   matter, citation 2017 WL 2212541, and this is at the very end
22   of page three.
23          "Plaintiff's position is that while they do not
24   utilize a standard royalty as a part of their income model,
25   plaintiff's utilize a method of income established by contract
```

1   with its dealers that when analyzed economically is the

2   functional equivalent of a royalty.  Plaintiff's position is

3   supported by expert testimony.  Thus, regardless of whether

4   plaintiffs utilize a royalty in the prototypical sense, it is

5   plaintiff's position, supported by expert testimony, that they

6   utilize the economic functional equivalent of a royalty and

7   must be compensated under that theory to be whole."

8           Dr. Matolo's analysis to create that royalty was

9   reviewing ADT's existing market supported contractual

10  relationships with its authorized dealers to determine what

11  percentage of that relationship, what percentage of the amount

12  that ADT charges those dealers, related to the use of the

13  brand.

14          That percentage, the 22 percent, is consistent with

15  what other dealers, including -- what other companies,

16  including Safe Home do, so it's not a simple matter of him just

17  making something up and then saying, This is my opinion;

18  therefore, you need to buy it.  It is a matter of reviewing

19  what is already existing as a contractual relationship to

20  understand what it is that one entity is willing to accept or

21  pay in order to use that brand.

22          That is supported not only by ADT's long-standing

23  relationships with its authorized dealers, but it is also

24  supported within the industry because other companies, like

25  Safe Home, utilize dealers and those dealers utilize Safe

1    Home's name and Safe Home, as a result, charges a percentage

2    for them to be able to utilize that name and that brand.

3          Now, there are additional considerations that

4    Dr. Matolo talks about.  There are costs to serve the company,

5    there are training materials that are provided, there is back

6    end support.  Those are not a part of what he is including,

7    right?  He is taking those out, those are the adjustments that

8    he is referring to there.

9          So if there is already an existing relationship,

10   contractual relationship supported by market forces that would

11   allow for someone to go and determine what it is that ADT would

12   charge or another company would charge a dealer who wants to

13   sell alarm systems, but use their name, that is a proper

14   methodology.  That is a proper measure and that is an intuitive

15   presentation of how the jury can go about calculating what the

16   harm was to ADT here.

17         THE COURT:  All right.  We are going to take a ten

18   minute break and then we will resume to hear the remaining

19   argument on the other two experts.  The Court is in recess.

20      (Recess was had at 9:41 a.m.; and the proceedings

21   resumed at 9:54 a.m.)

22         THE COURT:  You may be seated.  Thank you.

23         All right.  Before we turn to the other two experts,

24   I wanted to just revisit one question on the punitive damages

25   issue.

```
 1              Mr. Scott, I guess, what is your best authority that
 2   the evidence you have supplied in this case on summary judgment
 3   would be sufficient to create a fact question on the punitive
 4   damage issue for your common law theories in counts two, three,
 5   four, which I understand are the counts on which you are
 6   seeking punitive damages?
 7              MR. SCOTT:  Your Honor, I apologize, I put my stuff
 8   away for the summary judgment, if I can pull it out briefly.
 9              So Your Honor, I believe that on page 12 of our
10   opposition, we are listing out various authority in this
11   particular Court, the Eleventh Circuit in the Southern
12   District, that outlines why it would be appropriate.
13              I think the most on point authority that we are
14   looking at here would be Judge Rosenberg's opinion in the *ADT
15   v. APT*, the older matter, and also Judge Middlebrooks' opinion
16   as it relates to *ADT versus Vivint*.  Those two cases set forth
17   the evidentiary support for at least a submission of punitive
18   damages to the jury related to the intentional conduct on the
19   part of the dealers working on behalf of Safe Home, the
20   knowledge on the part of Safe Home's director -- I'm sorry, the
21   president of the dealer program, as well as the president of
22   the overall company with regard to that conduct, in addition to
23   knowledge of this conduct having occurred going as far as back
24   as 2014 without actually taking the steps to deter that conduct
25   despite representations to the contrary in a consent judgment.
```

```
 1            THE COURT:  And those cases analyze those state law
 2   claims that you are bringing here, common law unfair
 3   competition, trade slander and tortious interference?
 4            MR. SCOTT:  The ADT matters, yes, Your Honor, the ADT
 5   v. APT and --
 6            THE COURT:  Can you get closer to the mic, just pull
 7   it closer there.
 8            MR. SCOTT:  The ADT v. APT and the ADT v. Vivint
 9   matters, Judge Rosenberg's and Judge Middlebrooks' opinions.
10            THE COURT:  All right.  Let's turn back then to the
11   experts, I'll have to review those decisions more closely.
12            I think we are now at a discussion of William Urban.
13   Defendant argues that he should be excluded, I think generally
14   because his method is purportedly flawed and misleading, let me
15   hear from Mr. Lipari on that point.
16            MR. LIPARI:  Sure, Your Honor.  As to Mr. Urban, in
17   essence, I think there are two main arguments.  The first
18   pertains to the information relied upon, the analysis, the
19   evaluation, and the basis for the opinions.  All of it is
20   parroted or simply adopted and repeated by Mr. Urban, and we
21   got into, I think, great detail about that in our brief.
22            Specifically -- specifically there was a particular
23   document and spreadsheet that Urban relied upon largely for his
24   damages opinion and, you know, we took great pains to show
25   through his testimony and the testimony of Stigler that he
```

 1   couldn't even answer basic questions about that document upon

 2   which he was relying.  And a lot of -- a lot of the information

 3   in that document came from raw data that he didn't have access

 4   to and that he never saw, and there was an evaluation and an

 5   analysis by individuals like Ken Pope and Brandt Stigler that

 6   he really couldn't explain, and he relied heavily on that

 7   document.

 8          Moreover, our expert indicated that there were dozens

 9   of things that he had to consider, but that he did not

10   consider.  And specifically, on pages 17 and 18 of our report,

11   we provide the deposition exchange where Mr. Urban concedes

12   that there are certain things that he should have considered,

13   but that he didn't consider, and I won't rattle them off, but

14   they are there.  For instance, he didn't review cost center

15   statements, he didn't review documents reflecting budgeted

16   future increases, et cetera.  There is a whole litany.

17          Our expert, who is not simply an in-house employee,

18   but he is a valuation expert, he is a CPA, he has been

19   qualified to opine about these things, he indicated that at a

20   bare minimum, Mr. Urban needed to review these things, but

21   didn't.  Instead what he did is he parroted information that

22   was created summarily based upon raw data by others within the

23   ADT organization.

24          And Your Honor, we cited two cases in particular --

25   well, I'll just cite them -- standing for the proposition that

1    simply repackaging, parroting, or adopting wholesale the

2    information or opinions of an in-house department is grounds

3    for exclusion, and that's the *City Group/Business Credit versus*

4    *Graco* case, and the *Ask Chems, LP versus Computer Packages* case

5    from the Sixth Circuit.

6            In opposition, they argue, Oh, well, you know,

7    Mr. Urban is not required to do original research, he is not

8    required to sort of reinvent, and we are not arguing that.  We

9    are simply saying that there can't be an analytical gap between

10   the opinions and the information, and when he can't even speak

11   about what that information is and when there are certain

12   essential factors that he should have considered, but didn't,

13   there is too great of an analytical gap.

14           Your Honor, the only other point I'll mention, and I

15   don't want to spend too much time, the only other point I'll

16   mention with respect to Urban is about this 15 percent minimum

17   return on investment.

18           Our expert indicated that that amounts to double

19   counting and there is case law standing for the proposition

20   that that is double counting and to be very clear about it,

21   instead of just building profit into the purchase price, he

22   adds profit on to the valuation a second time, and as our

23   expert indicated, the market value of a transaction already

24   includes the required rate of return to compensate the buyer

25   for the investment's risk.  Here, he includes that 15 percent

1   at the end, that's double counting, and Your Honor, that's

2   impermissible.

3          THE COURT:  All right.  Let me hear from Plaintiffs'

4   Counsel.

5          Mr. Urban is set out as an expert on what exactly?

6          MR. SCOTT:  Thank you, Your Honor.  Mr. Urban will be

7   providing a valuation of the accounts that were affected by

8   Safe Home's conduct.  His analysis is actually identical to the

9   expert analysis that was provided by Safe Home in support of

10  their counterclaim, which is to identify what the recurring

11  monthly revenue is for a particular customer account, and then

12  provide a market supported multiple as to get an overall

13  valuation of what that is.

14         Mr. Roman, who is the non-retained expert that Safe

15  Home has proffered to provide its account valuation, has said

16  that that multiple is 42 -- I'm sorry, I think he said it is

17  45.  Mr. Urban, in doing his analysis, said that the multiple

18  is 40 to 42, and when multiplied with the average RMR of the

19  affected accounts, which is the information that Mr. Stigler

20  provided to him, would give you the overall value of just over

21  $2,000 for each lost account.

22         That's similar to what Mr. Roman analyzes, though he

23  has different numbers.  The RMR is not $50 per account, it is

24  slightly lower and his multiple of 45 multiplied by that RMR

25  gives them a valuation of just under $1,700 per lost account.

1          So there is nothing so overtly complex about what

2     Mr. Urban is doing such that it would require the -- I guess

3     the exclusion because he did not go and independently verify

4     the information that was provided.  It is the same approach,

5     methodology, analysis that Mr. Roman would provide on behalf of

6     Safe Home when testifying.

7          The only complaint I'm hearing from Mr. Lipari is

8     that, Well, he didn't look to confirm all of the numbers that

9     ADT provided to him, but an expert is not required to do that

10    under controlling Eleventh Circuit precedent, and the case that

11    we cited for that, Your Honor, I believe is the -- I know the

12    case, but I'm going to cite it improperly if I don't look.

13         It's *Maiz v. Virani* case, 253 F.3d 641, a 2001 case

14    from the Eleventh Circuit.  And in that case, there is a good

15    analysis or good discussion about why the expert is not

16    required to do its own independent research and analysis as to

17    the underlying information provided and is able to rely upon

18    that, and any issue that there is goes to the weight the jury

19    can afford it, not to the admissibility of that expert's

20    testimony.

21         So the methodology utilized by Mr. Urban here is

22    identical to the methodology utilized by Mr. Roman in support

23    of Safe Home's claim.

24         THE COURT:  So the methodology, I guess how would you

25    describe it, what is it exactly?

```
1            MR. SCOTT:  Sure.  So it is simply taking the

2    recurring monthly revenue, what does ADT, on an average, get

3    from these affected accounts, and I think Mr. Urban identified

4    that as just over $50, and you multiply that by an industry

5    supported multiplier, so the expectation that these individuals

6    would remain customers based upon various factors.  That comes

7    from the Barnes' report that Mr. Urban referenced in his

8    report, and it's similar to, I imagine -- we haven't had the

9    chance to depose Mr. Roman yet, but I imagine it is similar to

10   the same type of multiplier that Mr. Roman would utilize in

11   conjunction with coming up with his 45 multiplier number.

12            It is common within the alarm systems industry to be

13   able to compile various data points associated with the

14   expectation that a customer will remain a customer for a set

15   period of time given credit scores, past involvement with the

16   company and other various data points to come up with that

17   multiplier.  So he gets the payment that ADT lost as a result

18   of that customer and he multiples it by what that industry

19   supported multiplier would be.

20            THE COURT:  So then what do you say to Defendant's

21   argument that various things were just not considered by

22   Mr. Urban?

23            MR. SCOTT:  So that litany of questions that was run

24   through there, those are challenging the underlying pieces of

25   information that was provided to him, right?  So he didn't --
```

1    the dispute that they have is that he got the information as it

2    relates to, let's say, the RMR --

3              THE COURT:  And for the record, RMR is?

4              MR. SCOTT:  I apologize, recurring monthly revenue.

5              THE COURT:  Thank you.

6              MR. SCOTT:  And he did not go and independently

7    verify what that is.  To the extent Safe Home is able to

8    establish in front of the jury that that information provided

9    is unreliable, they can then attack Mr. Urban's credibility in

10   providing that testimony, but it does not go to the

11   admissibility of that testimony.

12             His methodology is sound, the information collected

13   and provided by ADT was then confirmed by his interviews and

14   follow-up research with those in ADT, and also based upon his

15   experience in valuing and providing valuation for alarm

16   accounts in working with ADT for a significant period of time.

17             So given the similarities of what both individuals

18   did here, Mr. Roman and Mr. Urban, it just appears to me that

19   the biggest complaint that Mr. Lipari has is he would like to

20   attack what it is that he was relying upon, right, the

21   sufficiency of what he is relying upon, but not the

22   methodology, and he can't really attack the conclusion because

23   it is the same type of conclusion that his own expert is

24   providing here, going, again, to the weight that the jury can

25   afford that testimony, but not to its admissibility.

```
 1           THE COURT:  All right.  It did seem, though, in the
 2   briefing that you didn't really defend his methodology very
 3   much.  It was primarily a discussion of his experience, so if
 4   pressed, I mean, how do you defend the method used by
 5   Mr. Urban?
 6           MR. SCOTT:  I think this method has been upheld by
 7   various courts, including Judge Rosenberg most recently in 2017
 8   in the ADT versus APT case.  And again, it is the same exact
 9   methodology that is utilized by Mr. Roman in support of Safe
10   Home's counterclaim here.
11           THE COURT:  Very brief rebuttal on this point.
12           MR. LIPARI:  So, Your Honor, again, there is no
13   evidence before the Court about what Mr. Roman did or did not
14   do.  We disagree with his characterization of Mr. Roman's
15   methodology, understanding that Mr. Roman is our president, who
16   put forth calculations in support of our claims against ADT.
17           But Your Honor, I mean, I can speak in generalities
18   about how I disagree and he can speak in generalities about
19   what he thinks about Mr. Roman's methodology, but none of that
20   is before the Court, Your Honor.
21           What is before the Court is as follows:  Mr. Ducey
22   (phonetic), in his report and as we have set forth, indicated
23   that at a minimum, what should have been reviewed by Mr. Urban
24   in forming his opinion in order to enable an accurate
25   calculation of the value of accounts were as follows, and it
```

```
 1    was this litany of things.

 2            He conceded that he didn't review them, this is not

 3    the methodology that has been accepted by Court after Court,

 4    it's not.  He applied this ad hoc methodology based upon

 5    information fed to him by ADT, which he can't even speak to.

 6    He couldn't even provide a cogent explanation about some of the

 7    information in the chart that he relied on, simply saying, Oh,

 8    well, Brandt did that; Oh, Ken Pope put that together, he

 9    figured out what to put in there; and then he didn't consider

10    these issues that our expert, who is a certified valuation

11    expert and a CPA, indicated he must in order to come up with a

12    reliable estimation of compensatory damages here.

13            THE COURT:  All right.  Let's move on to Mr. Taylor,

14    the final expert, I believe, in dispute at this time.

15            Mr. Lipari.

16            MR. LIPARI:  Yes, Your Honor.

17            We have multiple basis to exclude Dr. Taylor.  The

18    first is the so-called tip of the iceberg opinion, and this is

19    essentially a multiplier.  I want to be very clear about

20    something because, you know, I don't want to be in a position

21    where ADT reframes our argument.

22            We acknowledge and admit that sometimes the number of

23    unhappy customers exceeds the number of customers who have

24    complained, all right.  We are not attacking that concept, it

25    is a concept, it is accepted, it is fine.
```

1          What we are attacking is the fact that taking that

2    concept, Mr. Taylor points generally to studies, all right, not

3    specifically, he just says, Hey, there are studies out there

4    about this issue and then says, I have come up with my own

5    multiplier and it is 7 to 25 time multiplier, 7 to 25 time

6    multiplier.  So the question was, Well, where in the studies

7    can you point to justify that particular multiplier?

8          Your Honor, we give him every opportunity to do it

9    and he could not do it, and it is because it is not there, Your

10   Honor.  He conjured it out of thin air.  Just because he can

11   point generally to studies that support this general concept

12   doesn't mean that he has met his burden to show that his 7 to

13   25 multiplier is in any way reliable and should make its way to

14   a jury.

15         Aside from the fact that he conjured it out of thin

16   air, the fact that the band is so wide, right, 7 to 25 times, I

17   mean, that is an enormous range, right, that's his multiplier,

18   it is not based on anything, and then he is going to put that

19   in front of the jury, what does it even mean?  If it could even

20   be supported, which it can't, what does it even mean; that they

21   should multiply times 7, times 8, times 9, all the way up to

22   25?

23         Another thing he did, he initially stated that in

24   making a determination about the number of -- about the

25   discrepancy between the number of unhappy customers versus the

1   complaining customers, one thing that's very important to note

2   is price, price is essential.  It dictates whether or not you

3   are going to complain.  If it's like a .50 cent charge, right,

4   there was some sort of charge you didn't see, now you are

5   charged .50 cents, all right, you do a cost benefit analysis,

6   okay, I got ripped off, but it's .50 cents, I'm not going to

7   complain, it is going to take too much time.  If it's a

8   recurring monthly $40 charge, right, for five years, your

9   incentive to complain is going to be much, much greater.

10          Initially, he acknowledged that that was the case,

11  but then he disavowed it once it became apparent during the

12  deposition that he had only a general sense of the price points

13  here.  He didn't review contracts, and he couldn't speak to

14  price points.

15          So Your Honor, his tip of the iceberg opinion is -- I

16  mean, it's just pure speculation, it's conjured out of thin

17  air, and frankly, Your Honor, I think it would be insulting to

18  a jury for Dr. Taylor to say, Well, I'm a doctor, I have a

19  Ph.D. in marketing from this university, and here's my

20  multiplier, here are the studies, I have a Ph.D., here is my

21  multiplier, but he is not connecting any of those things, and

22  it is a huge analytical gap and his exclusion -- or at least,

23  you know, striking that particular opinion, right, limiting his

24  opinion is --

25          THE COURT:  Why can't you just challenge this on

 1  cross-examination through the traditional methods of testing

 2  such evidence?

 3          MR. LIPARI:  Well, Your Honor, it should never get to

 4  a jury because he simply made it up, and I think in accordance

 5  with the gatekeeping role, when an expert -- there is no --

 6  here's the thing:  It is not based on testing, there is no

 7  known error rate, this is -- you know, he purports to do this

 8  with mathematical precision and yet it is based on nothing.

 9          When that happens, there is a real danger of

10  confusing the jury, when it purports to be mathematically

11  precise and it is conjured out of nothing, that's, I think,

12  when the Court really needs to exercise its gatekeeping role to

13  keep that kind of opinion away from a jury.

14          THE COURT:  All right.  Mr. Scott, so the argument is

15  the expert's testimony is based on nothing, how do you respond?

16          MR. SCOTT:  I would disagree with that.

17          THE COURT:  Or that it's pure speculation, conjured

18  up.

19          MR. SCOTT:  I, again, disagree with that, Your Honor.

20  I think what I'm hearing from Mr. Lipari is -- again, there is

21  no dispute that the -- and I apologize, I don't know if I'm

22  getting bad feedback for you.

23          THE COURT:  It is okay now, I think.

24          MR. SCOTT:  I'll try and stay away from the

25  microphone.

Monday, April 4th, 2022

1        THE COURT:  What is it based on, let's start there?

2        MR. SCOTT:  Sure.  As Dr. Taylor testified to, what

3    he did was he took the TARP studies, those studies were done,

4    various consumer surveys of consumers that had been aggrieved

5    and the complaints associated with that in finding the

6    difference between those that necessarily had been aggrieved in

7    a various industry and those that complained, right, and it is

8    a whole host of studies that comprise a whole host of

9    industries across the board.

10        He reviewed -- and he reviewed those studies and

11    utilizing the information in those studies and the various

12    industries associated -- I don't believe that there were any

13    specific to what we are looking at here, which is the alarm

14    services industry -- he determined that, one, which I don't

15    think there is a dispute, not every customer complains, right.

16    So the customers that are complaining, in this instance

17    complaining to ADT are just the tip of the iceberg.

18        And then, two, based upon his review and analysis of

19    those studies, but also other studies that he referenced in his

20    report, the numbers, the range of customers that are not

21    complaining would be between 7 and 25, right.

22        So if you want to put it a different way, you have a

23    complaining percentage of between 4 percent of customers

24    complained to up to 14 percent of customers complaining.

25        And the issue with regard to conjuring out of thin

```
 1    air or not being based on anything is simply not true.  I think
 2    Judge Middlebrooks, in analyzing a similar opinion as it
 3    relates to whether or not a multiplier can be applied, was able
 4    to take judicial notice of the fact that others in the alarm
 5    services industry have determined that 4 percent of customers
 6    will complain, it was the ADT v. Vivint case.  Judge Rosenberg,
 7    in analyzing whether or not it would be proper to present this
 8    tip of the iceberg testimony to a jury, makes the conclusion
 9    that if there is a dispute as it relates to the multiplier
10    itself, right, not the theory that not all customers complain,
11    but the specifics of what is that multiplier, that's handled on
12    cross-examination.
13          THE COURT:  But it does seem like a pretty wide
14    range.  Are you saying that these studies that were relied
15    upon, none actually concern this industry?
16          MR. SCOTT:  I do not believe any are specific to the
17    alarm industry, which is why he is having to review the whole
18    host of studies, right.  So the methodology that was utilized
19    and the studies that were performed -- again, I think it is
20    long-ranging wide studies over a period of years that was done
21    by the TARP Institute, we asked Dr. Till, who is the rebuttal
22    exert here, Look, do you have any issue with these studies?
23          No, they're peer reviewed, they're well supported,
24    there is no issue he takes with the studies themselves.  In
25    fact, he would more or less concede they are authoritative, so
```

 1    the review of those studies to be able to come up with an

 2    analogous multiplier for this particular context, right, this

 3    particular industry as to what percentage of customers would

 4    complain is what Dr. Taylor did in this instance.

 5          So he is reviewing the type of industry involved, is

 6    there a similarity, he is reviewing the cost associated with

 7    the issues, right.  And I know that Mr. Lipari had issue with,

 8    you know, his consideration of cost, and I can briefly address

 9    that in just a second, but he is also reviewing the duration,

10    right, the time period associated with the customer

11    relationship with the company.

12          All of these factors are going into his analysis and

13    consideration and then he, based upon his expertise and also

14    his review of this information and his experience in kind of

15    handling these types and other types of surveys in the past,

16    comes up with this multiplier.  Again, it is a broad multiplier

17    because there is so many different components that could go

18    into it, but I think it is something that the jury can be

19    presented with in being able to make their calculation.

20          THE COURT:  In those cases that you cite, Judge

21    Rosenberg's case and Judge Middlebrooks', did they permit the

22    use of an expert who had a range this wide or was it just the

23    4 percent that was considered to be reliable?

24          MR. SCOTT:  So in the case with Judge Middlebrooks,

25    the expert did not testify because there was the judicial --

```
 1    it's not judicial admission, but there was the judicial notice

 2    of the Defendant in that case, Vivint, had already put out

 3    information that says 4 percent of customers complained, so

 4    there was no need to present to the jury this expert testimony

 5    as it relates to a range based upon what we have here.

 6          In this instance, I don't think Safe Home is going to

 7    concede that there is a particular percentage of customers that

 8    will or will not complain, so we utilize the expert to provide,

 9    based upon his analysis of those individual studies, what the

10    range can be.

11          THE COURT:  So you're saying -- so the discrete

12    testimony that is being objected to is exactly what this expert

13    is saying, quote, "The number of customers complaining that we

14    know of is just the tip of the iceberg, really it could be as

15    great as 14 percent"?

16          I just want to understand, exactly what is the scope

17    of the testimony that is allegedly problematic?

18          MR. SCOTT:  From what I understand, it is the -- it's

19    the range.  It is the 7 -- I'm sorry, yeah, 7 to 25 that is put

20    in his report.  That is ultimately what I think Mr. Lipari has

21    an issue with, and I think our position is that's sufficient to

22    attack on cross-examination because there is no dispute that's

23    the tip of the iceberg, right, that there will be more

24    customers that will complain than will not complain is

25    something that is not in dispute.
```

```
1              THE COURT:  And 7 to 25 is coming from a compilation

2    of various studies in other industries that generally comment

3    on how bad it must get, I guess, for a customer to really

4    complain?

5              MR. SCOTT:  Not necessarily generally comment on.  I

6    think they are doing specific surveys of customers in those

7    various industries covering a long period of time.

8              THE COURT:  Okay, all right.  So it is like rates of

9    customer complaints?

10             MR. SCOTT:  In effect, Your Honor, yes, the number of

11   customers that are affected versus those that are affirmatively

12   reaching out to the company to complain.

13             THE COURT:  Okay.  All right, thank you.

14             Final rebuttal on this, then we are going to recess.

15             MR. LIPARI:  Your Honor, just a point of

16   clarification.  So this is only -- if you only want to hear my

17   tip of the iceberg attack on Taylor, that's fine, but there are

18   other points.  Do you want to hear those or just focus on the

19   tip of the iceberg?

20             THE COURT:  Well, what are your other general

21   criticisms?

22             MR. LIPARI:  Sure.  The other general criticisms are

23   that Taylor's opinions about deception and confusion are based

24   on his subjective credibility determinations; that Taylor's

25   opinions about deception and confusion are within the scope of
```

1    the ordinary knowledge of the jury, and therefore, Taylor

2    doesn't need -- as a Ph.D. in marketing doesn't need to provide

3    the jury with his opinion about whether or not an interaction

4    with a customer was deceptive.

5          The other one is his brand equity opinion is based on

6    one thing; a Harris poll.  It is inadmissible hearsay, it was

7    prepared by somebody else.  He just held it up and said, Here

8    you go, here's my brand equity opinion and it was given to me

9    by ADT's Counsel.

10         Finally, his negative or electronic negative word of

11   mouth opinion, it is completely undeveloped, and it is based on

12   nothing.  He said he looked at BBB complaints online, but he

13   didn't no when, what, et cetera, and he even acknowledged that

14   he didn't do much analysis because he wasn't asked to, so those

15   are all of the other points.

16         But getting back to tip of the iceberg, Your Honor,

17   so these studies are -- I mean, and I think our expert Till

18   pointed out, he mentioned that these studies are decades old,

19   too, so this was before people could complain via email, people

20   could complain via online portal and chatroom, what have you.

21   These are antiquated studies.

22         And when I asked him, you know, Dr. Taylor, where did

23   the 7 come from, can you just give me -- just point to

24   something, where did the 7 come from?

25         Because I'm an expert, it is because I say so.  And

```
 1   Your Honor, this is so dangerous because they are using this
 2   multiplier to inflate damages.  You know, essentially they are
 3   saying, Well, there is 100 we know about, but, you know, you
 4   can multiply that by 7 all the way up to 25, it is your choice,
 5   so it is dangerous.
 6           And Your Honor, it would -- again, I think it would
 7   be well within the Court's gatekeeping role to exclude this
 8   type of testimony.
 9           THE COURT:  All right, thank you.  I'm going to take
10   a much closer look at all of the pertinent expert testimony and
11   make a determination, so I'm going to take both motions under
12   advisement and enter an order in due course.
13           I do note the parties are set to attend a settlement
14   conference at the end of this month, is that correct,
15   Mr. Scott?
16           MR. SCOTT:  Yes, Your Honor.
17           THE COURT:  And in terms of mediation, has that
18   already been conducted?
19           MR. LIPARI:  Yes.
20           MR. SCOTT:  We did.
21           MR. LIPARI:  Yes, we had a mandatory mediation at the
22   outset of the case with Jeff Grubman.
23           THE COURT:  All right.  Okay, excellent.
24           Well, thank you all for your assistance this morning.
25   There is a lot to consider, and that's all I have, so thank you
```

Monday, April 4th, 2022

1    all.  We are in recess.

2              MR. LIPARI:  Thank you, Your Honor.

3              MR. SCOTT:  Thank you, Your Honor.

4         (PROCEEDINGS ADJOURNED AT 10:26 A.M.)

5

6                    * * * * * * * * * *

7

8                    **C-E-R-T-I-F-I-C-A-T-E**

9              I hereby certify that the foregoing is

10        an accurate transcription and proceedings in the

11        above-entitled matter.

12

     **_5/4/2022_**                    **_/s/DIANE MILLER_**
13    DATE                      DIANE MILLER, RMR, CRR, CRC
                                Official Court Reporter
14                              United States District Court
                                101 South U.S. Highway 1
15                              Fort Pierce, FL  34950
                                772-467-2337
16

17

18

19

20

21

22

23

24

25

                         Monday, April 4th, 2022

**MR. LIPARI: [32]** 3/11
3/20 4/1 5/22 6/15 7/3
7/7 7/12 7/21 8/17 17/16
17/22 19/10 20/15 20/17
20/25 21/3 26/14 28/1
28/3 28/11 37/20 39/8
44/16 51/12 52/16 55/3
60/15 60/22 62/19 62/21
63/2
**MR. SCOTT: [46]** 3/7
9/11 10/9 10/25 11/24
12/14 12/25 13/11 14/13
14/18 14/21 15/19 16/11
16/20 23/13 23/17 23/25
32/15 35/13 35/18 36/1
36/18 37/2 40/15 40/19
43/7 44/4 44/8 47/6 49/1
49/23 50/4 50/6 51/6
55/16 55/19 55/24 56/2
57/16 58/24 59/18 60/5
60/10 62/16 62/20 63/3
**MS. McLOONE: [1]**
3/9
**THE COURT: [76]**
**THE COURTROOM**
**DEPUTY: [1]** 3/3

**$**

**$1,700 [1]** 47/25
**$2,000 [1]** 47/21
**$40 [1]** 54/8
**$50 [2]** 47/23 49/4

**.**

**.50 [3]** 54/3 54/5 54/6

**/**

**/s/DIANE [1]** 63/12

**1**

**100 [1]** 62/3
**10016 [1]** 2/9
**101 [2]** 2/24 63/14
**10:26 [1]** 63/4
**12 [1]** 43/9
**122 [2]** 3/17 3/19
**131-1 [4]** 10/6 14/11
16/19 16/20
**14 [1]** 37/4
**14 percent [2]** 56/24
59/15
**15 percent [2]** 46/16
46/25
**17 [1]** 45/10
**18 [2]** 37/4 45/10
**1800 [1]** 2/9
**1999 [1]** 26/17

**2**

**20-cv-23918 [1]** 1/3
**20-cv-23918-Cannon [1]**
3/4
**2001 [1]** 48/13
**201 [2]** 2/5
**2014 [4]** 24/18 25/22

26/2 43/24
**2015 [5]** 32/16 33/4
33/22 34/12 35/4
**2016 [6]** 10/8 32/16 33/4
33/22 35/4 37/10
**2017 [8]** 7/8 7/9 28/25
36/8 37/10 37/11 40/21
51/7
**2020 [1]** 35/5
**2021 [1]** 10/8
**2022 [2]** 1/6 63/12
**213 [1]** 37/4
**22 percent [1]** 41/14
**2212541 [1]** 40/21
**2337 [2]** 2/25 63/15
**23918 [1]** 1/3
**25 [9]** 53/5 53/5 53/13
53/16 53/22 56/21 59/19
60/1 62/4
**253 [1]** 48/13
**2555 [1]** 2/3
**26 [7]** 4/6 5/7 5/12 5/15
17/2 18/7 39/17
**270 [1]** 2/9
**2nd [1]** 8/22

**3**

**3200 [1]** 2/5
**33131 [1]** 2/5
**34950 [2]** 2/24 63/15
**37 [6]** 5/1 5/3 5/5 5/5 6/1
19/8

**4**

**4 percent [4]** 56/23 57/5
58/23 59/3
**40 [1]** 47/18
**400 [1]** 33/6
**42 [2]** 47/16 47/18
**45 [3]** 47/17 47/24 49/11
**467-2337 [1]** 2/25
**4TH [1]** 1/6

**5**

**5/4/2022 [1]** 63/12

**6**

**60711 [1]** 7/8
**641 [1]** 48/13
**64108 [1]** 2/3

**7**

**74 [1]** 1/8
**772 [1]** 2/25
**772-467-2337 [1]** 63/15

**9**

**9:41 [1]** 42/20
**9:54 [1]** 42/21

**A**

**a.m [3]** 42/20 42/21 63/4
**ability [1]** 15/22
**able [14]** 14/1 15/25
25/5 25/8 26/25 32/20
33/17 42/2 48/17 49/13
50/7 57/3 58/1 58/19

**about [53]** 4/23 6/12
7/18 8/8 11/3 13/8 14/21
14/22 14/25 16/14 18/8
18/20 19/5 20/12 21/21
22/22 24/6 24/24 25/19
29/22 29/24 31/4 31/14
32/8 35/7 36/11 36/13
38/3 38/14 39/10 42/4
42/15 44/21 45/1 45/19
46/11 46/16 46/20 48/1
48/15 51/13 51/18 51/18
51/19 52/6 52/19 53/4
53/24 53/24 60/23 60/25
61/3 62/3
**above [1]** 63/11
**above-entitled [1]** 63/11
**absolutely [1]** 29/13
**abstract [2]** 30/6 30/22
**accept [3]** 23/1 39/13
41/20
**accepted [6]** 35/21 35/23
38/20 39/7 52/3 52/25
**access [1]** 45/3
**accordance [1]** 55/4
**account [7]** 22/14 22/25
47/11 47/15 47/21 47/23
47/25
**accounts [10]** 16/13
16/14 27/8 27/10 27/21
47/7 47/19 49/3 50/16
51/25
**accurate [2]** 51/24 63/10
**acknowledge [4]** 29/2
35/11 36/21 52/22
**acknowledged [2]** 54/10
61/13
**acknowledging [2]**
35/17 37/5
**across [1]** 56/9
**Act [6]** 11/25 12/17
12/18 15/24 23/20 32/17
**action [4]** 24/18 25/3
25/21 32/9
**actions [2]** 18/14 27/9
**actor [1]** 13/20
**acts [2]** 9/18 13/20
**actual [1]** 10/5
**actually [13]** 5/20 6/13
8/18 9/10 9/12 11/17
12/7 17/11 18/3 35/24
43/24 47/8 57/15
**ad [2]** 12/12 52/4
**Adams [1]** 2/23
**addiction [1]** 10/21
**addition [3]** 9/25 31/24
43/22
**additional [6]** 15/7
16/11 24/23 24/24 25/20
42/3
**address [3]** 3/23 23/18
58/8
**adds [1]** 46/22
**adequate [1]** 7/20
**adhere [1]** 30/24
**ADJOURNED [1]** 63/4
**adjustments [5]** 31/2

39/3 39/19 39/20 42/7
**admissibility [3]** 48/19
50/11 50/25
**admissible [2]** 11/13
26/19
**admission [1]** 59/1
**admit [1]** 52/22
**Admittedly [1]** 8/9
**adopted [1]** 44/20
**adopting [1]** 46/1
**ADT [82]**
**ADT's [14]** 11/1 14/14
15/8 21/6 33/1 33/18
34/16 35/1 37/13 38/11
38/22 41/9 41/22 61/9
**advertising [7]** 6/25 9/5
11/5 19/19 20/1 20/5
20/7
**advisement [1]** 62/12
**affect [1]** 37/14
**affected [6]** 15/3 16/16
47/7 47/19 49/3 60/11
**affidavit [5]** 4/22 5/2
26/7 30/17 30/17
**affiliated [1]** 15/11
**affirmatively [1]** 60/11
**afford [2]** 48/19 50/25
**after [10]** 8/21 8/22 8/22
9/18 10/14 10/19 20/14
24/22 24/22 52/3
**again [21]** 5/23 8/14
13/11 18/16 20/4 21/18
27/13 30/21 32/6 34/24
37/8 38/2 38/23 50/24
51/8 51/12 55/19 55/20
57/19 58/16 62/6
**against [8]** 11/22 17/2
21/13 22/1 25/21 32/17
34/7 51/16
**agent [1]** 21/15
**aggrieved [2]** 56/4 56/6
**agree [2]** 12/5 38/24
**AILEEN [1]** 1/19
**air [4]** 53/10 53/16
54/17 57/11
**akin [2]** 8/5 24/4 27/3
**al [4]** 1/4 1/7 1/10 1/13
**alarm [9]** 33/1 33/9
40/20 42/13 49/12 50/15
56/13 57/4 57/17
**all [54]** 3/15 3/21 5/1
5/25 6/8 8/5 8/14 8/25
9/8 10/6 12/7 14/10
17/14 18/5 21/1 23/4
23/9 25/16 26/6 26/11
28/5 28/6 30/12 30/18
31/3 32/12 37/18 39/4
40/11 42/17 42/23 44/10
44/19 47/3 48/8 51/1
52/13 52/24 53/2 53/21
54/5 55/14 57/10 58/12
60/8 60/13 61/15 62/4
62/9 62/10 62/23 62/24
62/25 63/1
**allegedly [2]** 30/18
59/17

**allow [1]** 42/11
**allowed [1]** 5/8
**allowing [1]** 24/16
**alluding [1]** 19/21
**along [1]** 3/8
**already [11]** 22/24 24/1
33/6 33/17 34/22 37/16
41/19 42/9 46/23 59/2
62/18
**also [12]** 3/18 10/14
15/20 30/8 34/8 36/9
41/23 43/15 50/14 56/19
58/9 58/13
**Although [1]** 12/5
**Alto [1]** 2/23
**altogether [1]** 28/10
**amount [6]** 4/21 5/17
12/11 14/7 15/17 41/11
**amounts [1]** 46/18
**analogous [1]** 58/2
**analysis [35]** 6/17 6/18
13/3 13/15 16/1 16/15
16/16 20/10 30/3 30/10
30/19 33/20 33/21 34/3
34/11 34/14 35/4 35/5
35/15 37/15 38/3 41/8
44/18 45/5 47/8 47/9
47/17 48/5 48/15 48/16
54/5 56/18 58/12 59/9
61/14
**analytical [4]** 38/25 46/9
46/13 54/22
**analyze [1]** 44/1
**analyzed [1]** 41/1
**analyzes [1]** 47/22
**analyzing [2]** 57/2 57/7
**another [11]** 6/3 16/7
22/12 29/1 32/24 32/24
32/25 34/6 40/8 42/12
53/23
**answer [2]** 38/2 45/1
**answering [1]** 37/23
**answers [1]** 30/1
**antiquated [1]** 61/21
**any [24]** 4/11 12/22
13/17 15/12 15/16 15/21
18/25 23/4 24/18 24/23
25/3 27/22 30/24 30/25
35/12 39/2 39/13 39/19
48/18 53/13 54/21 56/12
57/16 57/22
**anybody [1]** 25/10
**anymore [2]** 15/4 23/3
**anything [7]** 11/23
18/19 37/19 37/25 38/13
53/18 57/1
**Apologies [1]** 40/19
**apologize [2]** 23/14
23/25 43/7 50/4 55/21
**apparent [2]** 37/22
54/11
**apparently [2]** 30/23
31/25
**appearance [1]** 3/5
**APPEARANCES [1]**
2/1

ADT LLC, Et al. vs SAFE HOME SECURITY, INC.

**A**

appears [4] 9/3 9/8 22/19 50/18
applicable [1] 24/10
applied [2] 52/4 57/3
apply [4] 33/12 39/23 39/24 40/2
applying [1] 13/5
approach [2] 38/25 48/4
approached [1] 21/20
appropriate [1] 43/12
approximating [1] 11/23
approximation [1] 19/24
APRIL [1] 1/6
APT [7] 34/9 36/8 37/10 43/15 44/5 44/8 51/8
are [121]
argue [3] 27/2 31/12 46/6
argues [1] 44/13
arguing [2] 40/6 46/8
argument [11] 3/15 4/5 19/14 25/9 28/9 28/12 39/6 42/19 49/21 52/21 55/14
arguments [2] 28/11 44/17
Arizona's [1] 19/18
as [88]
ascertain [1] 12/11
aside [3] 16/9 19/11 53/15
ask [5] 3/22 15/16 16/7 23/23 46/4
asked [12] 18/10 23/25 29/12 29/14 29/16 29/22 29/24 31/4 40/5 57/21 61/14 61/22
aspect [1] 8/15
asserted [2] 4/2 25/25
assistance [1] 62/24
assisted [1] 37/25
associated [7] 16/17 17/5 49/13 56/5 56/12 58/6 58/10
Assuming [1] 16/7
assumption [1] 5/14
attack [5] 50/9 50/20 50/22 59/22 60/17
attacking [1] 31/14 52/24 53/1
attempt [1] 13/9
attempting [1] 36/25
attend [1] 62/13
attention [2] 28/18 32/7
Attorney [3] 22/2 25/20 26/7
attributable [1] 6/20
authoritative [2] 19/12 57/25
authority [6] 6/24 12/22 13/7 43/1 43/10 43/13
authorized [7] 33/7 33/19 33/24 34/17 35/1

**B**

B-R-A-N-D-T [1] 14/18
back [12] 12/10 13/12 15/23 17/14 24/18 25/22 26/2 32/16 42/5 43/23 44/10 61/16
Bacon [2] 2/2 2/4
bad [3] 9/18 55/22 60/3
band [1] 53/16
bare [1] 45/20
Barnes' [1] 49/7
based [25] 4/10 5/14 7/25 8/11 13/19 14/2 14/2 34/2 45/22 49/6 50/14 52/4 53/18 55/6 55/8 55/15 56/1 56/18 57/1 58/13 59/5 59/9 60/23 61/5 61/11
basic [1] 45/1
basing [1] 32/2
basis [4] 4/18 36/24 44/19 52/17
bastardized [1] 39/15
BBB [1] 61/12
be [84]
became [1] 54/11
because [39] 4/17 6/2 6/6 7/15 13/5 15/8 18/7 18/23 19/7 23/2 26/5 28/16 28/25 31/15 32/22 33/13 34/14 34/21 34/22 34/23 37/12 38/21 39/15 40/2 41/24 44/14 48/3 50/22 52/20 53/9 53/10 55/4 58/17 58/25 59/22 61/14 61/25 61/25 62/1
been [25] 9/5 19/24 20/8 23/18 26/1 27/5 27/5 27/12 29/13 32/9 33/21 33/23 33/23 33/24 35/21 35/24 38/19 38/20 45/18 51/6 51/23 52/3 56/4 56/6 62/18
before [13] 1/19 16/24 20/18 23/14 25/15 29/22 38/12 38/17 42/23 51/13 51/20 51/21 61/19
began [2] 29/19 32/17
begs [1] 30/13
behalf [4] 3/8 3/12 43/19 48/5
being [9] 20/21 24/4 25/5 25/12 28/7 32/20 57/1 58/19 59/12

**C**

C-E-R-T-I-F-I-C-A-T-E [1] 63/8
calculated [2] 4/8 18/12
calculating [1] 42/15
calculation [10] 5/15 11/7 33/12 33/14 35/24 36/12 36/17 40/12 51/25 58/19

belabor [1] 26/14
believe [20] 3/18 12/16 13/11 14/3 15/24 20/14 20/18 23/15 25/7 29/12 35/13 36/2 36/24 37/2 39/11 43/9 48/11 52/14 56/12 57/16
benefit [2] 23/24 54/5
beside [2] 26/24 27/15
best [4] 6/24 12/25 13/7 43/1
bets [1] 39/22
better [1] 17/20
between [5] 46/9 53/25 56/6 56/21 56/23
biggest [1] 50/19
Biscayne [1] 2/5
bit [3] 6/10 22/17 23/24
bizarre [1] 38/21
board [1] 56/9
bolsters [1] 19/14
bordering [1] 31/19
both [5] 3/22 35/14 38/24 50/17 62/11
Boulevard [2] 2/3 2/5
Brad [1] 22/8
brand [23] 4/21 6/6 6/8 6/23 7/16 9/20 9/25 10/12 10/13 10/17 11/5 13/24 13/25 15/8 32/24 33/1 34/4 34/16 41/13 41/21 42/2 61/5 61/8
Brandt [5] 4/22 14/13 14/19 45/5 52/8
break [1] 42/18
brief [7] 6/2 8/18 28/16 28/22 29/11 44/21 51/11
briefing [1] 51/2
briefly [4] 10/9 26/12 43/8 58/8
bringing [2] 32/7 44/2
broad [1] 58/16
broken [1] 13/12
Bront [1] 14/16
brought [1] 28/17
brutally [1] 37/22
budgeted [1] 45/15
build [5] 9/24 10/12 10/17 11/4 13/23
building [4] 9/17 9/20 37/16 46/21
bunch [1] 21/16
burden [3] 5/4 6/2 53/12
Business [1] 46/3
buy [1] 41/18
buyer [1] 46/24

calculations [2] 31/10 51/16
called [5] 14/24 30/14 39/19 39/23 52/18
Calling [1] 3/3
came [5] 10/14 10/21 31/7 39/4 45/3
can [34] 3/4 6/10 8/6 8/20 11/13 13/2 13/16 13/22 14/4 17/15 20/17 22/8 24/20 28/20 29/10 34/1 35/22 38/19 42/15 43/8 44/6 48/19 50/9 50/24 51/17 51/18 53/7 53/10 57/3 58/8 58/18 59/10 61/23 62/4
can't [9] 20/5 31/25 37/24 46/9 46/10 50/22 52/5 53/20 54/25
cancel [1] 15/4
CANNON [2] 1/19 3/4
cannot [2] 6/1 26/18
Capital [5] 6/3 7/4 34/10 36/7 37/9
cart [1] 25/14
case [60] 1/3 3/3 6/3 6/4 6/4 7/4 7/10 7/19 9/13 9/14 9/15 11/11 12/21 12/25 13/4 13/6 14/8 15/21 16/9 19/6 19/7 19/25 20/22 21/8 21/12 24/5 24/6 24/7 26/15 26/16 27/3 28/24 28/25 31/22 34/6 34/6 34/9 35/6 36/6 37/10 37/10 37/11 38/1 39/15 43/2 46/4 46/4 46/19 48/10 48/12 48/13 48/13 48/14 51/8 54/10 57/6 58/21 58/24 59/2 62/22
cases [23] 11/25 12/17 21/7 21/13 21/17 23/19 24/2 24/10 27/1 27/4 27/6 27/17 27/23 28/21 28/23 29/3 29/8 35/23 39/9 43/16 44/1 45/24 58/20
casually [1] 18/2
categories [2] 4/12 16/8
categorize [1] 4/11
category [1] 16/4
cent [1] 54/3
center [1] 45/14
cents [2] 54/5 54/6
certain [3] 34/1 45/12 46/11
certainly [3] 18/24 19/3 20/21
certified [1] 52/10
certify [1] 63/9
cetera [3] 28/15 45/16 61/13
chain [2] 22/18 24/19
challenge [1] 54/25
challenged [1] 28/8
challenging [1] 49/24

chance [1] 49/9
change [3] 33/23 34/17 34/19
changed [4] 34/25 35/3 37/13 38/16
changes [1] 33/25
characterization [1] 51/14
charge [6] 33/8 42/12 42/12 54/3 54/4 54/8
charged [1] 54/5
charges [2] 41/12 42/1
charging [1] 34/3
chart [1] 52/7
chatroom [1] 61/20
check [1] 20/17
Chems [1] 46/4
chief [1] 9/22
choice [1] 62/4
Circuit [11] 7/18 9/13 11/10 12/1 14/8 26/16 26/17 43/11 46/5 48/10 48/14
circumstances [1] 13/6
citation [3] 7/6 37/3 40/21
cite [4] 26/15 45/25 48/12 58/20
cited [12] 21/7 21/11 22/10 23/19 26/15 27/1 28/21 28/23 30/13 36/7 45/24 48/11
City [2] 2/3 46/3
claim [7] 7/14 21/6 21/22 48/23
claimed [1] 16/4
claims [5] 10/2 17/9 18/3 44/2 51/16
clarification [1] 60/16
clear [4] 9/15 22/24 46/20 52/19
client [4] 13/9 17/19 22/1 22/13
client's [1] 22/7
close [1] 10/19
closed [2] 16/24 23/15
closely [1] 44/11
closer [3] 44/6 44/7 62/10
cobble [1] 7/25
cogent [2] 52/6
cogently [1] 31/6
coherently [1] 31/6
collaborating [1] 36/21
collaboration [3] 35/12 36/25 38/15
collaborative [1] 35/17
collect [1] 26/3
collected [1] 50/12
come [13] 8/4 8/10 10/3 13/2 19/23 27/6 40/1 49/16 52/11 53/4 58/1 61/23 61/24
comes [4] 11/25 28/19 49/6 58/16
coming [3] 15/23 49/11

**C**

**coming... [1]** 60/1
**comment [2]** 60/2 60/5
**committing [1]** 32/18
**common [3]** 43/4 44/2 49/12
**companies [3]** 32/18 41/15 41/24
**company [11]** 13/19 17/24 24/22 27/7 32/24 42/4 42/12 43/22 49/16 58/11 60/12
**company's [1]** 12/1
**comparative [5]** 6/17 6/18 13/15 30/2 30/19
**compensate [1]** 46/24
**compensated [1]** 41/7
**compensatory [3]** 4/4 32/20 52/12
**competition [3]** 23/20 24/8 44/3
**competitor [2]** 14/25 34/8
**competitors [2]** 11/18 15/10
**compilation [1]** 60/1
**compile [1]** 49/13
**complain [14]** 14/25 54/3 54/7 54/9 57/6 57/10 58/4 59/8 59/24 59/24 60/4 60/12 61/19 61/20
**complained [4]** 52/24 56/7 56/24 59/3
**complaining [7]** 54/1 56/16 56/17 56/21 56/23 56/24 59/13
**complains [1]** 56/15
**complaint [3]** 22/22 48/7 50/19
**complaints [12]** 4/23 10/3 22/5 22/11 22/14 22/18 24/23 24/24 26/4 56/5 60/9 61/12
**completely [3]** 22/22 32/5 61/11
**complex [1]** 48/1
**component [3]** 6/9 20/7 32/14
**components [1]** 58/17
**comprise [1]** 56/8
**compromised [1]** 29/5
**computation [11]** 5/21 8/10 9/3 11/23 12/4 12/15 14/21 15/22 15/25 16/4 17/4
**compute [2]** 12/11 13/13
**computed [1]** 4/9
**Computer [1]** 46/4
**computing [2]** 14/20 20/24
**Cona [10]** 4/10 9/23 10/21 10/23 10/25 12/9 14/12 15/19 18/6 18/7
**Cona's [1]** 10/15
**concealment [1]** 35/7

**concede [2]** 57/25 59/7
**conceded [1]** 52/2
**concedes [1]** 45/11
**concept [4]** 52/24 52/25 53/2 53/11
**concern [1]** 57/15
**concerns [1]** 25/23
**conclusion [3]** 50/22 50/23 57/8
**conclusions [1]** 34/16
**conduct [18]** 6/21 13/25 14/2 14/15 15/23 21/19 24/4 24/7 24/15 25/4 25/19 25/22 30/14 43/18 43/22 43/23 43/24 47/8
**conducted [1]** 62/18
**conference [1]** 62/14
**confident [1]** 16/23
**confirm [1]** 48/8
**confirmed [1]** 50/13
**confirming [1]** 34/24
**confronted [3]** 29/18 29/23 29/25
**confused [2]** 20/12 31/14
**confusing [1]** 55/10
**confusion [2]** 60/23 60/25
**conjunction [11]** 9/21 10/20 11/10 14/14 16/20 32/20 33/19 34/8 35/5 36/5 49/11
**conjured [5]** 53/10 53/15 54/16 55/11 55/17
**conjuring [1]** 56/25
**Connect [5]** 6/3 7/5 34/10 36/7 37/10
**Connecticut [2]** 17/24 22/2
**connecting [1]** 54/21
**connection [1]** 4/21
**consent [2]** 26/3 43/25
**consequential [2]** 16/12 17/9
**consider [11]** 9/16 19/18 20/1 26/18 39/17 40/9 45/9 45/10 45/13 52/9 62/25
**consideration [3]** 20/2 58/8 58/13
**considerations [1]** 42/3
**considered [5]** 27/5 45/12 46/12 49/21 58/23
**consistent [3]** 33/25 41/14
**constitute [1]** 27/13
**constitutes [1]** 26/24
**consumer [2]** 21/23 56/4
**consumers [1]** 21/24 56/4
**contained [1]** 37/12
**contempt [3]** 22/1 22/3 26/5
**contention [3]** 4/3 18/23 21/5
**context [1]** 58/2

**continue [1]** 24/16
**continuing [1]** 6/22
**contract [1]** 40/25
**contracts [2]** 33/7 54/13
**contractual [5]** 33/6 33/18 41/9 41/19 42/10
**contrary [1]** 43/25
**contributed [1]** 38/4
**controlling [2]** 24/11 48/10
**copied [1]** 30/4
**corporate [3]** 15/16 22/21 27/17
**corporation's [1]** 21/14
**corporations [1]** 21/13
**correct [4]** 3/19 20/25 28/2 62/14
**corrective [4]** 19/19 20/1 20/5 20/6
**correspondence [1]** 25/19
**corresponds [1]** 8/20
**cost [4]** 45/14 54/5 58/6 58/8
**costs [1]** 42/4
**could [14]** 7/13 7/14 7/25 18/13 19/9 27/19 31/20 31/22 53/9 53/19 58/17 59/14 61/19 61/20
**couldn't [6]** 29/6 31/11 45/1 45/6 52/6 54/13
**counsel [9]** 9/1 9/22 17/14 19/18 23/10 32/13 40/13 47/4 61/9
**Counsel's [1]** 38/11
**counterclaim [5]** 1/1 1/14 17/2 47/10 51/10
**Counterclaim-Defendant
ts [1]** 1/14
**Counterclaim-Plaintiffs
[1]** 1/11
**counting [3]** 46/19 46/20 47/1
**counts [2]** 43/4 43/5
**couple [1]** 4/25
**course [2]** 10/18 62/12
**court [29]** 1/1 2/22 3/23 7/14 9/2 11/11 19/15 20/2 22/2 22/8 23/24 25/8 26/17 29/6 37/21 38/11 38/12 38/17 39/13 42/19 43/11 51/13 51/20 51/21 52/3 52/3 55/12 63/13 63/14
**Court's [2]** 28/18 62/7
**Courthouse [1]** 2/23
**courts [6]** 35/21 36/14 39/7 39/9 39/11 51/7
**covering [1]** 60/7
**CPA [2]** 45/18 52/11
**CRC [1]** 63/13
**create [5]** 8/1 33/16 34/23 41/8 43/3
**created [1]** 45/22
**credibility [9]** 28/19 29/3 29/5 30/7 30/22

31/21 31/23 50/9 60/24
**credit [2]** 46/3 49/15
**crime [1]** 21/10
**criminal [2]** 21/19 24/4
**criticisms [2]** 60/21 60/22
**cross [3]** 55/1 57/12 59/22
**cross-examination [3]** 55/1 57/12 59/22
**CRR [2]** 2/22 63/13
**cry [1]** 27/16
**curiosity [1]** 27/22
**customer [19]** 4/23 18/20 22/11 22/18 23/1 23/1 23/2 23/2 25/17 26/4 47/11 49/14 49/14 49/18 56/15 58/10 60/3 60/9 61/4
**customers [22]** 10/2 14/24 15/3 16/15 49/6 52/23 52/23 53/25 54/1 56/16 56/20 56/23 56/24 57/5 57/10 58/3 59/3 59/7 59/13 59/24 60/6 60/11
**cutoff [2]** 20/16 20/18
**cv [2]** 1/3 3/4

**D**

**damage [2]** 32/21 43/4
**damaged [1]** 19/24
**damages [44]** 4/4 4/8 4/9 4/12 4/14 4/15 5/18 5/21 7/2 7/14 9/3 12/24 14/20 14/22 16/4 16/8 16/8 16/10 16/12 17/4 17/9 17/9 17/19 18/9 18/20 19/2 20/21 20/24 21/2 21/6 23/12 24/5 24/13 25/5 25/12 31/10 39/11 39/12 42/24 43/6 43/18 44/24 52/12 62/2
**danger [1]** 55/9
**dangerous [2]** 62/1 62/5
**data [4]** 45/3 45/22 49/13 49/16
**date [4]** 8/22 16/6 16/22 63/13
**dates [1]** 24/21
**DAUBERT [4]** 1/18 30/16 31/12 38/13
**David [2]** 22/21 26/2
**day [1]** 25/1
**deal [4]** 23/3 23/19 24/2 36/22
**dealer [10]** 22/15 22/16 24/25 32/25 33/9 33/24 34/17 35/1 42/12 43/21
**dealers [16]** 24/8 24/16 27/7 33/7 33/19 34/2 34/3 37/14 41/1 41/10 41/12 41/15 41/23 41/25 41/25 43/19
**dealers' [1]** 25/19
**Deboer [1]** 26/16

**decades [1]** 61/18
**December [6]** 8/22 8/22 8/23 18/23 20/14 20/15
**December 2nd [1]** 8/22
**deception [2]** 60/23 60/25
**deceptive [6]** 11/2 11/17 15/1 15/9 32/18 61/4
**decided [1]** 7/11
**decision [2]** 26/10 36/8
**decisions [1]** 44/11
**declaration [4]** 10/1 10/21 11/16 14/13
**deemed [2]** 32/9 39/20
**deems [1]** 39/3
**defend [3]** 11/22 51/2 51/4
**Defendant [7]** 6/21 9/7 11/22 15/15 20/22 44/13 59/2
**defendant's [2]** 9/18 49/20
**Defendants [5]** 1/8 1/14 2/8 3/12 5/13
**Defendants' [2]** 3/16 3/17
**Defense [1]** 17/14
**defer [1]** 18/11
**delve [1]** 35/18
**demonstrate [1]** 6/19
**demonstrated [1]** 19/17
**denied [1]** 36/15
**department [2]** 10/1 46/2
**depose [2]** 18/6 49/19
**deposed [3]** 15/19 15/20 18/18
**deposition [13]** 11/8 22/6 22/7 22/9 22/12 27/18 29/2 29/24 31/20 36/2 37/4 45/11 54/12
**depositions [1]** 21/24
**describe [2]** 40/14 48/25
**despite [2]** 24/17 43/25
**detail [1]** 44/21
**deter [1]** 43/24
**determination [12]** 11/14 14/4 14/7 16/2 25/13 25/15 26/9 29/10 30/7 30/22 53/24 62/11
**determinations [2]** 39/10 60/24
**determine [3]** 19/15 41/10 42/11
**determined [3]** 18/16 56/14 57/5
**determining [1]** 20/3
**developed [4]** 30/23 31/3 31/6 33/18
**devoted [1]** 28/16
**diane [2]** 2/22 2/25 63/12 63/13
**dictates [1]** 54/2
**did [41]** 4/10 8/15 15/12 15/15 29/14 29/15 29/16 30/13 31/17 33/15 33/16

**D**

did... **[30]** 34/12 34/17 34/23 35/4 35/11 35/13 36/20 37/25 38/6 38/14 39/3 39/25 40/16 45/9 45/21 48/3 50/6 50/18 51/1 51/13 51/13 52/8 53/23 56/3 58/4 58/21 58/25 61/22 61/24 62/20

didn't **[25]** 8/23 8/23 12/9 13/9 29/2 30/8 39/2 39/18 39/24 40/1 45/3 45/13 45/14 45/15 45/21 46/12 48/8 49/25 51/2 52/2 52/9 54/4 54/13 61/13 61/14

difference **[1]** 56/6

different **[4]** 13/15 47/23 56/22 58/17

difficult **[4]** 9/6 9/9 13/13 13/17

difficulties **[2]** 32/19 33/13

difficulty **[2]** 11/24 31/5

direct **[4]** 10/10 16/11 28/24 37/21

directed **[3]** 19/18 20/1 25/8

director **[1]** 43/20

disagree **[5]** 17/23 51/14 51/18 55/16 55/19

disavowed **[2]** 31/17 54/11

discern **[1]** 9/10

disclose **[2]** 19/3 38/5

disclosed **[10]** 4/13 5/12 6/9 6/16 8/24 18/19 18/23 29/13 29/21 29/22

disclosure **[3]** 18/7 18/22 18/25

disclosures **[4]** 4/6 5/15 17/3 20/19

discovery **[14]** 4/7 5/13 8/16 10/11 10/19 10/19 10/20 16/21 16/23 16/24 18/24 20/16 20/18 23/15

discrepancy **[1]** 53/25

discrete **[1]** 59/11

discussed **[2]** 12/18 24/20

discusses **[1]** 12/2

discussing **[5]** 9/13 13/4 13/8 13/14 24/12

discussion **[4]** 24/3 44/12 48/15 51/3

dispose **[1]** 18/2

dispute **[8]** 23/20 50/1 52/14 55/21 56/15 57/9 59/22 59/25

disqualifying **[2]** 28/21 28/22

distinguishable **[1]** 19/7

DISTRICT **[13]** 1/1 1/1 1/20 6/4 7/4 7/8 7/9 28/24 34/7 34/11 34/6 43/12 63/14

dive **[1]** 23/14

DIVISION **[1]** 1/2

do **[33]** 5/20 9/7 10/8 12/4 12/16 12/21 14/16 23/10 26/21 29/15 30/2 30/10 38/7 39/2 39/6 40/23 41/16 46/7 48/9 48/16 49/20 51/4 51/14 53/8 53/9 54/5 55/7 55/15 57/16 57/22 60/18 61/14 62/13

docket **[4]** 3/17 3/19 10/6 27/13

doctor **[1]** 54/18

document **[28]** 4/19 4/25 5/2 7/24 8/11 8/12 8/15 8/16 8/19 8/19 8/21 9/4 10/7 10/10 10/18 12/8 14/11 15/15 16/19 18/23 19/23 20/8 20/12 20/13 44/23 45/1 45/3 45/7

documentation **[4]** 8/6 19/1 25/18 25/20

documents **[3]** 4/11 17/5 45/15

does **[13]** 6/6 9/2 10/23 11/7 12/25 13/23 14/19 17/25 49/2 50/10 53/19 53/20 57/13

doesn't **[6]** 23/2 25/7 30/24 53/12 61/2 61/2

doing **[8]** 15/2 25/1 34/14 35/5 37/15 47/17 48/2 60/6

dollars **[3]** 9/24 10/16 11/4

Dominguez **[1]** 21/12

don't **[25]** 8/19 11/8 15/3 15/14 15/21 15/24 16/3 16/22 17/22 17/24 18/4 20/13 27/2 27/15 29/9 38/18 38/19 38/19 46/15 48/12 52/20 55/21 56/12 56/14 59/6

done **[7]** 16/5 16/5 26/6 34/12 37/16 56/3 57/20

door **[22]** 11/2 11/2 11/18 11/18 14/25 14/25 15/10 15/10 21/25 21/25 23/22 23/22 24/8 24/9 24/17 24/17 32/19 32/19 32/25 32/25 33/10 33/10 double **[4]** 22/4 46/18 46/20 47/1

down **[4]** 19/9 23/23 28/19 40/18

dozens **[1]** 45/8

Dr **[15]** 16/15 16/16 33/3 33/3 33/4 33/11 33/19 33/20 35/14 36/18 36/21 37/5 37/15 40/17 54/18

Dr. **[23]** 33/11 34/5 34/9 34/10 34/13 34/20 35/10 35/17 35/23 36/3 36/16 36/18 36/24 37/1 38/16 39/2 41/8 42/4 52/17

56/2 57/21 58/4 61/22

Dr. Mangan **[7]** 34/9 34/10 35/10 35/17 36/3 37/1 38/16

Dr. Matolo **[7]** 33/11 34/13 34/20 36/18 36/24 39/2 42/4

Dr. Matolo's **[4]** 34/5 35/23 36/16 41/8

Dr. Taylor **[4]** 52/17 56/2 58/4 61/22

Dr. Till **[1]** 52/17

dragged **[1]** 15/6

Ducey **[1]** 51/21

due **[3]** 19/19 20/19 62/12

duration **[1]** 58/9

during **[8]** 8/16 10/18 26/20 26/25 27/18 29/24 31/20 54/11

**E**

each **[2]** 16/4 47/21

earlier **[3]** 9/14 19/22 36/7

economic **[1]** 41/6

economically **[1]** 41/1

effect **[1]** 60/10

efficiency **[1]** 37/16

effort **[1]** 35/17

eight **[2]** 21/22 24/24

either **[1]** 26/24

electronic **[1]** 61/10

element **[1]** 21/9

Eleventh **[5]** 26/16 26/17 43/11 48/10 48/14

elicited **[1]** 27/18

else **[3]** 10/8 40/13 61/7

email **[7]** 22/17 22/20 22/20 23/4 24/19 24/22 61/19

emails **[1]** 27/14

emerging **[1]** 12/22

emphasizes **[1]** 36/22

employed **[2]** 31/1 39/14

employee **[1]** 45/17

employees **[1]** 27/8

enable **[1]** 51/24

end **[5]** 25/13 40/21 42/6 47/1 62/14

enormous **[1]** 53/17

enough **[3]** 11/19 19/22 26/11

enter **[2]** 3/5 62/12

entered **[1]** 26/2

entirely **[1]** 30/3

entirety **[2]** 4/7 5/13

entitled **[5]** 4/3 21/5 25/9 25/11 63/11

entity **[2]** 32/25 41/20

entry **[3]** 3/17 3/19 10/6

equity **[2]** 61/5 61/8

equivalent **[2]** 41/2 41/6

Eric **[1]** 28/8

error **[2]** 8/18 55/7

especially **[1]** 30/5

ESQ **[3]** 2/2 2/4 2/8

essence **[2]** 21/6 44/17

essential **[2]** 46/12 54/2

essentially **[13]** 4/19 12/5 13/5 17/20 20/9 21/17 21/24 22/8 22/23 22/24 25/22 52/19 61/2

establish **[2]** 38/24 50/8

established **[9]** 31/13 31/15 31/18 38/19 38/20 38/23 39/18 40/3 40/25

establishes **[1]** 40/7

estimate **[1]** 9/17

estimation **[1]** 52/12

et **[7]** 1/4 1/7 1/10 1/13 28/15 45/16 61/13

ether **[1]** 11/21

evaded **[2]** 29/17 29/25

evaluation **[2]** 44/19 45/4

evasive **[2]** 30/1 38/8

even **[32]** 5/3 5/20 6/1 8/19 11/23 15/1 15/3 16/5 19/13 20/5 24/12 27/5 27/15 29/8 30/7 30/13 30/24 31/11 31/20 35/4 39/5 39/24 40/2 40/10 45/1 46/10 52/5 52/6 53/19 53/19 53/20 61/13

event **[1]** 23/4

ever **[5]** 15/12 15/15 16/5 35/11 38/20

every **[3]** 38/5 53/8 56/15

evidence **[29]** 4/18 5/8 6/13 6/19 7/23 8/4 12/23 13/24 15/7 17/5 19/2 20/23 22/17 23/6 23/6 23/7 23/12 23/17 24/14 25/6 25/16 25/24 26/22 26/23 27/6 38/12 43/2 51/13 55/2

evidentiary **[4]** 17/11 24/12 26/6 43/17

exact **[1]** 51/8

exactly **[11]** 6/11 12/1 12/2 15/14 20/13 38/7 38/7 47/5 48/25 59/12 59/16

examination **[3]** 55/1 57/12 59/22

examine **[1]** 15/13

example **[1]** 37/24

examples **[1]** 14/23

exceedingly **[1]** 9/6

exceeds **[1]** 52/23

excellent **[1]** 62/23

excerpts **[1]** 29/11

excessive **[2]** 19/16 20/3

exchange **[1]** 45/11

exclude **[3]** 3/18 52/17 62/7

excluded **[9]** 5/2 5/3 5/25 6/1 28/10 28/25 31/23 38/8 44/13

exclusion **[3]** 46/3 48/3 54/22

exercise **[1]** 55/12

exercising **[1]** 29/6

exert **[1]** 57/22

Exhibit **[1]** 36/2

exhibits **[1]** 21/22

existing **[3]** 41/9 41/19 42/9

expectation **[2]** 49/5 49/14

expenditures **[1]** 9/17

experience **[3]** 50/15 51/3 58/14

experiences **[1]** 14/23

expert **[46]** 4/9 5/15 5/16 12/3 12/6 12/10 12/15 13/10 13/17 13/18 18/25 19/4 20/9 20/19 28/6 28/25 29/7 32/10 39/4 39/16 40/8 41/3 41/5 45/8 45/17 45/18 46/18 46/23 47/5 47/9 47/14 48/9 48/15 50/23 52/10 52/11 52/14 55/5 58/22 58/25 59/4 59/8 59/12 61/17 61/25 62/10

expert's **[3]** 29/1 48/19 55/15

expertise **[1]** 58/13

experts **[11]** 3/18 4/13 4/15 8/24 18/12 18/16 28/7 38/24 42/19 42/23 44/11

explain **[4]** 31/11 31/20 32/1 45/6

explaining **[1]** 31/5

explanation **[1]** 52/6

explanations **[2]** 38/10 38/11

explicitly **[2]** 31/17 31/17

extent **[9]** 17/7 18/15 22/24 25/1 25/2 25/7 25/10 27/1 50/7

extremely **[1]** 19/19

**F**

F.3d **[1]** 48/13

fact **[23]** 4/15 5/10 9/8 9/23 11/3 11/15 14/6 14/22 15/5 16/1 18/14 28/18 28/22 28/23 29/8 29/20 31/10 43/3 53/1 53/15 53/16 57/4 57/25

factors **[7]** 13/16 39/23 39/24 40/1 46/12 49/6 58/12

facts **[1]** 13/6

failed **[2]** 39/17 40/9

fails **[1]** 5/6

fairly **[1]** 16/23

far **[4]** 24/17 26/1 27/16 43/23

fed **[1]** 52/5

feedback **[1]** 55/22

**F**

few [3] 17/17 18/5 26/13
Fife [1] 22/19
figure [2] 8/1 12/12
figured [1] 52/9
filed [1] 26/5
final [6] 14/12 16/18 17/15 22/17 52/14 60/14
Finally [1] 61/10
financials [1] 10/12
find [3] 5/16 8/6 25/5
finding [1] 56/5
fine [2] 52/25 60/17
finish [1] 14/10
first [12] 3/16 3/23 3/24 4/25 5/1 5/25 14/16 28/3 28/12 38/10 44/17 52/18
fit [3] 31/3 39/3 39/20
five [4] 7/1 9/21 12/13 54/8
FL [2] 2/24 63/15
flawed [1] 44/14
flaws [1] 28/14
FLORIDA [6] 1/1 1/5 2/5 21/11 28/25 34/7
flows [1] 15/8
flsd.uscourts.gov [1] 2/25
focus [1] 60/18
focusing [3] 8/14 28/15 34/21
follow [1] 50/14
follow-up [1] 50/14
following [1] 25/3
follows [3] 21/23 51/21 51/25
forces [1] 42/10
foregoing [1] 63/9
form [4] 6/21 26/20 35/25 36/11
forming [1] 51/24
FORT [4] 1/2 1/5 2/24 63/15
forth [8] 17/12 18/8 21/16 21/21 31/10 43/16 51/16 51/22
forward [2] 8/4 27/6
forwarded [1] 20/9
found [3] 11/11 11/12 21/10
four [4] 21/23 28/23 40/5 43/5
framework [1] 37/7
Frank [1] 4/10
frankly [1] 54/17
front [4] 29/7 30/2 50/8 53/19
frustrated [1] 15/5
full [1] 12/12
functional [2] 41/2 41/6
further [3] 6/10 15/17 37/19
future [1] 45/16

**G**

gap [3] 46/9 46/13 54/22

gatekeeper [1] 29/6
gatekeeping [3] 55/5 55/12 62/7
Gates [2] 34/21 35/8
gave [1] 30/1
general [6] 22/2 26/7 53/11 54/12 60/20 60/22
generalities [2] 51/17 51/18
generalized [1] 12/8
generally [9] 4/20 4/23 6/11 35/14 44/13 53/2 53/11 60/2 60/5
Generals [1] 25/21
geographic [1] 19/17
Georgia [2] 39/24 40/1
Georgia-Pacific [2] 39/24 40/1
get [15] 5/23 10/5 12/9 12/23 21/2 24/23 26/8 26/25 27/9 28/14 44/6 47/12 49/2 55/3 60/3
gets [2] 22/22 49/17
getting [2] 55/22 61/16
give [6] 26/13 29/17 37/24 47/20 53/8 61/23
given [8] 5/10 5/12 13/19 17/10 25/16 49/15 50/17 61/8
gives [1] 47/25
Gladys [1] 22/13
go [16] 11/13 12/9 14/5 16/12 23/11 24/16 24/20 28/20 33/15 42/11 42/15 48/3 50/6 50/10 58/17 61/8
goes [2] 37/22 48/18
going [37] 3/22 4/15 10/20 11/18 13/12 14/25 15/10 19/1 19/2 20/6 22/22 23/1 23/22 23/23 24/8 24/17 25/22 26/1 26/25 32/16 32/18 32/25 33/12 42/17 43/23 48/12 50/24 53/18 54/3 54/6 54/7 54/9 58/12 59/6 60/14 62/9 62/11
gone [1] 27/23
good [9] 3/2 3/7 3/9 3/10 3/11 3/14 40/16 48/14 48/15
goodwill [32] 3/24 4/4 4/8 4/14 5/21 6/11 6/11 7/2 7/13 9/1 9/10 9/16 10/13 10/24 11/1 12/1 12/24 13/18 14/4 14/10 14/22 15/9 15/13 15/17 16/7 17/6 17/8 17/20 18/8 18/20 19/1 20/21
got [5] 12/7 20/14 44/21 50/1 54/6
Graco [1] 46/4
Grand [1] 2/13
great [5] 36/22 44/21 44/24 46/13 59/15
greater [1] 54/9

gross [6] 6/5 6/16 7/16 20/4 24/15 25/4
grounds [1] 46/2
Group [2] 2/8 46/3
Group/Business [1] 46/3
Grubman [1] 62/22
guess [8] 5/17 7/19 15/16 35/24 43/1 48/2 48/24 60/3
guides [1] 32/7

**H**

had [31] 10/11 10/15 11/8 15/22 16/24 18/6 18/14 18/25 19/3 19/13 21/18 21/18 29/19 31/5 33/23 34/22 35/9 37/5 37/6 37/6 38/5 42/20 45/9 49/8 54/12 56/4 56/6 58/7 58/22 59/2 62/21
handled [1] 57/11
handles [1] 4/23
handling [2] 10/1 58/15
happen [1] 11/3 13/16
happens [1] 55/9
Hardy [2] 2/2 2/4
harm [21] 9/16 9/18 11/1 11/8 11/14 11/15 11/17 11/21 11/25 12/8 12/16 13/18 14/3 15/7 15/8 16/12 16/17 17/5 17/8 19/17 42/16
harmed [1] 25/10
harmful [2] 13/25 19/19
Harrington [1] 39/17
Harris [1] 61/6
has [40] 9/5 11/17 14/1 14/23 17/2 17/12 17/20 17/21 19/23 26/1 27/5 27/7 32/9 33/6 33/21 33/24 34/4 34/6 34/24 34/25 35/3 35/21 35/24 37/13 38/16 38/19 38/20 39/14 40/8 40/9 45/18 47/15 47/15 47/23 50/19 51/6 52/3 53/12 59/20 62/1
have [90]
haven't [2] 8/4 49/8
having [5] 5/17 25/10 37/16 43/23 57/17
he [176]
hear [9] 3/15 25/9 32/13 36/23 42/18 44/15 47/3 60/16 60/18
heard [1] 26/11
hearing [5] 1/18 5/9 25/12 48/7 55/20
hearsay [9] 22/5 23/6 23/7 25/24 26/18 26/19 26/24 27/13 61/6
heavily [1] 45/6
hedged [1] 39/22
held [1] 61/7
help [2] 29/15 29/16

helped [1] 33/20
helpful [1] 32/16
her [2] 29/10 34/24
here [48] 3/15 6/5 8/7 9/19 13/8 13/12 13/16 13/24 14/3 14/11 17/1 17/9 19/22 20/4 21/16 23/18 23/21 24/6 24/13 25/6 27/10 27/21 29/7 29/9 32/16 35/19 35/25 36/4 37/7 38/24 39/17 39/18 42/16 43/14 44/2 46/25 48/21 50/18 50/24 51/10 52/12 54/13 54/20 54/20 56/13 57/22 59/5 61/7
here's [4] 13/23 54/19 55/6 61/8
hereby [1] 63/9
Hey [1] 53/3
high [2] 21/18 27/17
Highway [1] 63/14
him [14] 18/10 29/14 30/14 31/4 35/17 36/16 38/2 41/16 47/20 48/9 49/25 52/5 53/8 61/22
himself [1] 32/1
his [59] 11/8 14/16 28/13 29/21 29/24 30/9 30/18 30/22 31/14 31/20 34/18 35/21 36/3 36/25 37/7 37/22 38/6 38/6 38/15 38/16 40/2 40/6 40/7 44/14 44/23 44/25 47/8 47/17 47/24 49/7 49/11 50/12 50/13 50/14 50/23 51/2 51/3 51/14 51/22 51/24 53/12 53/12 53/17 54/15 54/22 54/23 56/18 56/19 58/8 58/12 58/13 58/14 58/19 59/5 59/9 59/20 60/24 61/3 61/5 61/10
history [1] 38/16
hoc [1] 52/4
hodgepodge [1] 31/19
hold [1] 17/10
HOME [25] 1/7 1/10 3/4 3/12 3/12 10/11 17/1 17/6 17/10 23/19 24/16 24/25 25/18 25/21 26/1 27/23 41/16 41/25 42/1 43/19 47/9 47/15 48/6 50/7 59/6
Home's [6] 24/8 42/1 43/20 47/8 48/23 51/10
hone [3] 6/13 6/15 6/17
Honor [95]
Honor's [1] 32/7
HONORABLE [1] 1/19
horse [1] 25/15
host [3] 56/8 56/8 57/18
house [2] 45/17 46/2
how [17] 4/23 9/4 9/7 10/7 11/22 14/16 15/1 15/17 18/12 19/24 38/16

42/15 48/24 51/4 51/18 55/15 60/3
however [2] 22/19 26/22
huge [1] 54/22
hundreds [3] 9/24 10/16 11/4
Hwy [1] 2/24
hybrid [3] 38/21 39/5 39/15
hypothetical [2] 33/16 38/25

**I**

I'll [9] 5/1 26/13 26/15 38/9 44/11 45/25 46/14 46/15 55/24
I'm [25] 3/22 8/6 13/12 14/6 16/5 16/22 20/12 23/23 24/1 29/15 32/22 33/8 33/12 43/20 47/16 48/7 48/12 54/6 54/18 55/20 55/21 59/19 61/25 62/9 62/11
iceberg [9] 52/18 54/15 56/17 57/8 59/14 59/23 60/17 60/19 61/16
idea [1] 25/11
identical [11] 13/6 17/2 25/22 30/12 30/13 30/13 34/11 37/8 37/11 47/8 48/22
identified [2] 10/15 49/3
identify [4] 5/6 32/21 33/5 47/10
identifying [1] 11/16
imagine [2] 49/8 49/9
impact [2] 18/13 18/15
impermissible [1] 47/2
important [2] 18/5 54/1
improperly [1] 48/12
inadmissible [2] 26/24 61/6
inappropriate [2] 18/1 23/8
INC [4] 1/7 1/10 3/4 3/13
incentive [1] 54/9
incentives [1] 34/1
inclined [1] 17/7
include [2] 18/10 22/4
includes [2] 46/24 46/25
including [4] 41/15 41/16 42/6 51/7
income [2] 40/24 40/25
incomprehensible [2] 31/19 31/24
increase [1] 6/19
increases [1] 45/16
incumbent [1] 22/15
independent [1] 48/16
independently [2] 48/3 50/6
indicate [2] 7/24 28/22
indicated [21] 4/7 4/9 4/15 6/2 7/14 8/17 19/6 19/16 21/4 26/17 31/1

Page 69
Case 1:20-cv-23918-AMC Document 143 Entered on FLSD Docket 05/04/2022 Page 69 of 74
ADT LLC, Et al v. SAFE STREETS HOME SECURITY, INC

**I**

indicated... [10] 39/12 39/16 40/4 40/8 45/8 45/19 46/18 46/23 51/22 52/11
indicates [2] 22/14 22/21
indicating [5] 8/3 21/17 21/24 27/7 27/19
individual [6] 4/22 18/19 18/21 22/19 30/18 59/9
individuals [3] 45/5 49/5 50/17
industries [4] 56/9 56/12 60/2 60/7
industry [11] 41/24 49/4 49/12 49/18 56/7 56/14 57/5 57/15 57/17 58/3 58/5
infer [1] 20/5
inflate [1] 62/2
information [26] 5/6 5/8 5/11 13/23 32/3 34/24 34/25 35/9 44/18 45/2 45/21 46/2 46/10 46/11 47/19 48/4 48/17 49/25 50/1 50/8 50/12 52/5 52/7 56/11 58/14 59/3
infrastructure [1] 17/25
inherently [1] 23/7
initial [1] 37/5
initially [2] 53/23 54/10
injury [9] 6/12 7/2 9/3 9/10 24/3 24/7 24/11 27/1 27/3
inkling [1] 23/4 23/5
innocuous [2] 23/4 23/5 27/14
inquiry [1] 6/11
instance [5] 37/24 45/14 56/16 58/4 59/6
instances [4] 11/16 14/23 24/17 33/13
instead [2] 45/21 46/21
Institute [1] 57/21
instructed [1] 25/12
insufficient [8] 4/24 5/4 6/6 7/1 7/15 8/2 8/12 26/22
insulting [1] 54/17
intellectual [1] 27/4
intentional [4] 24/7 24/14 25/4 43/18
interacting [1] 14/24
interaction [1] 61/3
interference [1] 44/3
internal [2] 10/1 25/18
internally [1] 33/5
interpreting [1] 12/17
interview [3] 34/21 34/23 35/8
interviewed [2] 30/18 34/24
interviews [7] 30/8 30/9 30/11 30/14 32/2 32/3

50/13
intuitive [1] 42/14
investigation [1] 10/2
investment [1] 46/17
investment's [1] 46/17
involved [2] 27/5 58/5
involvement [1] 49/15
involving [4] 24/6 24/7 27/23 28/1
IP [1] 9/22
is [372]
issue [26] 3/23 3/25 6/14 7/10 7/12 8/7 10/15 13/8 17/19 19/4 19/13 21/1 23/11 27/16 28/17 31/21 32/1 42/25 43/4 48/18 53/4 56/25 57/22 57/24 58/7 59/21
issues [4] 19/8 28/6 52/10 58/7
it [228]
it's [26] 4/3 7/8 8/2 11/20 14/4 19/22 26/16 30/5 31/3 32/6 32/8 37/3 38/24 39/5 41/16 48/13 49/8 52/4 54/3 54/6 54/7 54/16 54/16 55/17 59/1 59/18
item [11] 12/9
itemization [1] 4/19
itemize [2] 4/11 10/4
its [37] 6/8 9/17 9/18 9/20 9/22 9/25 10/1 10/12 10/13 10/13 10/13 11/5 11/5 13/24 16/1 17/9 24/16 25/18 25/19 26/2 29/6 32/24 33/9 33/18 33/24 34/3 34/16 34/17 37/14 41/1 41/10 41/23 47/15 48/16 50/25 53/13 55/12
itself [6] 5/1 30/22 31/21 32/9 38/18 57/10

**J**

James [1] 39/16
January [1] 23/15
January 3 [1] 23/15
JASON [2] 2/2 3/7
Jeff [1] 62/22
JENNIFER [2] 2/4 3/8
job [2] 13/1 40/16
JOSEPH [2] 2/8 3/11
JUDGE [27] 1/20 9/12 9/12 11/12 11/12 12/2 12/19 12/19 13/3 13/3 13/21 13/21 14/9 14/9 36/8 36/9 40/15 43/14 43/15 44/9 44/9 51/7 57/2 57/6 58/20 58/21 58/24
judgment [20] 1/18 3/17 3/24 4/4 4/17 7/22 7/22 8/3 8/12 14/15 18/4 21/5 23/8 25/16 26/3 26/10 26/19 43/2 43/8 43/25

**JUDGMENT/DAUBER T [1]** 1/18
judicial [4] 57/4 58/25 59/1 59/1
jury [41] 5/18 8/2 8/7 9/16 11/13 12/23 13/2 13/22 14/1 14/5 15/25 19/16 19/18 19/23 19/25 20/1 20/3 23/11 25/5 25/9 25/12 26/19 27/19 28/20 29/7 42/15 43/18 48/18 50/8 50/24 53/14 53/19 54/18 55/4 55/10 55/13 57/8 58/18 59/4 61/1 61/3
just [59] 4/20 6/5 6/16 8/11 10/9 11/20 11/21 12/12 14/10 15/5 15/17 17/17 18/2 20/4 20/14 23/23 26/1 27/22 28/1 28/15 28/18 30/3 30/6 31/23 31/25 32/2 32/7 35/22 36/14 36/15 37/20 38/9 38/17 38/22 39/25 41/16 42/24 44/6 45/25 46/21 47/20 47/25 49/4 49/21 50/18 53/3 53/10 54/16 54/25 56/17 58/9 58/22 59/14 59/16 60/15 60/18 61/7 61/23 61/23
justify [1] 53/7

**K**

Kansas [1] 2/3
keep [3] 19/5 19/11 55/13
keeping [1] 18/18
keeps [1] 15/23
Ken [2] 45/5 52/8
kind [11] 12/6 12/8 12/22 19/12 25/14 32/5 32/6 38/7 38/8 55/13 58/14
kinds [1] 27/16
knew [1] 20/6
know [44] 6/22 9/4 15/14 15/16 15/23 16/3 19/12 19/23 20/13 21/7 21/16 21/18 21/19 22/22 22/25 27/17 27/18 28/17 29/14 29/19 29/19 30/17 31/5 31/7 35/20 36/22 38/15 39/8 39/9 39/14 44/24 46/6 48/11 52/20 54/23 55/7 55/21 58/7 62/8 59/14 61/22 62/2 62/3 62/3
knowledge [7] 21/15 25/2 27/16 27/20 43/20 43/23 61/1
known [1] 55/7

**L**

lack [1] 17/11
language [1] 19/13
Lanham [6] 11/25 12/17 12/18 15/24 23/20 32/17

large [3] 12/12 29/1 30/3
largely [1] 44/23
last [1] 35/3
late [1] 20/13
law [8] 2/8 4/24 7/2 31/22 43/4 44/1 44/2 46/19
lawsuit [1] 24/11
lawsuits [1] 32/17
laying [1] 13/1
learned [1] 38/3
least [9] 9/2 11/13 12/23 21/15 24/15 26/8 36/25 43/17 54/22
Lee [1] 2/23
Leeflang [2] 22/8 22/10
legal [1] 10/1
lengthy [1] 9/6
less [1] 17/11 57/25
let [8] 5/23 9/1 10/5 16/7 17/14 32/13 44/14 47/3
let's [14] 3/23 8/25 10/4 14/10 17/18 21/1 21/2 23/10 23/10 28/6 44/10 50/2 52/13 56/1
level [1] 21/18
LEXIS [1] 7/8
license [1] 38/25
lie [1] 35/7
light [2] 21/11 35/22
like [11] 11/20 27/10 29/3 35/25 36/23 41/24 45/5 50/19 54/3 57/13 60/8
limiting [1] 54/23
line [1] 9/9
lines [1] 37/4
lip [1] 25/2
LIPARI [19] 2/8 3/11 3/14 3/19 3/22 13/14 21/2 25/7 26/12 28/9 36/22 37/19 44/15 48/7 50/19 52/15 55/20 58/7 59/20
Lipari's [1] 25/23
listing [1] 43/10
litany [3] 45/16 49/23 52/1
litigation [2] 9/22 27/25
little [2] 6/10 23/24
LLC [4] 1/4 1/13 6/3 40/20
LLP [2] 2/2 2/4
long [5] 22/17 38/15 41/22 57/20 60/7
long-ranging [1] 57/20
long-standing [1] 41/22
look [8] 8/5 24/20 26/21 33/5 48/8 48/12 57/22 62/10
looked [2] 29/20 61/12
looking [3] 37/3 43/14 56/13
lost [4] 16/13 47/21 47/25 49/17
lot [5] 22/18 26/22 45/2

45/2 62/25
lower [1] 47/24
LP [1] 46/4
luckily [1] 28/3
lying [1] 23/22

**M**

M-A-T-O-L-O [1] 28/8
Macuba [1] 26/16
made [5] 10/2 10/11 17/3 39/9 55/4
Madison [1] 2/9
Magnan [2] 36/18
main [1] 44/17
maintain [2] 6/23 7/13
Maiz [1] 48/13
make [12] 11/13 14/6 15/12 16/1 25/13 26/9 29/10 31/2 36/14 53/13 58/19 62/11
makes [3] 9/6 36/22 57/8
making [4] 24/9 25/15 41/17 53/24
malicious [1] 21/14
managing [1] 21/14
mandatory [1] 62/21
Mangan [25] 29/15 29/17 29/18 29/20 30/11 31/8 31/25 32/3 32/3 33/3 33/4 33/11 33/20 34/9 34/10 35/10 35/12 35/14 35/17 36/3 36/21 37/1 37/25 38/6 38/6 38/16
Mangan's [1] 37/5
Mangan. [1] 29/16
Mangan. I [1] 29/16
manner [2] 18/2 33/25
manslaughter [1] 24/4
many [2] 13/15 58/17
market [10] 13/24 31/2 33/17 39/3 39/19 39/19 41/9 42/10 46/23 47/12
marketing [6] 9/5 10/8 10/13 11/5 54/19 61/2
markups [1] 34/1
materialized [2] 12/7 27/24
materials [2] 34/15 42/5
mathematical [1] 55/8
mathematically [1] 55/10
Matolo [23] 28/8 28/12 28/13 29/16 30/11 30/17 31/16 32/13 33/3 33/11 33/19 34/13 34/20 36/18 36/24 37/15 37/22 38/14 39/2 39/24 40/5 40/17 42/4
Matolo's [10] 16/16 29/13 29/16 34/5 35/23 36/2 36/16 37/4 39/13 41/8
matter [11] 4/24 7/1 23/15 25/25 28/23 36/10 40/21 41/16 41/18 43/15 63/11

**M**

matters [2]  44/4 44/9
mature [1]  27/24
may [7]  3/2 8/9 9/16
 16/25 17/16 24/10 42/22
maybe [3]  22/4 29/19
 29/19
MCLOONE [2]  2/4 3/8
me [15]  5/23 9/1 10/5
 11/20 16/7 17/14 23/25
 32/13 34/25 37/24 44/14
 47/3 50/18 61/8 61/23
mean [15]  8/2 22/23
 27/12 27/15 28/1 32/10
 36/21 51/4 51/17 53/12
 53/17 53/19 53/20 54/16
 61/17
means [2]  6/12 22/25
meant [1]  29/16
measure [1]  42/14
measuring [1]  9/15
mediation [2]  62/17
 62/21
meet [2]  5/4 6/2
mention [3]  8/13 46/14
 46/16
mentioned [4]  21/25
 35/21 36/15 61/18
merely [3]  6/25 9/4
 26/22
met [1]  53/12
method [6]  35/21 36/17
 40/25 44/14 51/4 51/6
methodological [2]
 28/14 30/25
methodologies [3]  38/24
 39/1 39/18
methodology [47]  5/19
 8/1 8/10 30/22 30/24
 31/3 31/5 31/7 31/9
 31/13 31/15 31/16 31/18
 31/24 32/8 36/12 36/16
 38/9 38/18 38/20 38/21
 39/5 39/7 39/13 39/14
 39/15 40/2 40/3 40/6
 40/7 40/10 40/11 40/16
 42/14 48/5 48/21 48/22
 48/24 50/12 50/22 51/2
 51/9 51/15 51/19 52/3
 52/4 57/18
methods [3]  30/25 31/2
 55/1
Miami [1]  2/5
mic [1]  44/6
microphone [1]  55/25
Middle [1]  28/24
Middlebrooks [8]  9/12
 11/12 12/2 12/20 13/22
 14/9 57/2 58/24
Middlebrooks' [5]  13/4
 36/9 43/15 44/9 58/21
miller [4]  2/22 2/25
 63/12 63/13
millions [3]  9/24 10/16
 11/4
mind [1]  18/18

minimum [3]  45/20
 46/16 51/23
minute [1]  42/18
minutes [1]  26/13
misconduct [2]  21/9
 21/14
misleading [1]  44/14
misrepresentations [3]
 11/2 19/20 24/9
misrepresenting [1]
 15/10
Missouri [1]  2/3
model [1]  40/24
moment [3]  10/4 12/10
 16/10
money [7]  6/7 6/7 6/22
 9/5 9/20 10/7 11/21
monies [1]  4/20
monitor [1]  26/3
month [1]  62/14
monthly [4]  47/11 49/2
 50/4 54/8
more [9]  11/19 16/25
 22/22 26/8 27/24 38/3
 44/11 57/25 59/23
Moreover [6]  18/4 21/11
 24/14 25/6 39/18 45/8
morning [7]  3/2 3/7 3/9
 3/10 3/11 3/14 62/24
most [2]  43/13 51/7
motion [25]  3/16 3/18
 4/3 4/18 5/9 5/12 7/22
 8/3 8/12 14/15 18/3
 20/21 21/4 21/21 22/1
 22/3 23/8 26/5 26/18
 30/16 31/12 35/25 37/21
 38/13 39/22
motions [4]  3/16 3/22
 36/15 62/11
mouth [1]  61/11
move [1]  52/13
moved [1]  4/17
moving [3]  21/17 26/15
 38/9
Mr [22]  10/22 10/23
 22/10 47/5 47/6 47/14
 47/17 47/22 48/5 48/22
 49/3 49/7 49/9 49/10
 50/9 50/18 50/18 51/13
 51/14 51/23 52/13 53/2
Mr. [52]  3/14 3/19 3/22
 9/23 10/15 10/21 10/25
 11/16 12/9 13/14 14/12
 15/19 15/20 16/14 21/2
 25/7 25/23 26/12 28/8
 28/9 28/13 29/15 29/17
 32/13 35/12 36/22 37/19
 38/14 43/1 44/15 44/16
 44/20 45/11 45/20 46/7
 47/19 48/2 48/7 48/21
 49/22 50/19 51/5 51/19
 51/15 51/19 51/21 52/15
 55/14 55/20 58/7 59/20
 62/15
Mr. Cona [6]  9/23 10/21
 10/25 12/9 14/12 15/19

Mr. Cona's [1]  10/15
Mr. Ducey [1]  51/21
Mr. Eric [1]  28/8
Mr. Lipari [17]  3/14
 3/19 3/22 13/14 21/2
 25/7 26/12 28/9 36/22
 37/19 44/15 48/7 50/19
 52/15 55/20 58/7 59/20
Mr. Lipari's [1]  25/23
Mr. Mangan [3]  29/15
 29/17 35/12
Mr. Matolo [3]  28/13
 32/13 38/14
Mr. Roman [2]  51/9
 51/15
Mr. Roman's [1]  51/19
Mr. Scott [3]  43/1 55/14
 62/15
Mr. Stigler [3]  11/16
 15/20 47/19
Mr. Urban [10]  16/14
 44/16 44/20 45/11 45/20
 46/7 48/2 48/21 49/22
 51/5
much [12]  9/5 10/7
 15/17 17/23 17/23 46/15
 51/3 54/7 54/9 54/9
 61/14 62/10
multiple [7]  24/17 28/11
 47/12 47/16 47/17 47/24
 52/17
multiples [1]  49/18
multiplied [2]  47/18
 47/24
multiplier [21]  49/5
 49/10 49/11 49/17 49/19
 52/19 53/5 53/5 53/6
 53/7 53/13 53/17 54/20
 54/21 57/3 57/9 57/11
 58/2 58/16 58/16 62/2
multiply [3]  49/4 53/21
 62/4
must [4]  21/13 41/7
 52/11 60/3
my [16]  8/18 22/1 22/7
 22/13 35/19 35/20 38/4
 40/5 40/8 41/17 43/7
 53/4 54/19 54/20 60/16
 61/2

**N**

name [7]  14/17 33/1
 33/9 34/4 42/1 42/2
 42/13
named [2]  4/22 22/19
narrative [3]  38/17
nature [3]  14/20 37/8
 37/11
nearly [1]  13/5
necessarily [6]  13/1
 17/22 25/25 34/19 56/6
 60/5
need [11]  19/18 33/15
 33/16 34/23 35/18 39/2
 40/2 41/18 59/4 61/2
 61/2

needed [2]  31/2 45/20
needs [3]  7/22 14/1
 55/12
nefarious [1]  27/9
negative [3]  18/14 61/10
 61/10
negatively [1]  15/3
negligence [2]  24/15
 25/4
negotiation [2]  33/16
 39/1
net [1]  4/21
never [3]  18/19 45/4
 55/3
Nevertheless [1]  18/1
new [3]  2/9 2/9 23/2
next [1]  61/9
Ninth [5]  7/18 9/13
 11/10 12/1 14/8
no [29]  1/3 4/18 4/18
 5/22 6/8 8/23 9/3 12/3
 12/10 12/14 20/21 20/23
 28/3 30/16 30/17 35/7
 35/7 38/11 38/14 40/5
 51/12 55/5 55/6 55/21
 57/23 57/24 59/4 59/22
 61/13
non [1]  47/14
non-retained [1]  47/14
none [6]  4/13 5/11 23/19
 38/17 51/19 57/15
nonetheless [1]  5/4
nonexistent [1]  17/6
normally [1]  32/23
Northern [5]  6/4 7/4 7/9
 34/11 36/6
not [105]
note [4]  22/14 28/19
 54/1 62/13
noted [1]  33/24
notes [3]  30/8 34/23
 35/19
nothing [11]  12/7 17/20
 21/20 27/10 37/13 38/16
 48/1 55/8 55/11 55/15
 61/12
notice [5]  24/17 25/19
 26/1 57/4 59/1
notion [1]  36/23
November [1]  20/18
now [11]  5/11 5/16 7/16
 15/12 17/4 19/23 38/15
 42/3 44/12 54/4 55/23
number [12]  9/9 13/20
 16/15 18/6 28/14 49/11
 52/22 52/23 53/24 53/25
 59/13 60/10
numbers [4]  11/9 47/23
 48/8 56/20

**O**

objected [1]  59/12
occurred [2]  11/17
 43/23
occurs [2]  11/1 11/15
off [4]  16/8 27/12 45/13

54/6
Official [2]  2/22 63/13
Oh [6]  7/7 19/10 26/21
 46/6 52/7 52/8
okay [19]  3/21 4/1 6/15
 7/25 10/8 14/1 14/19
 16/18 28/5 29/14 31/14
 32/21 36/20 37/18 54/6
 55/23 60/8 60/13 62/23
old [1]  61/18
older [1]  43/15
once [2]  23/25 54/11
one [33]  4/14 4/19 6/18
 8/15 10/4 10/7 12/3 12/7
 16/18 16/25 17/18 18/2
 18/6 18/7 18/9 22/20
 22/22 23/14 23/19 28/14
 28/15 28/23 29/20 32/19
 36/1 38/24 40/7 41/20
 42/24 54/1 56/14 61/5
 61/6
ones [2]  29/20 30/12
online [2]  61/12 61/20
only [12]  18/7 18/9
 18/14 22/20 34/6 41/22
 46/14 46/15 48/7 54/12
 60/16 60/16
opening [1]  25/11
operating [1]  5/14
opine [2]  4/16 45/19
opined [1]  4/14
opinion [19]  12/19 13/18
 32/8 36/9 41/17 43/14
 43/15 44/24 51/24 52/18
 54/15 54/23 54/24 55/13
 57/2 61/3 61/5 61/8
 61/11
opinions [10]  13/4 30/9
 34/18 36/4 44/9 44/19
 46/2 46/10 60/23 60/25
opportunity [6]  15/16
 18/6 19/3 20/9 38/5 53/8
opposed [1]  6/21
opposition [13]  4/18
 5/12 14/14 21/21 24/21
 26/18 30/16 31/12 36/2
 38/12 39/22 43/10 46/6
order [17]  6/7 6/22 9/17
 9/24 10/12 10/16 11/14
 13/23 14/1 15/25 27/9
 27/21 33/9 41/21 51/24
 52/11 62/12
ordinary [1]  61/1
organization [1]  45/23
original [1]  46/7
other [34]  11/18 12/21
 12/22 15/14 16/8 19/5
 23/14 25/20 27/4 27/23
 29/3 30/21 35/20 35/21
 41/15 41/15 41/24 42/19
 42/23 46/14 46/15 49/16
 56/19 58/15 60/2 60/18
 60/20 60/22 61/5 61/15
others [2]  45/22 57/4
our [43]  4/2 4/3 4/18

**O**

our... [40] 5/10 6/2 8/21
11/21 18/3 18/22 19/3
19/14 20/9 21/5 21/17
21/21 23/24 24/21 26/15
28/3 28/12 28/16 28/22
31/10 31/12 36/2 37/21
39/4 39/16 39/16 40/4
43/9 44/21 45/8 45/10
45/17 46/18 46/22 51/15
51/16 52/10 52/21 59/21
61/17
ourselves [1] 5/16
out [20] 13/1 27/22
30/15 31/16 33/3 37/22
42/7 43/8 43/10 47/5
52/9 53/3 53/10 53/15
54/16 55/11 56/25 59/2
60/12 61/18
outlined [2] 14/8 24/21
outlines [1] 43/12
outlining [1] 10/7
outrage [2] 21/9 21/18
outset [1] 62/22
outside [4] 18/24 18/24
27/7 27/20
over [12] 6/25 9/5 9/21
13/19 15/11 15/15 33/6
35/9 38/2 47/20 49/4
57/20
overall [4] 34/2 43/22
47/12 47/20
overcome [1] 9/8
overlapped [1] 39/25
overlapping [1] 37/8
oversell [1] 29/9
overtly [1] 48/1
own [8] 13/2 19/4 20/9
29/10 38/22 48/16 50/23
53/4

**P**

P-R-O-C-E-E-D-I-N-G-
S [1] 3/1
Pacific [2] 39/24 40/1
Packages [1] 46/4
page [6] 8/15 10/7 12/8
37/4 40/22 43/9
pages [3] 1/8 36/20
45/10
pains [1] 44/24
papers [5] 21/17 26/16
31/10 38/22 39/16
paperwork [1] 17/24
parameters [2] 13/1
14/7
parroted [2] 44/20
45/21
parroting [1] 46/1
part [8] 8/11 15/4 19/7
24/16 40/24 42/6 43/19
43/20
partial [4] 1/18 3/16
3/24 14/15
particular [24] 4/11
6/14 8/19 10/9 12/16

13/19 13/20 15/21 16/13
19/25 21/8 28/23 29/8
33/13 35/23 43/11 44/22
45/24 47/11 53/7 54/23
58/2 58/3 59/7
particularly [2] 18/13
39/21
parties [3] 3/5 28/1
62/13
party [2] 5/6 5/7
past [3] 35/9 49/15
58/15
patterns [1] 29/8
pay [1] 41/21
paying [1] 25/2
payment [1] 49/17
PC [1] 2/8
peer [1] 57/23
pending [2] 18/3 34/7
people [2] 61/19 61/19
per [2] 47/23 47/25
percent [9] 41/14 46/16
46/25 56/23 56/24 57/5
58/23 59/3 59/15
percentage [8] 37/15
41/11 41/11 41/14 42/1
56/23 58/3 59/7
perfectly [1] 27/14
perform [1] 16/1
performed [2] 34/22
57/19
performing [1] 15/1
perfunctory [1] 18/2
perhaps [2] 7/19 36/15
period [16] 7/1 9/6 9/21
13/19 15/20 16/24 18/24
18/25 32/17 33/4 33/22
49/15 50/16 57/20 58/10
60/7
permissible [2] 39/11
39/12
permit [1] 58/21
permitted [1] 36/16
perplexing [1] 30/23
person [1] 22/4
personal [5] 24/3 24/6
24/11 27/1 27/3
perspective [1] 5/10
persuasive [1] 24/12
pertaining [1] 19/1
pertains [4] 22/10 22/18
28/12 44/18
pertinent [1] 62/10
Ph.D [3] 54/19 54/20
61/2
phonetic [1] 51/22
picked [1] 12/3
piece [1] 14/12
pieces [1] 49/24
PIERCE [4] 1/2 1/5
2/24 63/15
pilfer [2] 27/8 27/21
place [1] 22/11
places [1] 32/23
plagiarism [3] 32/14
36/23 38/7

plagiarization [1] 28/15
plagiarized [3] 29/1
31/8 31/25
plagiarizing [3] 28/13
29/12 34/14
plaintiff [5] 2/2 3/6 3/8
17/21 19/17
plaintiff's [5] 9/16 40/23
40/25 41/2 41/5
plaintiffs [3] 1/5 1/11
41/4
Plaintiffs' [8] 3/18 4/6
7/19 9/1 23/10 32/13
40/13 47/3
play [1] 19/8
plus [3] 31/2 39/3 39/20
poach [1] 27/9
point [28] 5/20 5/22
5/24 5/25 7/3 7/15 7/24
8/23 13/7 16/25 17/15
20/20 21/8 23/14 26/12
26/24 27/15 27/24 38/14
43/13 44/15 46/14 46/15
51/11 53/7 53/11 60/15
61/23
pointed [7] 4/19 4/22
6/4 8/18 19/21 31/16
61/18
pointing [5] 6/5 7/16
8/11 9/4 19/12
points [9] 17/17 23/18
49/13 49/16 53/2 54/12
54/14 60/18 61/15
poll [1] 61/6
Pope [2] 45/5 52/8
portal [1] 61/20
portion [2] 6/20 28/16
position [8] 5/17 7/19
8/9 40/23 41/2 41/5
52/20 59/21
potentially [2] 6/17
16/15
Power [1] 21/11
practices [5] 11/3 11/18
15/1 15/9 32/18
precedent [2] 15/24
48/10
precise [1] 55/11
precision [1] 55/8
preclude [1] 17/7
prejudicial [2] 5/17 8/13
prepared [1] 61/7
present [7] 8/1 8/7 13/2
25/8 27/19 57/7 59/4
presentation [1] 42/15
presented [5] 5/18 25/10
26/19 26/23 58/19
presenting [1] 25/6
president [6] 22/21
24/22 26/2 43/21 43/21
51/15
pressed [1] 51/4
pretty [3] 9/15 33/25
57/13
price [5] 46/21 54/2 54/2
54/12 54/14

primarily [1] 51/3
principle [1] 33/17
probably [1] 13/7
probe [2] 6/10 15/17
problematic [3] 9/2 30/6
59/17
proceeding [1] 22/1
proceedings [2] 42/20
63/4 63/10
process [3] 4/7 15/4 15/6
produced [1] 8/21
production [3] 8/20 9/19
16/22
proffered [1] 47/15
profit [2] 46/21 46/22
profoundly [1] 30/19
program [4] 33/24 35/1
35/2 43/21
promised [1] 12/6
promises [1] 17/3
proper [4] 14/3 42/13
42/14 57/7
property [1] 27/4
proposition [4] 21/12
31/22 45/25 46/19
protect [3] 9/25 11/5
13/24
Protection [1] 40/20
prototypical [1] 41/4
prove [1] 25/25
provide [14] 5/6 13/9
13/17 13/22 15/22 16/4
34/2 45/11 47/12 47/15
48/5 52/6 59/8 61/2
provided [24] 9/22
10/18 14/14 16/19 16/20
16/23 17/20 20/7 20/11
20/12 23/18 25/18 26/6
34/25 37/25 42/5 47/9
47/20 48/4 48/9 48/17
49/25 50/8 50/13
provides [1] 5/5
providing [6] 25/24
38/10 47/7 50/10 50/15
50/24
public [1] 27/13
pull [2] 43/8 44/6
pulling [2] 27/12 34/15
punitive [13] 16/9 21/2
21/6 21/12 23/11 24/5
24/13 25/5 25/11 42/24
43/3 43/6 43/17
punitive's [1] 21/22
punitives [1] 27/5
purchase [1] 46/21
pure [2] 54/16 55/17
purportedly [1] 44/14
purporting [1] 12/11
purports [2] 55/7 55/10
purposes [1] 18/8
pursuing [1] 32/17
put [23] 17/12 20/9 22/3
29/6 29/11 30/1 33/11
33/20 34/6 34/9 34/10
35/9 36/4 37/7 38/12
43/7 51/16 52/8 52/9

53/18 56/22 59/2 59/19
putting [3] 25/14 27/14
34/18

**Q**

qualified [1] 45/19
question [6] 16/7 29/17
30/13 35/20 37/23 42/24
43/3 53/6
questions [5] 29/12
29/25 31/4 45/1 49/23
quickly [1] 38/9
quotations [1] 32/22
quote [1] 59/13
quotes [1] 37/21

**R**

ramifications [1] 19/20
ran [1] 32/19
range [5] 53/17 56/20
57/14 58/22 59/5 59/10
59/19
ranging [1] 57/20
ranking [1] 7/7
rate [5] 39/3 39/20 40/3
46/24 55/7
rates [1] 60/8
rattle [1] 45/13
raw [2] 45/3 45/22
reach [1] 19/17
reached [1] 33/3
reaching [1] 60/12
read [1] 22/9
real [2] 14/23 55/9
really [10] 8/8 15/17
22/19 24/11 45/6 50/22
51/2 55/12 59/14 60/3
reasonable [4] 19/24
36/24 39/10 39/12
reasonably [5] 5/14 9/7
42/5 42/25 30/6
rebuttal [3] 51/11 57/21
60/14
recently [2] 26/5 51/7
recess [4] 42/19 42/20
60/14 63/1
recognition [1] 33/1
recognizable [1] 40/10
recognize [1] 17/1
record [8] 13/12 20/23
21/20 25/17 26/8 36/24
37/3 50/3
records [1] 10/5
recovery [1] 17/8
rectify [2] 22/16 24/18
recurring [4] 47/10 49/2
50/4 54/8
reduced [1] 27/12
referenced [2] 49/7
56/19
references [1] 30/10
referencing [1] 9/14
referring [1] 42/8
reflecting [1] 45/15
reframes [1] 52/21
refutes [1] 38/13
regard [5] 10/11 17/10

**R**

regard... [3] 25/23 43/22 56/25
regarding [1] 22/5
regardless [1] 41/3
rehabilitate [1] 6/8
rehabilitative [1] 6/9
reinvent [1] 46/8
related [3] 11/9 41/12 43/18
relates [25] 9/23 11/15 11/25 12/15 13/15 13/16 13/18 14/6 16/12 16/16 17/3 23/17 24/8 33/25 34/16 34/20 35/1 35/2 35/14 37/13 43/16 50/2 57/3 57/9 59/5
relating [2] 25/19 36/3
relationship [8] 33/6 33/18 37/13 41/11 41/19 42/9 42/10 58/11
relationships [3] 34/17 41/10 41/23
relatively [1] 23/5
reliable [5] 32/8 40/10 52/12 53/13 58/23
reliance [1] 29/21
relied [7] 12/19 23/19 44/18 44/23 45/6 52/7 57/14
rely [1] 48/17
relying [7] 4/12 5/11 13/22 24/2 45/2 50/20 50/21
remain [2] 49/6 49/14
remainder [1] 23/6
remained [1] 34/4
remaining [1] 42/18
remedies [1] 38/4
remedy [1] 24/18
repackaging [1] 46/1
repeated [1] 44/20
reply [1] 40/4
report [26] 18/11 28/13 29/1 29/13 29/16 29/18 29/22 30/11 30/11 31/8 32/4 34/5 37/6 37/6 37/7 37/9 37/9 37/10 37/12 38/6 45/10 49/7 49/8 51/22 56/20 59/20
REPORTED [1] 2/22
reporter [3] 2/22 23/24 63/13
reports [4] 30/2 31/1 34/18 35/8
represent [1] 8/20
representations [1] 43/25
representative [3] 22/8 22/13 27/17
representatives [2] 23/21 27/20
representing [1] 12/12
reputation [17] 4/5 6/12 6/13 7/2 7/13 9/10 9/17 9/18 9/21 9/25 10/13

11/1 11/22 13/18 14/3 15/8 17/6
reputational [7] 4/8 4/14 5/18 17/8 18/9 18/20 19/2
request [4] 10/11 10/14 16/21 16/21
require [1] 48/2
required [12] 5/7 11/10 12/17 12/23 13/2 15/25 24/12 46/7 46/8 46/24 48/9 48/16
requirement [1] 12/3
requires [1] 21/8
research [3] 46/7 48/16 50/14
resources [1] 9/20
respect [5] 18/22 20/21 28/12 30/8 46/16
respects [1] 18/5
respond [6] 9/7 17/15 17/16 26/4 26/12 55/15
response [2] 10/10 16/21
result [4] 11/17 15/9 42/1 49/17
resume [1] 42/18
resumed [1] 42/21
retained [1] 47/14
return [2] 46/17 46/24
reveal [1] 36/25
revealed [1] 38/22
revenue [3] 47/11 49/2 50/4
reverse [7] 24/19 33/12 35/3 35/24 36/12 37/14 40/12
review [10] 44/11 45/14 45/15 45/20 52/2 54/13 56/18 57/17 58/1 58/14
reviewed [4] 51/23 56/10 56/10 57/23
reviewing [6] 34/15 41/9 41/18 58/5 58/6 58/9
revisit [1] 42/24
right [67]
ripped [1] 54/6
risk [1] 46/25
RMR [7] 2/22 47/18 47/23 47/24 50/2 50/3 63/13
roadmap [1] 36/4
rodeo [1] 28/3
role [4] 29/6 55/5 55/12 62/7
Roman [12] 22/21 26/2 47/14 47/22 48/5 48/22 49/9 49/10 50/18 51/9 51/13 51/15
Roman's [2] 51/14 51/19
Rosenberg [10] 9/12 11/12 12/2 12/19 13/21 14/9 36/8 40/15 51/7 57/6
Rosenberg's [4] 13/3 43/14 44/9 58/21
rough [1] 22/12

royalty [23] 16/17 31/9 31/13 31/15 31/18 32/21 32/22 33/12 33/14 35/3 35/24 36/12 37/15 38/25 39/10 39/12 40/3 40/12 40/24 41/2 41/4 41/6 41/8
rule [13] 4/6 5/1 5/3 5/5 5/5 5/7 5/12 5/15 6/1 16/3 17/2 18/7 19/8
run [1] 49/23
running [1] 17/1

**S**

SAFE [31] 1/7 1/10 3/4 3/12 3/12 10/11 17/1 17/6 17/10 23/19 24/8 24/16 24/25 25/18 25/21 26/1 27/23 41/16 41/25 41/25 42/1 43/19 43/20 47/8 47/9 47/14 48/6 48/23 50/7 51/9 59/6
said [15] 26/3 29/15 31/13 31/17 38/13 39/2 39/4 39/17 39/24 40/5 47/15 47/16 47/17 61/7 61/12
sales [7] 11/2 11/18 15/11 15/9 23/21 32/18 34/2
salesman [1] 21/25
salesperson [1] 24/25
Sam [1] 22/19
same [16] 17/3 17/10 24/25 24/25 33/21 34/4 34/14 34/15 34/16 36/11 36/13 39/14 48/4 49/10 50/23 51/8
Santiago [1] 22/13
satisfy [2] 11/19 24/5
saw [2] 31/3 45/4
say [17] 10/23 11/21 14/1 14/19 18/20 19/22 20/11 31/6 36/20 38/9 39/6 39/23 40/1 49/20 50/2 54/18 61/25
saying [12] 8/5 24/23 26/21 26/23 38/15 41/17 46/9 52/7 57/14 59/11 59/13 62/3
says [4] 16/3 53/3 53/4 59/3
scope [3] 12/12 59/16 60/25
scores [1] 49/15
SCOTT [5] 2/2 3/7 43/1 55/14 62/15
scratch [1] 33/15
seated [2] 3/2 42/22
second [4] 5/23 28/16 46/22 58/9
sections [2] 23/5 29/1
SECURITY [5] 1/7 1/10 3/4 3/12 3/13
see [2] 23/10 54/4
seek [1] 7/2
seeking [3] 17/8 17/19

43/6
seem [3] 9/2 51/1 57/13
seems [1] 11/20
seen [2] 29/19 39/13
self [3] 30/23 31/3 31/6
self-developed [3] 30/23 31/3 31/6
sell [1] 42/13
selling [2] 33/1 33/9
sense [4] 32/23 33/14 41/4 54/12
serve [1] 42/4
service [2] 15/5 25/2
services [3] 18/21 56/14 57/5
set [10] 13/20 18/8 21/16 21/21 31/10 43/16 47/5 49/14 51/22 62/13
setting [3] 16/9 19/11 19/12
settlement [1] 62/13
seven [1] 24/24
severe [2] 24/15 32/10
shape [1] 6/21
she [1] 22/13
She's [1] 23/25
shed [1] 35/22
Shook [2] 2/2 2/4
short [1] 12/11
should [16] 5/2 5/25 14/5 19/3 23/11 28/9 29/13 32/10 38/8 44/13 45/12 46/12 51/23 53/13 53/21 55/3
show [4] 6/7 26/1 44/24 53/12
showing [1] 21/8
shown [1] 21/13
shows [1] 37/9
sic [2] 14/16 29/13
significant [4] 15/20 22/20 28/16 50/16
similar [6] 21/9 33/21 47/22 49/8 49/9 57/2
similarities [1] 50/17
similarity [1] 58/6
similarly [2] 17/19 18/4
simple [2] 4/5 41/16
simply [19] 4/17 6/22 7/3 7/15 7/16 7/24 8/5 19/22 23/2 23/6 26/15 44/20 45/17 46/1 46/9 49/1 52/7 55/4 57/1
since [3] 3/21 33/21 35/3
situated [1] 18/5
situation [2] 22/16
six [1] 35/9
Sixth [1] 46/5
Skydive [11] 9/14 11/11 12/18 12/21 12/25 13/4 19/6 19/7 19/11 19/15 19/18
slander [1] 44/3
slightly [1] 47/24
slow [3] 19/9 23/23 40/18

smaller [1] 17/23
snippet [1] 22/9
snippets [1] 21/23
so [111]
so-called [1] 52/18
some [15] 6/19 6/20 6/20 8/10 8/10 8/22 12/11 19/8 19/13 19/23 27/1 27/6 35/17 52/6 54/4
somebody [1] 61/7
somehow [2] 15/11 34/13
someone [1] 42/11
something [12] 7/25 8/6 14/5 14/5 18/15 31/7 40/13 41/17 52/20 58/18 59/25 61/24
sometimes [1] 52/22
sorry [10] 13/12 14/6 19/10 24/1 29/15 33/8 35/18 43/20 47/16 59/19
sort [10] 9/9 18/2 19/23 20/6 27/9 28/18 39/22 39/25 46/8 54/4
sorts [2] 6/13 12/23
sought [1] 20/22
sound [1] 50/12
sources [2] 13/7 32/3
South [2] 2/24 63/14
SOUTHERN [3] 1/1 34/7 43/11
speak [6] 27/15 46/10 51/17 51/18 52/5 54/13
speaking [3] 4/20 4/23 6/12
specific [13] 6/7 8/1 11/7 11/9 12/15 14/23 15/22 15/24 16/22 37/24 56/13 57/16 60/6
specifically [15] 10/23 12/18 13/5 19/14 19/21 20/24 22/9 22/10 29/14 34/22 35/14 44/22 44/22 45/10 53/3
specifics [2] 35/1 57/11
specify [1] 33/7
specifying [1] 23/12
speculation [2] 54/16 55/17
spell [1] 14/16
spend [13] 6/6 6/22 6/25 7/16 10/16 11/6 11/9 11/14 11/15 11/21 12/12 20/4 46/15
spending [3] 9/23 11/4 14/2
spends [2] 9/20 10/12
spent [7] 4/20 4/21 6/7 6/18 6/20 9/5 10/7
Spiral [1] 28/24
spreadsheet [2] 10/5 44/23
Sr [1] 2/23
stage [1] 25/16
standard [4] 19/13 21/6 27/2 40/24

**S**

**standing [5]** 21/12 31/22 41/22 45/25 46/19
**standpoint [1]** 32/21
**stands [1]** 17/4
**start [4]** 5/1 17/18 33/15 56/1
**started [1]** 21/2
**starting [6]** 3/5 3/24 5/5 24/19 28/8 32/14
**state [3]** 22/2 25/20 44/1
**stated [1]** 53/23
**statement [1]** 34/13
**statements [2]** 25/11 45/15
**STATES [3]** 1/1 1/20 63/14
**stay [2]** 8/25 55/24
**steps [1]** 43/24
**Stigler [1]** 4/22 5/2 10/22 11/16 14/13 15/20 18/18 18/18 44/25 45/5 47/19
**still [6]** 6/1 9/3 16/9 20/12 25/1 30/1
**stop [2]** 22/23 24/23
**stricken [1]** 32/11
**strike [2]** 35/25 36/15
**striking [1]** 54/23
**studies [24]** 53/2 53/3 53/6 53/11 54/20 56/3 56/3 56/8 56/10 56/11 56/19 56/19 57/14 57/18 57/19 57/20 57/22 57/24 58/1 59/9 60/2 61/17 61/18 61/21
**stuff [1]** 43/7
**subject [2]** 9/1 12/22
**subjective [1]** 60/24
**submission [1]** 43/17
**subterfuge [1]** 27/9
**such [5]** 20/24 32/24 38/21 48/2 55/2
**Sue [2]** 34/21 35/8
**sufficiency [1]** 50/21
**sufficient [6]** 24/4 24/14 25/7 26/8 43/3 59/21
**suggest [1]** 6/24
**suggesting [1]** 9/4
**Suite [1]** 2/9
**Sultzer [1]** 2/8
**sum [1]** 6/7
**summarily [1]** 45/22
**summarizing [1]** 40/16
**summary [19]** 1/18 3/16 3/24 4/3 4/17 7/21 7/22 8/3 8/12 14/15 18/4 21/5 23/8 24/21 25/16 26/10 26/18 43/2 43/8
**supplied [2]** 9/8 43/2
**supply [2]** 5/8 12/6
**support [17]** 4/12 10/12 14/8 17/11 21/22 23/12 24/12 25/4 26/6 26/7 42/6 43/17 47/9 48/22 51/9 51/16 53/11

**supported [13]** 30/9 33/17 41/3 41/5 41/9 41/22 41/24 42/10 47/12 49/5 49/19 53/20 57/23
**supports [1]** 7/19
**suppose [1]** 8/2
**supposed [2]** 11/22 20/8
**sure [11]** 7/7 8/6 16/5 21/3 26/14 36/14 37/20 44/16 49/1 56/2 60/22
**surprising [1]** 37/12
**surrounding [3]** 22/18 33/13 35/2
**surveys [3]** 56/4 58/15 60/6
**suspicious [1]** 30/20
**swaths [1]** 30/3
**systems [5]** 22/11 33/1 33/10 42/13 49/12

**T**

**table [1]** 16/8
**tables [1]** 22/3
**take [8]** 3/23 20/20 30/8 42/17 54/7 57/4 62/9 62/11
**taken [1]** 20/22
**takeovers [3]** 22/23 24/24 25/1
**takes [1]** 57/24
**taking [8]** 15/11 24/18 25/3 25/21 42/7 43/24 49/1 53/1
**talking [12]** 6/12 8/8 10/25 11/3 13/8 14/21 14/22 16/14 19/5 24/6 36/11 36/13
**talks [1]** 42/4
**TARP [2]** 56/3 57/21
**Taylor [9]** 52/13 52/17 53/2 54/18 56/2 58/4 60/17 61/1 61/22
**Taylor's [3]** 16/15 60/23 60/24
**telling [2]** 6/25 39/21
**ten [1]** 42/17
**tending [1]** 6/19
**term [1]** 33/12
**terms [3]** 18/12 25/15 62/17
**tested [4]** 35/25 36/6 36/7 36/9
**testified [5]** 18/10 18/11 18/13 34/20 56/2
**testify [5]** 18/14 35/13 36/16 38/14 58/25
**testifying [4]** 18/8 22/10 29/19 48/6
**testimony [36]** 4/10 5/16 9/22 10/15 10/20 11/14 12/6 12/8 12/10 12/15 13/10 14/11 17/5 25/17 27/18 28/7 30/19 35/16 36/3 38/8 40/7 41/3 41/5 44/25 44/25 48/20 50/10 50/11 50/25 55/15 57/8

59/4 59/12 59/17 62/8 62/10
**testing [3]** 36/5 55/1 55/6
**Texas [5]** 6/4 7/4 7/9 34/11 36/6
**than [8]** 11/19 12/21 17/11 17/20 26/8 27/24 29/8 59/24
**thank [17]** 4/2 9/11 17/13 23/13 23/16 32/12 32/15 37/18 42/22 47/20 50/5 60/13 62/9 62/24 62/25 63/2 63/3
**that [480]**
**that's [34]** 3/17 4/24 6/6 7/8 8/8 11/24 12/1 12/16 13/21 23/17 24/3 24/4 24/5 25/3 27/21 28/13 29/20 30/14 31/9 39/14 40/5 40/20 46/3 47/1 47/1 47/22 53/17 54/1 55/11 57/11 59/21 59/22 60/17 62/25
**their [24]** 3/5 4/15 4/21 5/4 6/2 6/6 6/23 7/13 13/2 14/4 15/4 17/2 18/14 18/17 20/1 21/22 27/7 27/8 39/6 39/22 40/24 42/13 47/10 58/19
**them [10]** 4/14 21/25 39/19 39/25 40/2 42/2 45/13 45/25 47/25 52/2
**themselves [1]** 57/24
**then [40]** 3/17 8/1 8/7 8/25 11/13 12/7 13/25 14/1 16/16 18/13 20/8 21/2 22/6 22/6 22/12 22/17 23/6 25/20 26/4 27/14 28/6 29/25 30/9 31/23 32/15 41/17 42/18 44/10 47/11 49/20 50/9 50/13 52/9 53/4 53/18 54/11 56/18 58/13 60/14
**theories [1]** 43/4
**theory [2]** 41/7 57/10
**there [109]**
**there's [2]** 12/14 23/18
**therefore [3]** 29/2 41/18 61/1
**therein [1]** 25/25
**these [29]** 10/2 11/1 11/2 11/25 23/4 23/5 26/4 27/6 27/10 28/1 30/14 31/1 31/9 32/17 33/7 33/12 39/23 45/19 45/20 49/3 49/5 52/10 57/14 57/22 58/12 58/15 61/17 61/18 61/21
**they [70]**
**they're [3]** 27/15 57/23 57/23
**thin [5]** 27/11 53/10 53/15 54/16 56/25
**thing [12]** 13/13 16/18

19/5 30/21 32/6 32/6 36/13 40/7 53/23 54/1 55/6 61/6
**things [16]** 4/16 18/12 27/12 32/2 36/1 38/10 38/14 39/17 40/9 45/9 45/12 45/19 45/20 49/21 52/1 54/21
**think [61]** 7/1 8/17 8/19 9/11 10/25 11/8 11/24 12/25 13/3 13/14 13/21 14/8 15/19 15/21 16/13 17/9 18/1 18/4 19/7 19/14 20/17 20/22 23/11 23/18 24/19 24/21 25/14 26/11 27/2 32/15 32/23 34/21 36/6 38/4 38/18 38/19 38/19 40/15 43/13 44/12 44/13 44/17 44/21 47/16 49/3 51/6 54/17 55/4 55/11 55/20 55/23 56/15 57/1 57/19 58/18 59/6 59/20 59/21 60/6 61/17 62/6
**thinks [1]** 51/19
**third [1]** 12/9
**this [107]**
**those [43]** 3/21 4/9 4/12 4/16 5/14 11/18 13/7 15/3 16/14 18/12 24/10 29/8 29/25 30/2 34/3 38/11 39/1 39/2 41/12 41/25 42/6 42/7 42/7 43/16 44/1 44/1 44/11 49/24 50/14 54/21 56/3 56/6 56/7 56/10 56/11 56/19 58/1 58/20 59/9 60/6 60/11 60/18 61/14
**though [4]** 15/1 30/7 47/22 51/1
**three [8]** 23/18 28/7 28/23 38/23 38/23 38/25 40/22 43/4
**through [8]** 10/3 10/21 11/5 24/20 34/12 44/25 49/24 55/1
**throughout [2]** 4/6 5/13
**Thus [1]** 41/3
**Tiger [1]** 21/7
**Till [2]** 57/21 61/17
**time [22]** 8/22 9/6 9/21 11/8 13/19 15/20 16/23 26/10 32/16 33/4 33/22 38/3 46/15 46/22 49/15 50/16 52/14 53/5 53/5 54/7 58/10 60/7
**times [5]** 40/5 53/16 53/21 53/21 53/21
**timing [1]** 8/15
**tip [9]** 52/18 54/15 56/17 57/8 59/14 59/23 60/17 60/19 61/16
**today [2]** 20/23 34/12
**together [13]** 7/25 22/3 33/11 33/20 34/6 34/9 34/10 34/15 34/18 35/9

36/4 37/7 52/8
**told [1]** 19/25
**too [6]** 18/18 20/13 46/13 46/15 54/7 61/19
**took [3]** 20/2 44/24 56/3
**top [1]** 9/9
**topic [2]** 13/10 15/13
**tortious [1]** 44/3
**track [1]** 26/4
**trade [1]** 44/3
**traditional [4]** 31/9 32/22 33/14 55/1
**trained [2]** 27/7 27/8
**training [2]** 27/20 42/5
**transaction [1]** 46/23
**transcript [3]** 1/18 22/7 22/9
**transcription [1]** 63/10
**transcripts [3]** 22/7 23/5 29/11
**trial [7]** 5/9 5/19 8/10 26/20 26/25 27/23 36/16
**trier [2]** 14/6 16/1
**trio [1]** 14/11
**triple [2]** 22/4 27/13
**true [3]** 8/2 17/10 57/1
**truth [1]** 25/25
**try [1]** 55/24
**trying [2]** 19/15 27/2
**turn [7]** 9/1 17/14 21/1 23/10 28/6 42/23 44/10
**turned [1]** 15/15
**two [12]** 3/15 22/6 30/6 36/1 38/10 38/25 42/19 42/23 43/4 43/16 44/17 45/24 56/18
**type [9]** 13/25 23/20 24/11 32/9 35/15 49/10 50/23 58/5 62/8
**types [3]** 31/1 58/15 58/15
**typically [2]** 30/25 31/9

**U**

**U.S [4]** 2/23 2/24 7/8 63/14
**ultimately [8]** 4/13 8/9 22/16 28/13 28/14 28/19 36/21 59/20
**under [9]** 5/2 5/14 12/17 12/17 15/24 41/7 47/25 48/10 62/11
**underlying [3]** 5/19 48/17 49/24
**undermined [2]** 29/3 29/5
**undermining [1]** 31/14
**understand [7]** 25/23 28/7 36/14 41/20 43/5 59/16 59/18
**understanding [3]** 8/21 16/19 51/15
**undertake [1]** 19/19
**undeveloped [1]** 61/11
**unfair [3]** 23/20 24/7 44/2

Page 74
ADT, LLC, Et al vs SAFE HOME SECURITY, INC.
Case 1:20-cv-23918-AMC   Document 143   Entered on FLSD Docket 05/04/2022   Page 74 of 74

**U**

**unfortunate [1]** 5/16
**unhappy [2]** 52/23
53/25
**UNITED [3]** 1/1 1/20
63/14
**university [1]** 54/19
**unknown [1]** 22/4
**unless [1]** 26/19
**unreliable [3]** 23/7 32/5
50/9
**until [2]** 29/2 29/18
**untrustworthy [1]** 32/10
**up [25]** 8/10 9/24 10/17
11/5 12/3 13/2 13/24
14/10 19/23 22/15 25/3
41/17 49/11 49/16 50/14
52/11 53/4 53/21 55/4
55/18 56/24 58/1 58/16
61/7 62/4
**upheld [2]** 36/9 51/6
**upon [33]** 4/10 4/12 5/11
5/14 7/25 8/11 12/19
13/19 13/22 14/2 14/2
22/15 23/19 24/2 29/21
32/23 34/2 37/16 44/18
44/23 45/1 45/22 48/17
49/6 50/14 50/20 50/21
52/4 56/18 57/15 58/13
59/5 59/9
**Urban [20]** 16/14 44/12
44/16 44/20 44/23 45/11
45/20 46/7 46/16 47/5
47/6 47/17 48/2 48/21
49/3 49/7 49/22 50/18
51/5 51/23
**Urban's [1]** 50/9
**us [1]** 6/25
**use [11]** 5/8 27/9 31/17
32/25 33/9 38/6 39/19
41/12 41/21 42/13 58/22
**used [7]** 30/23 30/23
31/2 31/9 31/13 31/15
51/4
**using [3]** 32/22 36/17
62/1
**usually [1]** 21/10
**utilize [11]** 34/3 35/3
40/24 40/25 41/4 41/6
41/25 41/25 42/2 49/10
59/8
**utilized [7]** 34/5 37/5
40/17 48/21 48/22 51/9
57/18
**utilizing [5]** 33/18 33/24
35/8 36/3 56/11

**V**

**valuation [12]** 33/8
33/17 34/16 37/14 45/18
46/22 47/7 47/13 47/15
47/25 50/15 52/10
**valuations [1]** 34/1
**value [7]** 16/13 16/14
32/24 33/2 46/23 47/20
51/25

**valuing [1]** 50/15
**variables [1]** 13/16
**various [12]** 21/7 43/10
49/6 49/13 49/16 49/21
51/7 56/4 56/7 56/11
60/2 60/7
**verdict [1]** 25/8
**verify [2]** 48/3 50/7
**versus [14]** 3/4 6/3 7/4
21/11 26/16 36/7 36/10
40/20 43/16 46/3 46/4
51/8 53/25 60/11
**very [18]** 8/11 8/12 9/9
11/20 12/12 13/13 13/17
21/18 24/15 33/21 33/21
40/16 40/21 46/20 51/2
51/11 52/19 54/1
**via [2]** 61/19 61/20
**view [2]** 6/1 20/23
**Virani [1]** 48/13
**vis [2]** 34/17 34/17
**Vivint [8]** 34/8 35/6
36/10 37/11 43/16 44/8
57/6 59/2
**volume [1]** 34/2
**vs [2]** 1/6 1/12

**W**

**want [12]** 15/3 23/2
26/12 29/9 36/14 46/15
52/19 52/20 56/22 59/16
60/16 60/18
**wanted [2]** 28/19 42/24
**wanting [1]** 32/25
**wanton [1]** 21/9
**wants [1]** 42/12
**was [114]**
**wasn't [5]** 29/17 29/21
29/22 31/8 61/14
**way [9]** 6/21 30/10
35/12 37/22 53/13 53/13
53/21 56/22 62/4
**we [131]**
**weight [2]** 48/18 50/24
**well [21]** 7/3 7/21 17/16
20/17 31/7 33/5 38/2
39/23 43/21 45/25 46/6
48/8 52/8 53/6 54/18
55/3 57/23 60/20 62/3
62/7 62/24
**were [26]** 4/13 5/13 8/24
9/13 9/14 16/8 18/12
19/21 20/7 20/8 20/12
20/19 21/24 22/11 27/2
30/3 32/18 40/13 45/8
47/7 49/21 51/25 56/3
56/12 57/14 57/19
**weren't [1]** 20/11
**what [128]**
**whatever [1]** 14/4
**when [36]** 6/12 8/24
11/1 11/25 15/14 16/19
18/3 18/10 19/15 20/8
20/11 20/12 20/14 20/19
22/14 26/2 29/20 29/22
29/24 29/25 30/9 31/4

**31/6 34/23 35/5 41/1
46/10 46/11 47/18 48/6
55/5 55/9 55/10 55/12
61/13 61/22
**where [24]** 5/6 8/3 10/15
11/16 14/23 21/24 22/21
26/17 27/4 27/17 28/17
28/25 29/12 32/2 35/16
36/20 36/23 37/4 37/21
45/11 52/21 53/6 61/22
61/24
**whether [12]** 7/13 19/15
32/8 35/4 37/9 39/10
39/10 41/3 54/2 57/3
57/7 61/3
**which [29]** 3/18 4/19 6/5
6/16 7/16 9/9 10/6 17/11
18/15 19/11 19/22 20/19
22/23 23/21 28/24 30/13
30/24 31/8 31/25 43/5
43/5 45/2 47/10 47/19
52/5 53/20 56/13 56/14
57/17
**while [3]** 10/20 24/10
40/23
**who [13]** 10/1 18/7
18/19 23/1 23/22 42/12
45/17 47/14 51/15 52/10
52/23 57/21 58/22
**whole [6]** 15/5 41/7
45/16 56/8 56/8 57/17
**wholesale [1]** 46/1
**whose [1]** 28/7
**why [11]** 13/9 13/21
20/13 23/10 24/3 28/9
29/11 43/12 48/15 54/25
57/17
**wide [4]** 53/16 57/13
57/20 58/22
**will [16]** 5/18 12/9 15/4
16/14 24/23 26/19 33/9
42/18 47/6 49/14 57/6
59/8 59/8 59/23 59/24
59/24
**willful [2]** 21/8 21/14
**William [1]** 44/12
**willing [2]** 33/8 41/20
**within [9]** 16/23 22/2
23/5 37/21 41/24 45/22
49/12 60/25 62/7
**without [1]** 43/24
**witness [11]** 5/7 5/8
15/12 15/16 15/21 18/17
30/8 30/9 30/10 32/1
32/2
**witnesses [1]** 30/14
**WL [1]** 40/21
**won't [2]** 26/14 45/13
**word [1]** 61/10
**words [1]** 15/14
**work [5]** 36/3 36/4
37/17 38/4 38/6
**worked [4]** 33/5 34/8
34/9 37/6
**working [8]** 33/4 33/19
35/10 35/13 38/2 38/16

43/19 50/16
**worse [1]** 29/8
**would [66]**
**wouldn't [1]** 6/15

**Y**

**yeah [2]** 17/16 59/19
**year [3]** 6/18 9/21 11/4
**years [5]** 7/1 12/13 35/9
54/8 57/20
**years that [1]** 57/20
**yes [14]** 3/20 11/21
17/18 18/6 20/15 36/1
36/5 36/18 44/4 52/16
60/10 62/16 62/19 62/21
**yet [2]** 49/9 55/8
**York [2]** 2/9 2/9
**you [144]**
**you're [1]** 59/11
**your [110]**